## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**TIFFIN EPS, LLC** and **TIFFIN MOUNT AIRY, LLC**, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**GRUBHUB INC.**,

Defendant.

Case No. 2:18-cv-05630-PD

## PLAINTIFFS' OPPOSITION TO GRUBHUB INC.'S RENEWED MOTION TO COMPEL ARBITRATION

Catherine Pratsinakis, Esq.
(PA ID# 88086)
Timothy J. Ford, Esq.
(PA ID# 325290)
DILWORTH PAXSON LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7000
Facsimile: (215) 575-7200
cpratsinakis@dilworthlaw.com
tford@dilworthlaw.com
*Attorneys for Plaintiffs*

Dated: June 3, 2019

# TABLE OF CONTENTS

I.   STATEMENT OF FACTS ...................................................................3

   A.   Tiffin's Structure and General Operations ................................3

   B.   Plaintiffs' Grubhub Contracts ...............................................4

   C.   Restaurants' Use of GH's Diner Website Is Limited ...............5

   D.   The GH Food Ordering Network .............................................6

   E.   The Terms and Conditions Debacle of GH's Own Making.....................7

   F.   Restaurants Had No Notice of Arbitration On Any GH Websites ..........8

      1.   GH's 2016 Banner Never Ran Live On the Diner Website............9

      2.   GH Failed to Notify Restaurants of Its 2018 Modification ..........11

      3.   Plaintiffs Did Not Consent To GFR Terms ...................12

II.  PROCEDURAL HISTORY AND STANDARD OF REVIEW ..........................14

III. LEGAL ARGUMENT .......................................................................14

   A.   Plaintiffs Did Not Agree to Arbitration in Their Written Contracts .......14

   B.   Plaintiffs Never Had Actual or Constructive Notice of Any Arbitration Clause ...................................................................16

      1.   Plaintiffs Had No Actual Knowledge .........................17

      2.   Plaintiffs Never Had Constructive Notice ....................19

   C.   Plaintiffs Did Not Agree to Arbitrate *Via* OrderHub ...............22

   D.   Plaintiffs Never Assented to Arbitration Following GH's Motion.........23

   E.   Third-Party Operator Employees Are Not Plaintiffs' Agents.................25

   F.   Even if the Arbitration Clauses Are Valid, this Court Can and Should Rule that this Dispute Is Outside Their Narrow Scope ...........................29

120941591_3

# TABLE OF AUTHORITIES

## Cases

*188 LLC v. Trinity Indus., Inc.*,
  300 F.3d 730 (7th Cir. 2002) ................................................................15

*AYH Holdings, v. Avreco*,
  826 N.E.2d 1111 (Ill. App. Ct. 2005) ..................................................29

*Balasanyan v. Nordstrom, Inc.*,
  2012 WL 760566, 4 (S.D. Cal. Mar. 8, 2012) .....................................24

*Be In, Inc. v. Google Inc.*,
  2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ........................................20

*Cairo, Inc. v. Crossmedia Servs., Inc.*,
  2005 WL 756610 (N.D. Cal. Apr. 1, 2005).........................................21

*Career Concepts, Inc. v. Synergy, Inc.*,
  865 N.E.2d 385 (Ill. App. Ct. 2007) ....................................................27

*Chesapeake Appalachia v. Scout Petroleum*,
  809 F.3d 746 (3d Cir. 2016) ................................................................31

*Commerce v. Hoffman*,
  829 F.3d 542 (7th Cir. 2016) ...............................................................15

*Cvent, Inc. v. Eventbrite, Inc.*,
  739 F.3d 927 (E.D. Va. 2010) ..............................................................20

*Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*,
  530 N.E.2d 439 (Ill. 1988).....................................................................14

*Duthie v. Matria Healthcare*,
  540 F.3d 533 (7th Cir. 2008) ...............................................................30

*EEOC v. Waffle House, Inc.*,
  534 U.S. 279 (2002) .............................................................................14

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995) .......................................................................30, 31

120941591_3

*Fteja v. Facebook*,
    841 F. sup. 2d 829 (S.D.N.Y. 2012)........................................................21

*GFR. See Sw. Airlines Co. v. BoardFirst, LLC*,
    2007 WL 4823761 (N.D. Tex. Sept. 12, 2007) ........................................19

*Griswold v. Coventry First LLC*,
    762 F.3d 264 (3d Cir. 2014) ....................................................................14

*Guidotti v. Legal Helpers Debt Resolution*,
    716 F.3d 764 (3d Cir. 2013) ....................................................................14

*Gyptec Iberica v. Alstom Power Inc.*,
    2012 WL 5305510 (N.D. Ill. Oct. 26, 2012) ..........................................15

*Hite v. Lush Internet Inc.*,
    244 F. Supp. 3d 444 (D.N.J. 2017)..........................................................20

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002) ..................................................................................14

*In re Currency Conv'n Fee Anti. Litig.*,
    361 F. Supp. 2d 237 (S.D.N.Y. 2005) ......................................................24

*Innovative Mech. Grp., Inc. v. Fitness Int'l, LLC*,
    2016 WL 1567461 (Ill. App. Ct. Apr. 18, 2016).....................................16

*Landmark Structures, Inc. v. F.E. Holmes & Sons Const. Co.*,
    552 N.E.2d 1336 (Ill. App. Ct. 1990) ......................................................15

*Latimer v. Perry*,
    101 N.E.2d 531 (Ill. 1951).................................................................27, 28

*Milwaukee Cheese Co. v. Rockford Carriage House, Inc.*,
    271 N.E.2d 670 (Ill. App. Ct. 1971) ........................................................27

*MJ & Partners Rest. Ltd. P'ship v. Zadikoff*,
    995 F. Supp. 929 (N.D. Ill. 1998)............................................................24

*Nguyen v. Barnes & Noble, Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ................................................................21

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ....................................................................21

*Reserve at Woodstock, LLC v. Woodstock*,
   958 N.E.2d 1100 (Ill. Ct. App. 2011) ....................................................24

*Rosenblum v. Travelbyus.com Ltd.*,
   299 F.3d 657 (7th Cir. 2002) ................................................................15

*Salsitz v. Kreiss*,
   761 N.E.2d 724 (Ill. 2001) ....................................................................29

*Schnabel v. Trilegiant Corp.*,
   697 F.3d 110 (2d Cir. 2012) .................................................................21

*Schwinder v. Austin Bank of Chi.*,
   809 N.E.2d 180 (Ill. App. Ct. 2004) .....................................................23

*Selden v. Airbnb, Inc.*,
   2016 WL 6476934 (D.D.C. Nov. 1, 2016) .............................................21

*Sgouros v. TransUnion Corp.*,
   817 F.3d 1029 (7th Cir. 2016) .........................................................16, 21

*Specht v. Netscape Commc'ns Corp.*,
   306 F.3d 17 (2d Cir. 2002) ..........................................................16, 20, 21

*State Farm Mut. Auto. Ins. Co. v. George Hyman Const. Co.*,
   715 N.E.2d 749 (Ill. App. Ct. 1999) .....................................................31

*State Sec. Ins. Co. v. Burgos*,
   583 N.E.2d 547 (Ill. 1991) ....................................................................27

*Swift v. Zynga Game Network, Inc.*,
   805 F. Supp. 2d 904 (N.D. Cal. 2011) ..................................................21

*Ticketmaster Corp. v. Tickets.com, Inc.*,
   2003 WL 21406289 (C.D. Cal. Mar. 7, 2003) ......................................24

*Timmerman v. Grain Exch., LLC*,
   915 N.E.2d 113 (Ill. App. Ct. 2009) .....................................................21

*Trujillo v. Apple Computer, Inc.*,
   578 F. Supp. 2d 979 (N.D. Ill. 2008) ....................................................16

*Van Tassell v. United Mktg. Grp., LLC*,
   795 F. Supp. 2d 770 (N.D. Ill. 2011) ....................................................16

*Wargel v. First Nat. Bank of Harrisburg*,
    460 N.E.2d 331 (Ill. App. Ct. 1984) ................................................................26, 28

*White v. Sunoco, Inc.*,
    870 F. 3d 257 (3d Cir. 2017) ...................................................................14

*Williams v. Securitas Sec. Service USA, Inc.*,
    2011 WL 2713818 (E.D. Pa. July 13, 2011) ...........................................24

## Rules and Regulations

Fed. R. Civ. P. 56 .......................................................................................14

## Additional Authorities

*https://www.tiffin.com/indian-food-bryn-mawr-main-line-delware-county-montgomery-county-pa-locations/index.html* (last visited April 6, 2019) ..............18

Grubhub Holdings, Inc. ("GH") *still* fails to meet its burden of demonstrating that Plaintiffs Tiffin EPS, LLC ("Elkins Park") and Tiffin Mt. Airy, LLC ("Mt. Airy") formed an agreement to arbitrate the underlying dispute. The relevant contracts (and terms referenced in those contracts) do not contain an arbitration clause, nor do they excuse GH's lack of notice. The record shows that GH's purported 2016 limited-run banner never occurred and GH's untimely 2018 popup notice was no notice at all. Providing small links to terms of use on the bottom of various webpages is also insufficient. GH failed to complete a *simple task*—deliver some communication to restaurants advising them of GH's intent to arbitrate.

GH's "click" theories also fail in material respects. Plaintiffs are not responsible for *any* of the "clicks" listed in Michael Young's Declaration because they do not use restaurant-level GFR accounts. Plaintiffs also provide the Declaration of David Yarnall, a certified forensic expert, who scanned the available data on Tiffin computers and found no evidence of Plaintiffs clicking onto the terms of use at GFR or GrubCentral. Meanwhile, GH could not identify *who* clicked onto the GFR terms much less that this unknown person(s) had *authority* to modify Plaintiffs' GH contracts. As Kokos testified, it could have been literally *any person walking by the GH tablet*. To the extent the clicks were caused by employees of Plaintiffs' third-party restaurant operators—Manan Ventures Inc. ("Manan") and Kathmandu Cuisine, Inc. ("Kathmandu," and with Manan, "Third-Party Operators")—Plaintiffs are *not*

bound by their actions as GH has long known that Mr. Narula is the only Tiffin representative with authority to modify GH contracts and the Third-Party Operators' responsibilities (and authority) is limited to fulfilling GH orders. Finally, GH's theory that Plaintiffs agreed to arbitrate because someone in 2013 agreed to the terms of use associated with the OrderHub software is unavailing. OrderHub software (and its terms) became obsolete in 2016. GH's claim that somehow this software (whose terms contained no arbitration clause) was "rebranded" GrubCentral is unsupported. GrubCentral was a ***new, different*** web-based platform that had as much in common with OrderHub as a fax machine bearing GH's logo.

Bottom line, GH does not show that it delivered adequate, timely notice of its intent to arbitrate. GH effortlessly could have sent an email notifying restaurants of GH's intent to arbitrate or added a notification to the more than 30 monthly statements issued by GH between April 6, 2016 and December 31, 2018, when the complaint was filed. GH had at its disposal numerous reasonable means and opportunities to communicate its intent to arbitrate, but failed to do so. GH is now Monday-morning quarterbacking, grasping at straws, scorching the earth, using every available resource, dozens of employees and lawyers, Google analytics, in a scramble to avoid liability. But none of the minutiae presented by GH shows an agreement to arbitrate was formed during this eight year relationship. The Court must deny GH's

renewed motion to compel.[1]

# I.     STATEMENT OF FACTS

## A.     Tiffin's Structure and General Operations

Tiffin.Com, Inc. ("Tiffin") is the parent company of Elkins Park and Mt. Airy,[2] Narula ¶3. Its employees are President and CEO Munish Narula ("Narula"), Director of Finance and Operations Rakesh Narula ("Rakesh"), and Director of Marketing and Operations Marianne Kelly ("Kelly"), Narula ¶ 7. From time to time, GH dealt with Kelly on matters that involved Tiffin at the behest of Narula. Narula ¶22; Kelly ¶3. Kelly does not now, nor has she ever, had the authority to bind Plaintiffs or Tiffin to a contract without permission from Narula. Narula ¶24; Kelly ¶6.

Tiffin Indian Restaurants is a brand owned by Tiffin and licensed to Third-Party Operators. Ford Ex. 2 (Kelly Tr. 167:22–68:5); Ford Exs. 4–5. The third-party operators' role is limited to running the day-to-day operations of a select Tiffin restaurant, which includes taking and fulfilling GH food orders. No more, no less. Narula ¶4; Ford Ex. 2 (Kelly Tr. 167:22–168:5) (third-party operators ensure the restaurant is ready for business, serve customers, prepare food, and handle daily revenues). As with other types of restaurant franchises, a franchisee does not have the authority to bind the franchisor and GH knows this. Ford Ex. 3 (Kokos Tr. 23:18–

---

[1] Plaintiffs reserve their objections to witnesses and data and analytics created for this litigation and not in the ordinary course of business and their right to compel GH to identify its process, custodians, sources, and search terms used in compiling documents. Ford Ex. 1.

[2] In support of their opposition, Plaintiffs file simultaneously herewith the June 3, 2019 Declarations of Marianne Kelly, Munish Narula, and David Yarnall.

24:1). Since 2015, Elkins Park has contracted with Kathmandu. Narula ¶4. Since February 1, 2018, Mt. Airy has contracted with Manan. *Id.* The individuals who work at the Mt. Airy and Elkins Park restaurants are employees of Kathmandu and Manan, not Tiffin. *Id.* After Elkins Park and Mt. Airy contracted with Third-Party Operators, they no longer had employees and were not involved in the day-to-day operations of the restaurants. Ford Ex. 2 (Kelly Tr. 299:15–19).

**B.   Plaintiffs' Grubhub Contracts**

On April 21, 2011, Plaintiffs entered into individual contracts with GH. Dkt. #28-5. The contracts were so illegible that GH needed to transcribe them for purposes of its motion to compel arbitration. Dkt.#28-6. Neither contract contains an arbitration clause and both contracts refer to terms located at URL www.grubhub.com/legal/. The Elkins Park contract states that "terms and conditions are subject to change by GrubHub upon 30 days advance notice" and the Mt. Airy contract states "[p]lease see GrubHub's Terms of Use at www.Grubhub.com/legal/, which are subject to change. The terms and conditions thereto shall bind my restaurant…." Dkt.# 28-5. No terms and conditions were attached or printed on the back-side of either contract, and no active hyperlink existed as these are paper contracts. When Kelly asked GH Senior Manager Kevin O'Malley for Plaintiffs' contracts, he sent the contracts without any terms and conditions attached and mentioned no other terms. Kelly ¶11. Neither contract contains language stating (or

suggesting) that GH could modify the contract without notice. And, in fact, in 2011 GH's practice was to include at the bottom of GH's monthly statements **direct written notification** that an amendment had been made to the "Terms and Conditions" and directed Plaintiffs to the specific URL in the contracts. Ford Exs. 6–7.

### C.    <u>Restaurants' Use of GH's Diner Website Is Limited</u>

GH diners access and order food through GH's diner websites or its mobile application and for several years those diner websites included: www.grubhub.com and www.seamless.com. GH did not require restaurants to visit diner websites. Ford Ex. 3 (Kokos Tr. 137:23–138:18, 145:17–18). Restaurants also had limited business reasons for visiting GH's diner websites. Marielle Kokos claims in her May 31, 2019 Declaration that restaurants "actively" use the diner website, Dkt.# 28-3 ¶ 5, but when pressed she offered only a couple of minor reasons. Ford Ex. 3 (Kokos Tr. 145:3–13). Instead, restaurants use conduct their business on other websites: myaccount.grubhub.com from 2011 through 2016, grubcentral.com from 2014 through 2018, and restaurants.grubhub.com (and at some point grubcentral.grubhub.com) from 2017 on. Ford Ex. 3, 8-10 (Kokos Tr. 146:20–147:1). All three URLs were created for restaurant business and the latter two are still live. GH did not provide screenshots, or proof that terms containing an arbitration clause were posted on myaccount.grubhub.com or grubcentral.com. Oddly, none of the 66

captures of grubcentral.com are accessible any longer on the Internet archive. Ford Exs. 8–10. Narula, Kelly, and Rakesh accessed grubcentral.com (now grubcentral.grubhub.com) from time to time in the course of their duties, but rarely had cause to visit GH's diner website. Narula ¶11. Kelly visited GH's Tiffin microsites sparingly in late 2016, but many months would go by without her visiting GH's diner website. Kelly ¶ 13; Ford Ex. 2 (Kelly Tr. 249:5–17).

###    D.    The GH Food Ordering Network

GH's network provides a two-sided ordering system between diners and restaurants.

*https://www.sec.gov/Archives/edgar/data/1594109/000156459016013426/grub-10k_20 151231.htm* ("GH's 2015 Form 10-K"). In early 2016, GH reported that restaurants could receive orders in these different ways: (1) "through a facsimile or email," (2) "tablet solutions, OrderHub and Boost," or (3) "the responsive web application that can be accessed from computers and mobile devices, GrubCentral." *Id.* OrderHub and Boost are food ordering software applications used to process food orders that could be run on software-specific devices only. By May 19, 2016, GH issued the press release, *Grubhub Unveils New In-Restaurant Technology*, stating GrubCentral was a "new in-restaurant technology platform" that was web-based and "[a]ccessible from any device." Ford Ex. 18. OrderHub and Boost software application and devices became obsolete in early 2016. Kokos claims that OrderHub

was "**rebrand[ed]**... to be called GrubCentral in the first quarter of 2016; and then renam[ed]... GrubHub for Restaurants in early 2017." Dkt.# 28-3 ¶ 8. This statement is unsupported by GH's public filings and press release stating GrubCentral is an entirely new web-based platform loadable on any device, that co-existed in time with OrderHub (and Boost) software applications accessible from one specific device. One did not evolve from the other and the commonality ends at the fact that they are both used for food orders, but the same holds true of email, telephone, fax machines, and Boost. GH's 2015 Form 10-K.

      **E.**      <u>**The Terms and Conditions Debacle of GH's Own Making**</u>

Discovery and further investigation have shown that throughout the years GH has thrown up various versions of terms on different URLs during partially overlapping time periods. A partial list of terms and conditions located on GH's diner website include: (1) www.grubhub.com/legal from at least 2011 through present; (2) www.grubhub.com/termsofuse from at least April 22, 2012 through April 2, 2016; (3) www.grubhub.com/legal/terms-of-use from at least November 2015 through present; and (4) www.grubhub.com/legal/updated-terms-of-use in 2016. Ford Exs. 11–17. There may also be other sub-URLs, but it would be impossible to know without a directory.

GH claims that it provided a "Terms of Use" link (in small font) at the bottom right of every webpage of its diner website, but given the many versions of terms and

conditions were on different URLs at the same time, it is unclear where the link took the diner. Moreover, at some point, certain terms on the diner website were directed to diners (not restaurants): "Welcome to our site!... we can't wait to deliver you food happiness, but before you use the site, please read these terms of use carefully!" Ford Ex. 15. Plaintiffs also used various overlapping restaurant websites: myaccount.grubhub.com (2011–2016), grubcentral.com (2014–2018), restaurants.grubhub.com (2017–present), and at some point grubcentral.grubhub.com. GH does not claim that links to "terms of use" were on myaccount.grubhub.com or grubcentral.com. GH's claim that the terms of use link appeared on every page of GrubCentral is also unproven.

### F.      Restaurants Had No Notice of Arbitration On Any GH Websites

At all relevant times hereto, neither Munish, Marianne, nor Rakesh were advised of an arbitration agreement between Plaintiffs and GH. Narula ¶¶8, 14, 21; Kelly ¶10. GH never notified Plaintiffs about arbitration or that GH was seeking to amend the terms of Plaintiffs' contracts to include an arbitration clause. *Id.* And, restaurants had no reason to visit the diner website as part of their regular operations, and were GH websites for restaurants by 2011. Despite this key fact, GH claims that it sufficiently notified restaurants of the arbitration clause through a limited-run banner on the diner website in 2016 and the popup over on the diner's terms and conditions webpage in 2018. GH never invited restaurants to Grubhub.com to view

the purported banner in 2016 or the popup in 2018. Ford Ex. 3 (Kokos Tr. 67:5–68:3, 69:3–7, 95:6–8, 96:2–3, 101:15–19, 171:19–22). GH failed to provide restaurants notice of these amendments by mail, email, fax, or telephone, though: (1) GH regularly communicated with restaurants in these ways; and (2) had the contact information. Ford Ex. 3 (Kokos Tr. 60:17–19, 62:4–7, 65:7–20). GH also did not notify Plaintiffs through their April 2016 or July 2018 statements. Ford Ex. 35-36.

## 1.    GH's 2016 Banner Never Ran Live On the Diner Website

GH continues to claim that it notified Plaintiffs and other restaurants of the April 6, 2016 modification through a banner that went live from March 7, 2016 through April 6, 2016, and *still* GH cannot locate a *single* copy of the actual banner that purportedly ran during that time frame. Numerous web captures of Grubhub.com available on the Internet archive, waybackmachine.org, from March 7 through April 6, 2016, show that the alleged 2016 banner was not live on the website during the purported time frame.  Ford Ex. 3 (Kokos Tr. 109:17–116:14).

Though Kokos relied on captures from the internet archive and testified that she knows of no reason to dispute its accuracy, Ford Ex. 3 (Kokos Tr. 112:8–9), she now claims that the internet archive is unreliable. Dkt.# 28-3 ¶ 29 n.1. The internet archive, however, can show banners.  In fact, the archived captures of Tiffin's website show the banner Tiffin uses to alert its loyal customers about the terms of its

rewards programs. These banners have been running live daily on the Tiffin website since the start of the programs.

In *lieu* of actual evidence of the banner that purportedly ran on GH's homepage—and despite having the analytics power and data of Google—GH's evidence that this banner was running live from March 7 through April 6, 2016 is an unauthenticated screenshot of a computer taken on April 7, 2016, *after* the period of time GH claims the banner ran. The "screen shot" was taken from a Word document (the native of which was requested, but not produced) that was attached to a heavily redacted email thread between Reed Smith and GH employees. GH also produced a couple of incoherent work tickets that either did not specifically identify which "banner" or website being discussed, or referenced only the "WDA" or "Web Diner App," not the diner website. Ford Exs. 19–21. The WDA work ticket seemed to describe an on-and-off-again plan to notify diners of the terms of use through its mobile app and suggests that when a diner on the mobile app sees the popup they could click the banner and be rerouted to "grubhub.com/legal/updated-terms-of-use" or "seamless.com/legal/updated-terms-of-use." Ford Ex. 22. The work ticket demonstrates that the "banner" was not even intended for restaurants, stating: "As a diner, I want to be notified when the TOU have been changed and provided a link so that I'm aware of all legal ramifications." *Id.* GH also provides no proof that a Tiffin employee clicked the banner or viewed the amended terms, nor did it track

acknowledgments of any kind, despite having Google click data and analytics. Kokos Tr. 173:19-174:3.

### 2. GH Failed to Notify Restaurants of Its 2018 Modification

Nonsensically, GH claims that it notified restaurants of its June 4, 2018 modification to its terms at grubhub.com/legal/terms-of-use through a popup hovering over just that one webpage. And GH still fails offers no proof that: (1) Plaintiffs visited that URL; (2) saw the popup; (3) identified and read the new terms; and (4) electronically assented to arbitration. GH also added the popup *after,* and not in advance of, the amendment on June 4, 2018. *See* Dkt.# 28-3 ¶ 37 (stating "[w]e *updated* our terms of use on June 4, 2018.") (emphasis added). GH still does not prove *when* it added the popup (though finally GH confessed that it was not added before June 4, 2018); *how long* the popup ran (stating only it "*would* have been available for at least 30 days") or proof that Plaintiffs or other restaurants were invited or prompted to see the modified terms. Moreover, the popup never ran on the homepage or any other webpage except for www.grubhub/com/legal/terms-of-use, defeating the entire purpose and constituting no notice at all. Finally, GH admits that the notification can be dismissed by clicking the "x" as opposed to clicking "Got it," Dkt.# 28-3 ¶ 37, which also creates ambiguity over whether people who click the "x" meant to reject, instead of accept, the terms. GH did not notify restaurants of this modification nor invite them to view the sole webpage running the popup.

The popup notice itself is written in the past tense suggesting that the popup was added *after* GH modified it terms in 2018. GH now claims that the popup went live June 4, 2018 thereby admitting that it failed to comply with the notice obligation in at least the Elkins Park contract. Yet, even still, GH provides no proof of the timing of this pop up. There are no work tickets, emails or screen shots or any explanation of the 2019 copyright on the bottom of the page. Thus, the timing of the pop up is still unclear. Also, GH misstated in its previous reply brief that the 2018 popup had appeared on other webpages (GH Reply Br. 5), but Kokos admitted at her deposition that the only location of this 2018 popup was the URL grubhub.com/legal/terms-of-use. Ford Ex. 3 (Kokos Tr. 182:24–183:3).

### 3. Plaintiffs Did Not Consent To GFR Terms

Tiffin employees Munish, Rakesh and Marianne do not use GFR daily nor do they use it to process food orders. Narula ¶19; Kelly ¶21. GH issued them all-restaurant administrative account login IDs: girard@tiffin.com and marianne@tiffin.com. These are the logins used by Tiffin employees—Narula, Ramesh and Marianne. GH could not locate a single click by Plaintiffs on the GFR terms. Moreover, a forensic expert reviewed every Tiffin computer and found no clicks to the GFR terms. Yarnall ¶5-9. None of the Tiffin computers had accessed any of the purported terms containing arbitration clauses on any GH URL prior to the commencement of this litigation on December 31, 2018. *Id.* at ¶10.

GH does not prove that Tiffin, Plaintiffs, Munish, Rakesh, or Marianne clicked onto the GH terms of use prior to filing the Complaint or beyond, nor is its data reliable. First, GH needed three months, a team of experts, analysts, and an outside data pull to compile reports created for purposes of litigation. Such data and the reports that were prepared (and relied upon by Kokos and Young) are not ordinary and customary business records. The two data sets relied upon do not even match up though they purport to be the same thing (# of clicks by GFR Tiffin IDs), showing reliability issues. GH also cannot identify *who* clicked the terms. GH tracks IP addresses, session time, and clicks on a page. Ford Ex. 23 (Young Tr. 76:18–19). GH did not report the approximate location of the user clicking the terms, the session duration, user clicks (or whether they scrolled down the page to the arbitration clause) or whether the account was accessed from a GH tablet used by restaurant workers or a computer at Tiffin's home office.

Moreover, Marianne had previously notified GH's O'Malley (who is overseen by Kokos) that Kathmandu and Manan were now operating Tiffin Elkins Park and Tiffin Mt. Airy, respectively. Ford Exs. 24–25. These and the other Tiffin restaurant operators use the GFR restaurant specific accounts, not Tiffin or any of its employees. Marianne instructed GH to reset GFR accounts, direct payables to Kathmandu and Manan, and provided GH the required tax forms. Ford Exs. 26–34. GH knew at least as of November 16, 2017 that Kathmandu and Manan's employees

were using GFR daily to receive and process GH orders associated with Mt. Airy and

Elkins Park, respectively. Ford Ex. 2 (Kelly Tr. 121:18–25, 127:7–14; 254:24–255:4).

## II.  PROCEDURAL HISTORY AND STANDARD OF REVIEW

Pursuant to the Court's May 17th  Order, the Court shall review this GH's

renewed motion under Fed. R. Civ. P. 56.[3]  GH has the burden of proving that there

are no genuine issues of disputed material facts with respect to the existence of a

valid and binding agreement to arbitrate, and "[t]he party opposing arbitration is

given the benefit of all reasonable doubts and inferences that may arise." *Griswold v.

Coventry First LLC*, 762 F.3d 264, 270 (3d Cir. 2014); *White v. Sunoco, Inc*., 870 F.

3d 257, 262 (3d Cir. 2017). None of the FAA's favorable presumptions apply to

issues of contract formation. *EEOC v. Waffle House*, 534 U.S. 279 (2002) (rejecting

pro-arbitration FAA policy on contract formation).

## III.  LEGAL ARGUMENT

"[A] party cannot be required to submit to arbitration any dispute which he has

not agreed so to submit." *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 530

N.E.2d 439, 447 (Ill. 1988) (internal quotes and citation omitted); *Howsam v. Dean

Witter Reynolds, Inc*., 537 U.S. 79, 83 (2002). GH failed to meet its burden of

proving that Plaintiffs—or any restaurant—actually agreed to arbitrate their disputes.

### A.  Plaintiffs Did Not Agree to Arbitration in Their Written Contracts

GH unilaterally slipped an arbitration clause into online terms five years after

---

[3] *Guidotti v. Legal Helpers Debt Resolution*, 716 F.3d 764, 776 (3d Cir. 2013).

Plaintiffs signed paper contracts with GH and argues Plaintiffs agreed to arbitrate because the online terms of use on GH's diner website were incorporated into Plaintiffs' contracts by reference. The arbitration clause GH seeks to enforce is located at an entirely different URL than the one referenced in the contracts. GH added an arbitration clause in 2016 to terms located at grubhub.com/termsofuse and later grubhub.com/legal/terms-of-use. Neither URL is referenced in the contracts. The contracts expressly incorporate the terms at grubhub.com/legal and GH admits that those terms never so much as referenced the word "arbitration." "Illinois requires that incorporation be clear and specific." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002). To be incorporated by reference, a document must be clearly identified. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 665–66 (7th Cir. 2002) ("Mere reference … is not sufficient[.]"). Courts have found no incorporation where referenced documents were undefined or described. *See, e.g.*, *Gyptec Iberica v. Alstom Power Inc.*, 2012 WL 5305510, *3 (N.D. Ill. Oct. 26, 2012). Specifically, when allegedly incorporated terms are not at the referenced location, courts cannot presume knowledge of the term. *Landmark Structures, Inc. v. F.E. Holmes & Sons Const. Co.*, 552 N.E.2d 1336, 1342 (Ill. App. Ct. 1990). GH argues that Plaintiffs agreed to GH's terms "*in general* no matter where they were located on the diner website. GH Br. at 13. The Court should reject GH's attempt to have the general control over the specific as this would be contrary to Illinois law. *Commerce v.*

*Hoffman*, 829 F.3d 542, 548 (7th Cir. 2016).

GH also insists that the parties meant to incorporate the terms of use, and not the privacy policy, but that would require the Court to rewrite existing contracts and any ambiguity is construed against the drafter, in this case, *GH. Innovative Mech. Grp., Inc. v. Fitness Int'l, LLC*, 2016 WL 1567461, at *6 (Ill. App. Ct. Apr. 18, 2016). Finally, one could not reasonably conclude that the terms found upon clicking a miniscule, incidental link on the lower right hand corner of the referenced URL page were intended to be incorporated. Finally, the eventual cross-reference to the link that was purportedly added to the second paragraph of the text in June 2018 also is not sufficiently clear nor was the timing of that addition established by GH (no work order or other record to show timing). The Court should reject GH's attempt to modify the contracts through cross-references and a "multi-step process." *Van Tassell v. United Mktg. Grp.*, 795 F. Supp. 2d 770, 793 (N.D. Ill. 2011).

### B.     Plaintiffs Had No Actual or Constructive Notice

Plaintiffs never assented to arbitration. "Mutual manifestation of assent . . . is the touchstone of contract." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002). "[A]rbitration agreements are no exception." *Id.* at 30. In the context of websites, "Illinois contract law requires that a website provide a user reasonable notice that his use of the site or click on a button constitutes assent to an agreement." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1036 (7th Cir. 2016); *Trujillo v. Apple*

*Computer, Inc.,* 578 F. Supp. 2d 979, 989–95 (N.D. Ill. 2008) (mere "availability" of an arbitration clause on website is insufficient to prove a consumer had notice and assented to it). Plaintiffs did not—and could not—assent to arbitration, because they had no actual or constructive notice of it.

### 1.   Plaintiffs Had No Actual Knowledge

Plaintiffs never had actual knowledge of the various arbitration clauses GH throws against the wall. Here, it is important to distinguish between the arbitration clause on the diner website, www.grubhub.com, and the arbitration clause on GFR. GH has offered no evidence that any person affiliated with Plaintiffs actually viewed the 2016 or 2018 GH terms. Nor can it. Kokos also admitted GH never emailed, mailed, texted, faxed, or otherwise notified Plaintiffs of the addition of the arbitration clause.[4] At the same time, she estimates GH could have sent "hundreds of thousands" of emails to restaurants, Ford Ex. 3 (Kokos Tr. 60:17–19) including a number of "importance notice[s]." *E.g.*, Kelly Ex. 1. And although GH purported to provide evidence tracking user activity on GFR, it did not even attempt to provide similar evidence for the diner website.

With respect to GFR, GH claims that Plaintiffs had actual notice of the GFR terms because certain unidentified "Tiffin representatives" clicked onto the GFR

---

[4] Ford Ex. 3 (Kokos Tr. 67:5–68:3, 69:3–7 ("We have not individually delivered a notice. We don't feel we need to."), 95:6–8, 96:2–3; 171:19–22 ("The B2B marketing team would—would not be sending out communications regarding our—our terms of use because they are subject to change at any time and they are in digital format.")).

terms five times over in the eight years prior to this case.[5] Significantly, the chart set forth in the Kokos Declaration fails to demonstrate that either Plaintiff had actual notice of the GFR terms. The Elkins Park GFR username does not appear anywhere on that chart, and GH does not contend that someone using an Elkins Park GFR account ever clicked onto the GFR terms. Dkt.# 19-1 ¶11. That the Mt. Airy GFR account appears on the chart is of no moment because the Third-Party Operators have permission to log into GFR to process food orders. These are separate and distinct business entities whose customer service employees have no authority to bind Plaintiffs. *See, supra,* Section III. Similarly, the three other accounts listed on the chart are associated with different restaurants.[6] However, the fact that the link to the GFR terms was clicked only **nine times** in the 271 days between June 8, 2018 and March 9, 2019 underscores that no one is being directed to these terms. **None** of the GFR accounts listed on that chart are the administrative accounts used by either Narula or Kelly.[7] Therefore, the chart in the Kokos Declaration only serves to demonstrate that Plaintiffs, Narula, or Marianne **never** clicked on or viewed the GFR terms.

       With respect to Elkins Park, GH failed to meet its contractual notice

---

[5] Dkt.# 19-1 ¶¶ 10–13. GH does not explain why these assertions were not presented as part of its opening briefing, nor proves when and where it posted the purported GFR terms.

[6] *Compare* Dkt.#19-1 ¶ 11, *with https://www.tiffin.com/indian-food-bryn-mawr-main-line-delware-county-montgomery-county-pa-locations/index.html* (last visited April 6, 2019).

[7] *Compare* Dkt.#19-1 ¶ 11, *with id.* at ¶12. The Mt. Airy account is a restaurant-specific account run by a third party. It is not a true admin account with access to all restaurants.

obligations. The Elkins Park contract required thirty-days advance notice, without qualification, which GH readily admits.[8]  Similarly, the Mt. Airy contract does not waive notice of modifications. Kokos admitted that GH never sent a notice or notification regarding the arbitration terms, even though GH frequently communicated with restaurants about other changes. GH made multiple modifications to the terms located at Grubhub.com/legal/terms-of-use and never once did it provide notice of these amendments to Plaintiffs. Meanwhile, GH claims that it made the June 4, 2018 modification without any advance notice. GH cannot now seek to rely on the very provision it has repeatedly breached over the years.

## 2.      Plaintiffs Never Had Constructive Notice

For constructive notice, it is also important to distinguish between the diner site and GFR. Plaintiffs simply do not have business reasons to visit the diner site on a regular basis.

With respect to GFR, GH repeats *ad nauseum* that a terms and conditions link appeared on many GFR webpages used by Plaintiffs. But GH *never* mentions these links—called "browsewraps," because nothing required Plaintiffs "to manifest assent to the terms and conditions expressly" to use them, *see Sw. Airlines Co. v. BoardFirst, LLC*, 2007 WL 4823761, at *5 (N.D. Tex. Sept. 12, 2007)—are buried at the bottom of the webpages used for specific purposes. Unable to show Plaintiffs had

---

[8] Ford Ex. 3 (Kokos Tr. 153:18–154:2 (Elkins Park required 30 days advance notice of any amendment)).

actual knowledge, GH has offered no evidence proving Plaintiffs had constructive knowledge of the GFR Terms of Use. Without actual or constructive knowledge, Plaintiffs cannot assent to arbitration.

"Where a website fails to provide adequate notice of the terms, and there is no showing of actual or constructive knowledge, browsewraps have been found unenforceable." *Id.* (citing *Specht*); *Cvent, Inc. v. Eventbrite, Inc.*, 739 F.3d 927, 937 (E.D. Va. 2010) ("Most courts... have held that in order to state a plausible claim for relief based upon a browsewrap agreement, the website user must have had actual or constructive knowledge of the site's terms and conditions, and have manifested assent to them."). Courts "generally refuse to find an enforceable agreement" when "presented with facts tending to show that the reasonably prudent offeree would be unaware of the browsewrap terms[.]" *Be In, Inc. v. Google Inc.,* 2013 WL 5568706, *7 (N.D. Cal. Oct. 9, 2013); *Hite v. Lush Internet Inc.*, 244 F. Supp. 3d 444, 451–52 (D.N.J. 2017).

Key factors for constructive notice include whether browsewrap terms are located at the bottom of a scrollable page or far in proximity from the user's activities on the website. "No court has suggested that the presence of a scrollable window containing buried terms and conditions of purchase or use is, in itself, sufficient for the creation of a binding contract, and we have no reason to think that Illinois would

be the first." *Sgouros*, 817 F.3d at 1036.[9]

GH's cited cases do not change the requirement that Plaintiffs could not assent to arbitration without actual or constructive notice. GH repeatedly calls Plaintiffs "a sophisticated business entity," but merely being a business entity "does not justify the use of unfair surprise" to Plaintiffs. *Timmerman v. Grain Exch., LLC*, 915 N.E.2d 113, 121 (Ill. App. Ct. 2009). In many of GH's cases the parties challenging arbitration admitted they had notice. *See Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 402 (2d Cir. 2004) (party "was fully aware of the terms"); *Swift v. Zynga Game Network, Inc.,* 805 F. Supp. 2d 904 (N.D. Cal. 2011) (consumer *admitted* awareness of term); *Cairo, Inc. v. Crossmedia Servs., Inc.,* 2005 WL 756610, *5 (N.D. Cal. Apr. 1, 2005) ("Cairo admits to actual knowledge of CMS's Terms."). In GH's other cases, the parties challenging arbitration had clicked a box referencing terms before entering the website. *Selden v. Airbnb, Inc.*, 2016 WL 6476934 (D.D.C. Nov. 1, 2016) ("[M]obile sign-up screen adequately placed Selden on notice … and … he assented to those terms by clicking the sign-up box and using the service"); *Fteja v. Facebook*, 841 F. sup. 2d 829, 839 (S.D.N.Y. 2012) (language next to sign-up box

---

[9] *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1178 (9th Cir. 2014) (finding no arbitration agreement where hyperlink to terms at bottom of website did not "give rise to constructive notice"); *Specht*, 306 F.3d at 23 (refusing to enforce terms "located in text that would have become visible to plaintiffs only if they had scrolled down to the next screen"); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 127 (2d Cir. 2012)("[When] confronted with non-negotiable contract terms... the presentation of these terms at a place and time that the consumer will associate with the initial purchase or enrollment, or the use of, the goods or services… at least indicates to the consumer that he or she is taking such goods or employing such services subject to additional terms and conditions[.]").

specifically referenced agreeing to terms). Here, the paper sign-up contracts reference one specific, but incorrect, URL. GH cannot meet the standard for constructive notice applicable to browsewrap terms on either the diner site or GFR. Thus, Plaintiffs did not have constructive notice of the purported arbitration clauses.

### C.    Plaintiffs Did Not Agree to Arbitrate *Via* OrderHub

Plaintiffs did not agree to arbitrate by or through its use of OrderHub.  First, Plaintiffs contracts do not reference OrderHub, GrubCentral, or GFR. GH, nonetheless, contends that in 2013 Plaintiffs received OrderHub devices and that, according to a ***2015*** user guide, the person setting up the device was required to "accept" the terms before using the OrderHub software app and device. Based on a print-out of a query from an outdated legacy database system, GH alleges that Plaintiffs clicked "accept," thus accepting the OrderHub terms and conditions. Plaintiffs requested an expert inspection of this legacy database and other databases, but GH denied the request.

Whether or not Plaintiffs clicked "accept" is entirely irrelevant, however, because the OrderHub terms never contained an arbitration clause and the software (and the terms associated with it) were rendered obsolete before an arbitration clause was adopted. Ford Ex. 3 (Kokos Tr. 29:5–8, 96:20–23, 264:11–13, 265:6–8). Thus, the fact that the OrderHub application terms could have been modified at any time without notice, even if true, is irrelevant because GH decommissioned the OrderHub

application in 2015. GH downplays the fact that OrderHub was rendered obsolete that year, and claims that OrderHub was rebranded GrubCentral, but the two systems were completely different and have very little if any relation to one another. Ford Ex. 3. GH also does not identify who accepted the OrderHub terms in 2013 as it could literally have been anybody, a former cashier, a waiter, a bus boy, literally anyone.[10] Thus, the Orderhub application terms of use have expired. *See Schwinder v. Austin Bank of Chi.*, 809 N.E.2d 180, 190–91 (Ill. App. Ct. 2004). GH's attempt to claim that OrderHub is a "continuation" of "GrubCentral" and later "GFR" is a complete fabrication and is inconsistent with GH's own SEC filings which clearly delineate OrderHub and GrubCentral as two separate systems that even coexisted for a period of time.

### D.   Plaintiffs Never Assented to Arbitration Following GH's Motion

GH claims that its March 2019 motion to compel arbitration put Plaintiffs on notice of the arbitration provisions and, therefore, Plaintiffs' continued use of services thereafter requires them to arbitrate. GH misses the mark in several respects and the Court should reject such sharp litigation tactics.

First, applying GH's logic, Plaintiffs did not consent because they immediately opposed the motion in all respects, *i.e.*, if GH's motion was notice of new arbitration terms, GH was on notice that Plaintiffs timely objected and did not assent to the

---

[10] Ford Ex. 2 (Kelly Tr. 121:18–25, 127:7–14; 254:24–255:4).

arbitration clauses.[11] Second, GH's attempt to subject Plaintiffs to arbitration after they had initiated their class action amounts to an openly hostile use of discretionary contract power to take unfair advantage of Plaintiffs in violation of the implied covenant of good faith and fair dealing, particularly because Plaintiffs and non-participating class members have no practical means to timely opt-out. *MJ & Partners Rest. Ltd. P'ship v. Zadikoff*, 995 F. Supp. 929, 932 (N.D. Ill. 1998) (holding Illinois' implied covenant of good faith/fair dealing requires parties to exercise their rights, particularly discretionary rights "reasonably and not arbitrarily or capriciously"); *Reserve at Woodstock v. Woodstock*, 958 N.E.2d 1100, 1112–13 (Ill. Ct. App. 2011) ("The purpose of this duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to… benefit [from] the contract."). Third, for similar reasons courts routinely invalidate arbitration agreements implemented while a putative class action is pending.[12]

Finally, even if this Court agrees with GH, at most GH could compel arbitration of claims arising ***after*** it filed its motion to compel on March 6, 2019.

---

[11] The cases GH relies on for this proposition are unreported, from distant jurisdictions, do not apply Illinois law, and/or are factually different; thus, those cases compel no particular result here. *Sw. Airlines*, 2007 WL 4823761, *7 (knowledge of arbitration prior to lawsuit); *Ticketmaster Corp. v. Tickets.com, Inc.*, 2003 WL 21406289 (C.D. Cal. Mar. 7, 2003).

[12] *Jimenez v. Menzies Aviation Inc.*, 2015 WL 4914727,*6 (N.D. Cal. Aug. 17, 2015) (refusing to enforce post-lawsuit arbitration); *Balasanyan v. Nordstrom, Inc.*, 2012 WL 760566, *1-2, 4 (S.D. Cal. Mar. 8, 2012) (same); *Williams v. Securitas Sec. Serv. USA, Inc.*, 2011 WL 2713818, *1 (E.D. Pa. July 13, 2011) (same); *In re Currency Conv'n Fee Anti. Litig.*, 361 F. Supp. 2d 237, 252-54 (S.D.N.Y. 2005) (same).

Specifically, the purported terms of use on both websites are effective "when posted" and nothing therein authorizes retroactive application of new or modified terms. Dkt. # 15-22 at 13, 15-25 at 11. Therefore, if this Court agrees with GH's continued use argument, it still must sever all claims arising before March 6, 2019 and allow those claims to proceed as a class action in this Court. Parallel proceedings in different forums would be inefficient and likely lead to inconsistent results. The class action should proceed in this Court.

### E. Third-Party Operator Employees Are Not Plaintiffs' Agents

Plaintiffs are not bound to the purported arbitration clauses by way of the actions of the customer service employees of the Third-Party Operators that operate Plaintiffs' respective restaurants. GH's assertions to the contrary are unreasonable. GH was directly and specifically made aware that Manan and Kathmandu are independent entities that operate Plaintiffs' respective restaurants via contract. The Third-Party Operators, and their respective employees engaging in customer service operations through GH, have no contractual authority to bind Plaintiffs to contracts[13] and Plaintiffs have never manifested anything to the contrary. To the extent GH alleges that it believed or believes anything to the contrary, it is unreasonable. Even if the customer-service employees of the Third-Party Operators have agency for some

---

[13] Plaintiffs expressly identified the Third-Party Operators as distinct corporate entities with distinct federal EIN numbers such that GH was required to issue Form 1099-Ks to each of the Third-Party Operators each year. *See, e.g.,* Ford Exs. 29–34; Narula ¶ 4; Ford Ex. 2 (Kelly Tr. 417:7–19); Ford Ex. 4 (§ 16.2); Ford Ex. 5 (§ 16.2).

things, *e.g.*, to sell food to Plaintiffs' customers, they are not agents of Plaintiffs *for all things*. Ford Ex. 3 (Kokos Tr. 23:18–24:1) (franchisee does not bind a franchise). Accordingly, GH's assertion that the customer service employees of the Third-Party Operators have the apparent authority and/or agency to waive Plaintiffs' legal rights and force them to arbitrate with GH is unreasonable. "The test of agency is the existence of the right to control the method or manner of accomplishing a task by the alleged agent, as well as the agent's ability to subject the principal to liability." *Wargel v. First Nat. Bank of Harrisburg*, 460 N.E.2d 331, 334 (Ill. App. Ct. 1984) (citations omitted). "The nature and extent of an agency are facts to be proved[.]" *Id.* (citations omitted).

Plaintiffs disclosed to GH that the role of the Third-Party Operators (and their employees) was to fill GH orders (customer service, food preparation, and handling daily revenue).[14] GH has no evidence to support, and has not alleged, that Plaintiffs have the right to control "the method or manner" of the work of the Third-Party Operators' customer-service employees who use GH tablets to fill orders.[15] That Third-Party Operators manage restaurants is insufficient as a matter of law to render them Plaintiffs' agents for contracting with GH. In fact, it did not even render them sufficient authority to secure their own GFR IDs. Kelly had to request them.

Further, GH's agency argument is overly general and completely ignores scope

---

[14] Ford Exs. 4–5; Ford Ex. 2 (Kelly Tr. 167:22–168:5).
[15] Narula ¶ 18; Ford Ex. 2 (Kelly Tr. 121:18–25, 127:7–14; 254:24–255:4).

of agency. "An agent may bind his principal by acts *which he appears authorized to perform*." *Career Concepts, Inc. v. Synergy, Inc.*, 865 N.E.2d 385, 393 (Ill. App. Ct. 2007) (citations omitted) (emphasis added). A principal's agent for one thing does not make it the principal's agent for all things—instead, the agent must have been acting within the scope of its agency. *Latimer v. Perry*, 101 N.E.2d 531, 535 (Ill. 1951) ("[W]e have stated that the agent is a fiduciary *only with respect to matters within the scope of the agency*." (emphasis added)). In *Latimer*, the Illinois Supreme Court found that even though defendant was trusted to access decedent's safety deposit box, pay decedent's bills, and arrange for decedent's medical care, defendant's agency did not extend to the sale of decedent's real property "since there is no proof indicating he was ever the agent for [decedent] in regard to the sale or disposal of her home or for the repair or maintenance thereof[.]"). So too here.

Similar limiting concepts apply to apparent agency. *State Sec. Ins. Co. v. Burgos*, 583 N.E.2d 547, 551 (Ill. 1991) ("Apparent authority arises where a principal creates, *through words or conduct*, the *reasonable* impression that the putative agent has been granted authority to perform *certain acts*."); *id.* ("Apparent authority is that authority which a reasonably prudent person, in view of the principal's conduct, would naturally suppose the agent to possess."); *Milwaukee Cheese Co. v. Rockford Carriage House,* 271 N.E.2d 670, 672 (Ill. App. Ct. 1971) (apparent authority exists only to the  it is reasonable).

Here, even if the employees of the Third-Party Operators are agents of Plaintiffs or have apparent authority in some respect (which is denied), GH has not alleged and has no evidence to support that the scope of that agency included the power to bind Plaintiffs to arbitrate disputes with GH. Plaintiffs offer no evidence of the words or conduct of Plaintiffs that demonstrate why it would be reasonable for "a reasonably prudent man, exercising diligence and discretion" to believe under these circumstances that the Third-Party Operators' low-level customer services employees using the GH tablets had authority to bind Plaintiffs (who are not their employers) to terms addressing their judicial rights against GH. *See Wargel*, 460 N.E.2d at 335. As in *Latimer*, GH has no evidence that Plaintiffs granted the Third-Party Operators or their employees authority to negotiate their contract rights with GH or other vendors and, in particular, authority to negotiate any right similar to waiving due process rights, waiving a jury trial, waiving the right to bring a class action/civil action. None of GH's agency cases involve use of a website and none involve an agent binding a principal to arbitration. Instead, GH's cases involve traditional agency scenarios where the principal, agent, and third-party had extensive and/or direct/in-person contact and communications where impressions of authority could be formed. Here, the context is internet transactions through GH tablets. GH could not have formed reasonable impressions about contract authority through their food ordering system. The Third-Party Operators' employees did not have contracting authority or authority

sufficient to bind Plaintiffs to arbitration,[16] and GH has not produced evidence to suggest otherwise.[17]

## F. Even if the Arbitration Clauses Are Valid, this Court Can and Should Rule that this Dispute Is Outside Their Narrow Scope

Even if the arbitration agreements were valid—which they are not—they would not govern Plaintiffs' claims in this action. "The parties to an agreement are bound to arbitrate only those issues they have agreed to arbitrate, as shown by the clear language of the agreement and their intentions expressed in that language. An arbitration agreement will not be extended by construction or implication." *Salsitz v. Kreiss*, 761 N.E.2d 724, 731 (Ill. 2001) (citations omitted). Additionally, the question of arbitrability can and should be resolved by this Court and GH waived any argument to the contrary.

The scope of GH's arbitration provisions are far more narrow than GH suggests. Both the 2016 and 2018 versions of the arbitration clause on the diner website state that "[y]ou agree that all claims, disputes or disagreements that may arise out of the interpretation or performance of *this Agreement* or that in any way relate to your use of the Sites, the Materials and/or other content on the Sites, shall be submitted exclusively to binding arbitration." Dkt. # 28-32, 28-34 (emphasis added). In addition, the 2016 GrubCentral and 2017 GFR arbitration clauses are similarly

---

[16] Narula ¶¶4, 18; TIFFIN000304 (§ 16.2); TIFFIN001543 (§ 16.2); Kelly Tr. 417:7–19.

[17] If the scope of the Third-Party Operators' employees is in dispute, then further proceeding may be warranted. *AYH Holdings, v. Avreco,* 826 N.E.2d 1111, 1125 (Ill. App. Ct. 2005) ("[T]he existence and scope of an agency relationship is a question of fact[.]").

narrow, each providing "[y]ou further acknowledge and agree that all claims or disputes arising out of ***this agreement***" are subject to arbitration. Dkt. # 28-31, 28-34. All four provisions define the operative "agreement" as the "terms of use," not the paper contracts. Dkt.# 28-31, 28-32, 28-34. Here, Plaintiffs' claims do not in any way relate to or arise from the terms of use, let alone relate to the "interpretation or performance" of those terms of use. Rather, Plaintiffs' contract claim relates to GH's performance of Plaintiffs' contracts. Plaintiffs' tort and statutory claims arise out of conduct and duties that are independent of the parties' contracts, and also have nothing to do with the terms of use. Dkt. #11 at 6-11, 13-15. Plaintiffs' claims do not "in any way relate to [their] use of the Sites, the Materials and/or other content on the Sites."[18] Plaintiffs' claims relate to *GH's* unlawful conduct.

The Court also has the authority to decide arbitrability. As held by the Supreme Court, whether a given type of claim falls within the scope of an arbitration clause is for the Court to decide "unless there is clear and unmistakable evidence that" the parties agreed to have that issue arbitrated.[19] While jurisdictions have found that incorporating the AAA's Rules into a contract qualifies as an agreement to arbitrate arbitrability, GH conveniently leaves out that the Seventh and Third Circuits have never ruled on this issue and, thus, the Court is not bound to follow that approach.

---

[18] Dkt.# 15-21 at 14; Dkt. # 15-22 at 14. The arbitration provisions in the GFR Terms of Use are even more narrowly drawn and do not contain this language.
[19] *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quotations omitted); *Duthie v. Matria Healthcare*, 540 F.3d 533, 536 (7th Cir. 2008).

Moreover, in similar circumstances, the Third Circuit recently ruled that the court, not the arbitrator, decides whether an arbitration agreement permits class action arbitration and specifically rejected the argument that incorporation of the AAA Rules gave this arbitrability issue to the arbitrator. *Chesapeake Appalachia v. Scout Petroleum*, 809 F.3d 746, 761 (3d Cir. 2016). Further, Illinois does not have established precedent on this issue. Here, other than vague incorporation the AAA Rules, the arbitration provisions do not state anywhere that "arbitrability" questions are to be ruled upon by the arbitrator. In other words, GH has no "clear and unmistakable evidence" that Plaintiffs agreed to arbitrate the issue of the arbitrability and, in fact, Plaintiffs objected. *First Options*, 514 U.S. at 944. Finally, GH waived the argument when it argued that "the Court determines... whether the particular dispute falls within the scope of the agreement."[20]

Respectfully submitted:

*/s/ Catherine Pratsinakis*
Catherine Pratsinakis, Esq.
(PA ID# 88086)
Timothy J. Ford, Esq.
(PA ID# 325290)
DILWORTH PAXSON LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 575-7200

---

[20] Dkt. # 15-1 at 7-8.  When the issue was raised by Plaintiffs at Dkt. # 17 at 2 n.1, GH said nothing and waived the argument. *Schroeder Murchie Laya Assocs., Ltd. v. 1000 W. Lofts, LLC*, 746 N.E.2d 294, 301-02 (Ill. App. Ct. 2001); *State Farm Mut. Auto. Ins. Co. v. George Hyman Const. Co.*, 715 N.E.2d 749, 757-58 (Ill. App. Ct. 1999).

cpratsinakis@dilworthlaw.com
tford@dilworthlaw.com

*Attorneys for Plaintiffs*

Dated:  June 3, 2019