# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TIFFIN EPS, LLC, et al.,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civ. No. 18-5630** |
| | : | |
| **GRUBHUB INC.,** | : | |
| **Defendant.** | : | |

## ORDER

**AND NOW**, this 18th day of September, 2019, upon consideration of the Parties' Stipulation and Proposed Order (Ex. A.), it is hereby **ORDERED** that:

1.  The Parties' Stipulation and Proposed Order (Ex. A) is **APPROVED** and **ADOPTED**; and

2.  The **CLERK OF COURT** shall **REPLACE** the Deposition transcript of Marielle Kokos filed under seal (Doc. No. 32-4) with the public version of the Kokos Transcript (Ex. B).

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**TIFFIN EPS, LLC** and **TIFFIN MOUNT
AIRY, LLC**, on behalf of themselves and all
others similarly situated,

               Plaintiffs,

               v.

**GRUBHUB INC.**,

     Defendant.

Case No. 2:18-cv-05630-PD

### STIPULATION AND [PROPOSED] ORDER TO UNSEAL PORTIONS OF MARIELLE KOKOS DEPOSITION TRANSCRIPT

Plaintiffs Tiffin EPS, LLC and Tiffin Mount Airy, LLC (together, "Plaintiffs") and Defendant Grubhub Inc. ("Defendant" or "Grubhub"), by and through their undersigned counsel, and pursuant to Local Rule 7.4(b)(1), state as follows:

WHEREAS**,** on May 23, 2019, the parties entered into a confidentiality agreement, wherein they agreed that for any information either party designated as confidential:  (1) the parties would treat the information as confidential, (2) the parties would not disclose the information or use it beyond this action, (3) that production of such information did not waive confidentiality, (4) the parties would return or destroy the information upon conclusion of the litigation, and (5) should the parties choose to use such information in their filings, they would seek leave of Court to file under seal.  The parties also agreed to meet and confer in good faith with respect to any potential disputes as to confidential designations;

WHEREAS, on May 28, 2019, Defendant designated the transcript of the deposition of Grubhub's Rule 30(b)(6) designee, Marielle Kokos, as confidential ("Kokos Transcript"). *See* Kokos Tr. 281:16–18, at ECF No. 32-4;

WHEREAS, on June 4, 2019, consistent with the parties' confidentiality agreement, Plaintiffs filed the Kokos Transcript under seal pursuant to Defendant's designation. *See* Declaration of Timothy Ford, Exhibit 3, at ECF No. 32-4;

WHEREAS, on June 4, 2019, the Court granted Plaintiffs' motion to seal the Kokos Transcript, and received a copy of these documents on the same day. (ECF Nos. 33 and 34);

WHEREAS, the parties have since met and conferred and have agreed on substantially narrowed confidential designations to the Kokos Transcript;

WHEREAS, the parties have applied those modified designations to the Kokos Transcript and agreed on a public version that may be filed on the public docket, attached hereto as Exhibit A;

WHEREAS, by agreeing to modify the confidential designations to the Kokos Transcript the parties do not intend to in any way affect the confidential designations of any documents marked as exhibits during the Kokos deposition, specifically Defendant's confidential designations of Exhibits 11, 12, 15, 20 and 23 to the Kokos deposition remain in effect;

THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and among the parties hereto, through their undersigned counsel, subject to the approval of the Court, that:

1.      The deposition transcript of Marielle Kokos filed under seal at ECF No. 32-4 as Exhibit 3 of the Declaration of Timothy Ford, shall be replaced by the public version of the Kokos Transcript attached hereto as Exhibit A.

2.     The Clerk of Court shall replace Exhibit 3 to the Declaration of Timothy J. Ford,

at ECF No. 32-4, with Exhibit A attached to this Stipulation.

Respectfully submitted,

 /s/ *Timothy J. Ford*                              /s/ *James W. Carlson*
Catherine Pratsinakis, Esq.                Rebekah B. Kcehowski, Esq.
Timothy J. Ford, Esq.                         James W. Carlson, Esq.
DILWORTH PAXSON LLP                  JONES DAY
1500 Market Street, Suite 3500E         500 Grant Street, Suite 4500
Philadelphia, PA 19102                       Pittsburgh, PA 15219
T: (215) 575-7000                               T: (412) 391-3939
F: (215) 575-7200                               F: (412) 394-7959
cpratsinakis@dilworthlaw.com          rbkcehowski@jonesday.com
tford@dilworthlaw.com                      jamescarlson@jonesday.com
*Attorneys for Plaintiffs*                     *Attorneys for Defendant Grubhub Inc.*

Dated: September 17, 2019

**IT IS SO ORDERED.**

                                                       _____
                                                       Paul S. Diamond, U.S.D.J.

Dated: September ___, 2019

# Exhibit A

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4  TIFFIN EPS, LLC and TIFFIN MOUNT  )

 5  AIRY, LLC, on behalf of themselves)

 6  and all others similarly situated,)

 7                      Plaintiffs,  ) Case No.:

 8           vs.                     ) 2-18-cv-05630-PD

 9  GRUBHUB INC.,                    )

10                      Defendant.   )

11

12          ***** C O N F I D E N T I A L *****

13

14          The confidential videotaped 30(b)(6)

15  deposition of GRUBHUB by and through MARIELLE KOKOS,

16  called for examination, taken pursuant to the Federal

17  Rules of Civil Procedure of the United States District

18  Courts pertaining to the taking of depositions, taken

19  before JULIANA F. ZAJICEK, a Registered Professional

20  Reporter and a Certified Shorthand Reporter, at the

21  offices of Jones Day, Suite 3500, 77 West Wacker

22  Drive, Chicago, Illinois, on May 28, 2019, at 10:33

23  a.m.

24
```

```
 1   PRESENT:

 2   ON BEHALF OF THE PLAINTIFFS:

 3        DILWORTH PAXSON LLP

 4        1500 Market Street, Suite 3500E

 5        Philadelphia, Pennsylvania 19102

 6        215-575-7013

 7        BY:  CATHERINE PRATSINAKIS, ESQ.

 8             cpratsinakis@dilworthlaw.com

 9   ON BEHALF OF THE DEFENDANT:

10        JONES DAY

11        500 Grant Street, Suite 4500

12        Pittsburgh, Pennsylvania 15219-2514

13        412-391-3939

14        BY:  JAMES W. CARLSON, ESQ.

15             jamescarlson@jonesday.com

16   ALSO PRESENT:

17        KATIE ARMISTEAD, ESQ.

18        Assistant General Counsel

19        Grubhub Inc.

20

21   THE VIDEOGRAPHER:

22        MR. MICHAEL NEWELL,

23        Golkow Litigation Services.

24   REPORTED BY:  JULIANA F. ZAJICEK, C.S.R. NO. 84-2604.
```

Confidential - Marielle Kokos

```
 1                    I N D E X
 2   WITNESS:                                PAGE:
 3    MARIELLE KOKOS
 4    EXAM BY MS. PRATSINAKIS               7
 5                        * * * * *
 6
 7                  E X H I B I T S
 8   KOKOS EXHIBIT                    MARKED FOR ID
 9    No. 1     Notice of Deposition Pursuant to    7
               Rule 30(b)(6)
10
      No. 2     E-mail from Carlson to             9
11               Pratsinakis, 5/25/2019, Subject:
               Grubhub 30(b)(6) Deposition/Other
12               Discovery Issues
13    No. 3     Marielle Kokos - LinkedIn          14
14    No. 4     E-mail exchange from               16
               marianne@tiffin.com to Kevin
15               O'Malley, Jake Cee,
               mnarula@tiffin.com; TIFFIN000682 -
16               683
17    No. 5     Declaration of Marielle Kokos      41
18    No. 6     Snapshot taken from the Wayback    50
               Machine of the URL
19               Grubhub.com/legal on 2/21/11
20    No. 7     Privacy Policy Updated and         53
               Effective 10/7/16
21
      No. 8     Privacy Policy Effective 6/4/18    56
22
      No. 9     Document marked "Important         70
23               Update," dated 2/12/19.  Sent by
               Grubhub to its restaurants,
24               including Marianne@Tiffin.com
```

```
 1              E X H I B I T S (Continued)
 2   KOKOS EXHIBIT                         MARKED FOR ID
 3   No. 10    Screen shot re "Who Delivers in      104
             your Neighborhood?";
 4           GRUBHUB_0000338
 5   No. 11    WDA-3932; GRUBHUB_0000351 - 365     119
 6   No. 12    E-mail chain dated 3/7/16, from      128
             Caryn Drange to Meagan Jaglowski
 7           among others; GRUBHUB_0000329 -
             336
 8
     No. 13    Document created from Grubhub for     147
 9           Restaurants' website, the HTTPS is
             Get.Grubhub.com
10
     No. 14    Printout of the microsite for the     155
11           Tiffin Mount Airy location
12   No. 15    Activity Log                         169
13   No. 16    Login Screens; GRUBHUB_0000050 -     190
             054
14
     No. 17    Screen shots of what Tiffin Elkins   198
15           Park owner or primary user or
             admin user would be able to see
16           when they log in to Grubhub for
             Restaurants; GRUBHUB_0000005 - 025
17
     No. 18    Terms of Use, Updated: May 29,       214
18           2017, Using Grubhub for
             Restaurants; GRUBHUB_0000314 - 324
19
     No. 19    Terms of Use, Updated: May 29,       219
20           2017, Using Grubhub for
             Restaurants; GRUBHUB_0000272 - 281
21
     No. 20    Defendant Grubhub Inc.'s             223
22           Objections and Responses to
             Plaintiffs' First Set of
23           Interrogatories
     No. 21    Reply Declaration of Marielle        226
24           Kokos; GRUBHUB_0001746 - 774
```

Confidential - Marielle Kokos

```
 1              E X H I B I T S (Continued)

 2    KOKOS EXHIBIT                        MARKED FOR ID

 3     No. 22   Timeline                              245

 4     No. 23   Data provided by the tech team     253

               that the terms of use were clicked

 5             on

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1        THE VIDEOGRAPHER:  We are now on the record.  My

 2   name is Michael Newell.  I am a videographer for

 3   Golkow Litigation Services.

 4             Today's date is May 28th, 2019.  The time

 5   is 10:33 a.m.

 6             This video deposition is being held in

 7   Chicago, Illinois, in the matter of Tiffin EPS, LLC

 8   and Tiffin Mount Airy versus Grubhub, Inc.

 9             The deponent today is Marielle Kokos.

10             Will counsel please identify themselves.

11        MS. PRATSINAKIS:  Good morning.  My name is

12   Catherine Pratsinakis.  I represent Plaintiffs Tiffin

13   Elkins Park and Tiffin Mount Airy in this matter.

14             And with me I have my colleague Tim Ford,

15   who also represents Plaintiffs in this matter.

16        MR. CARLSON:  James Carlson from Jones Day on

17   behalf of Grubhub and the witness.  And with me today

18   is Katie Armistead who is in-house counsel at Grubhub.

19        THE VIDEOGRAPHER:  The court reporter today is

20   Juliana Zajicek who will now swear in the witness.

21             (WHEREUPON, the witness was duly

22              sworn.)

23             MARIELLE KOKOS,

24   called as a witness herein, having been first duly
```

1  sworn, was examined and testified as follows:

2                          EXAMINATION

3  BY MS. PRATSINAKIS:

4        Q.    Good morning, Marielle.

5              So, I identified myself earlier.  I

6  represent the Plaintiffs in the matter brought against

7  your employer Grubhub.  I'm here to ask you some

8  questions about assertions that you've made in your

9  declarations that you've filed in our court case.  And

10  those were filed in connection with the Motion to

11  Compel Arbitration filed by Grubhub.

12              So my objective today is not to ask you

13  questions just to ask them.  I do want to move this

14  along very efficiently and -- and as quickly as I can.

15  And my commitment to you and your lawyer is -- is that

16  we wrap things up as -- as my questions are winding

17  down.  So I just wanted to show you my first document,

18  Kokos Exhibit 1.

19                      (WHEREUPON, a certain document was

20                      marked Kokos Deposition Exhibit No. 1

21                      for identification, as of

22                      05/28/2019.)

23  BY MS. PRATSINAKIS:

24        Q.    And what I -- what I'm handing you is the

1    Notice of Deposition pursuant to Rule 30(b)(6) that we

2    served on Grubhub.

3         MR. CARLSON:  Do you have do a copy for me?

4         MS. PRATSINAKIS:  Pardon.

5         MR. CARLSON:  Thank you.

6    BY MS. PRATSINAKIS:

7         Q.    Are you familiar with this document?

8         A.    Yes.

9         Q.    Have you reviewed this document before

10   coming here today?

11        A.    I have.

12        Q.    Are you prepared to testify to the

13   categories identified in this document except for the

14   few categories that your colleague Michael Young will

15   be testifying to?

16        MR. CARLSON:  And I'll just say, I think that

17   this is subject to additional topics that you sent us

18   on Thursday of last week and that we objected to, and

19   subject to our objections that we sent on Saturday.

20        MS. PRATSINAKIS:  I'd like to mark as Exhibit 2

21   the e-mail Mr. Carlson is referring to dated May 25th,

22   2019, sent 9:52 p.m.

23                  (WHEREUPON, a certain document was

24                   marked Kokos Deposition Exhibit

Confidential - Marielle Kokos

```
 1                    No. 2, for identification, as of

 2                    05/28/2019.)

 3    BY MS. PRATSINAKIS:

 4         Q.    Ms. Kokos, are you -- have you reviewed

 5    this e-mail prior to coming here today?

 6         A.    Yes.

 7         Q.    And are you familiar with each of the

 8    categories in which you have been designated by the

 9    company as a representative?

10         A.    Yes.

11         Q.    Have you ever been deposed before?

12         A.    I have not.

13         Q.    Okay.  So let me go over a few ground

14    rules.  I need you to respond verbally, so no nodding

15    of head so that the court reporter can accurately take

16    down your answers.  I need you to wait until I finish

17    asking my questions before you start answering and --

18    and I'll reciprocate.

19               And I also would be happy to give you a

20    break so long as there is no open question pending, if

21    you'd just answer the question, then at that point we

22    can take a break any time you'd like.

23               Is there any reason why you're unable to

24    testify truthfully today?
```

```
 1        A.    No.

 2        Q.    Is -- are you on any medications that

 3   could impact your memory or --

 4        A.    No.

 5        Q.    Okay.  During today's deposition I may be

 6   using the terms "Grubhub diners website."

 7              Are you familiar with what I'd be

 8   referring to if I used that term?

 9        A.    I assume you mean Grubhub.com?

10        Q.    Yes.

11              And I also will be referring to "Grubhub

12   tablet."  Are you familiar with that term as I use it

13   today?

14        A.    I assume you mean our platform for the

15   restaurants to log into.

16        Q.    Actually, I don't.  I mean the device that

17   is given to restaurants to process food orders.

18        A.    Okay.

19        Q.    Okay.

20              And as far as the platform you were just

21   referring to, we'll refer to that as GFR?

22        A.    Okay.

23        Q.    Okay.  So what have you done to prepare

24   for today's deposition?
```

```
 1        A.    Sure.

 2              I began preparation with Katie, who is our

 3    inside counsel, as well as the Jones Day lawyers with

 4    my declaration in March.  We also have worked on that

 5    and my reply declaration.  I've met with the Jones Day

 6    lawyers and Katie probably around four to five times

 7    just preparing these documents, going over these

 8    documents, as well as about three-and-a-half hours

 9    yesterday with James and Katie continuing our

10    preparation.

11        Q.    And you brought with you a binder?

12        A.    Yes.

13        Q.    Can you identify what's in that binder?

14        A.    Sure.

15              Within the binder is a timeline of events,

16    and beginning with when the Tiffin companies signed up

17    as well as some events that have happened on the

18    Grubhub websites, the e-mail that you referred to from

19    Mr. Carlson, the 30(b)(6) document and our responses

20    to the interrogatories, as well as my declaration, any

21    of the exhibits within my declaration and my reply

22    declaration with the exhibits.

23        Q.     Are there any notations in those

24    documents?
```

Confidential - Marielle Kokos

```
 1      A.    No.

 2      Q.    Do we have -- did you produce a copy of

 3   each of the documents, such as a timeline, for

 4   example?

 5      MR. CARLSON:  So I think the timeline hasn't

 6   been produced, but I can get you a copy, actually, if

 7   you give me a second.

 8          Do you want to go off the record for just

 9   a second?  It is up to you.  If you want me to go --

10      MS. PRATSINAKIS:  That's fine.

11      MR. CARLSON:  I have one.  I just forgot to

12   bring it in.

13      THE VIDEOGRAPHER:  We are going off the record

14   at 10:39.

15                 (WHEREUPON, a recess was had

16                  from 10:39 to 10:41 p.m.)

17      THE VIDEOGRAPHER:  We are back on the record at

18   10:41.

19   BY MS. PRATSINAKIS:

20      Q.    Okay.  So what is your current title at

21   Grubhub?

22      A.    My current title is Senior Director of

23   Restaurant Success.

24      Q.    And what are your responsibilities as the
```

Confidential - Marielle Kokos

```
1   Senior Director of Restaurant Success?

2       A.    My responsibilities are running a

3   department that interacts with our restaurant partners

4   once they go-live on the Grubhub.com website and we

5   consult and work with them on -- on growing their

6   accounts and -- and getting the most they can out of

7   Grubhub.

8       Q.    And by "them," you mean the restaurants

9   themselves?

10      A.    Correct.

11      Q.    Are all communications with restaurants

12  emanating from your group?

13      A.    There are communications with restaurants

14  through my group as well as a group that we call

15  Restaurant Care that helps the restaurants from an

16  operational standpoint and occasionally restaurants

17  could call in to our Customer Care department if there

18  is an issue that's order related, and then the final

19  place where communications could be happening with

20  restaurants is through our B2B marketing team and they

21  can send e-mails or communications to restaurants as

22  well.

23      Q.    And how are those B2B marketing

24  communications different from the ones that emanate
```

Confidential- Marielle Kokos

1    from your department?

2         A.    The B2B marketing communications are sent

3    generally en masse to a certain subset of restaurants

4    and they would be discussing, you know, product

5    enhancements or product changes that are available to

6    restaurants.  Things that would be coming from my

7    department are a little bit more of a personal

8    interaction with the restaurant one-on-one with the

9    account adviser.

10        Q.    Who do you report to?

11        A.    My direct boss is Kevin Kearns who is the

12   Senior Vice President of Restaurant Network.

13        Q.    And who does Kevin report to?

14        A.    Kevin reports to Adam DeWitt who is our

15   President and CFO.

16        Q.    Okay.  I'd like to mark as Kokos Exhibit 3

17   a document.

18                    (WHEREUPON, a certain document was

19                     marked Kokos Deposition Exhibit

20                     No. 3, for identification, as of

21                     05/28/2019.)

22   BY MS. PRATSINAKIS:

23        Q.    Please review the document and let me know

24   when you are ready.

```
 1       A.    I'm ready.

 2       Q.    Okay.  My first question is did you draft

 3   this?

 4       A.    I did.

 5       Q.    And what is it?

 6       A.    This is my current LinkedIn profile.

 7       Q.    Okay.  And does it reflect an accurate

 8   representation of your education?

 9       A.    It does.

10       Q.    And does it provide an accurate overview

11   of your work history?

12       A.    Yes, it does.

13       Q.    It states in here that you manage 60 plus

14   client advisers, is that correct?

15       A.    That is correct.

16       Q.    Do you know Kevin O'Malley?

17       A.    I do.

18       Q.    Does he report to you?

19       A.    Kevin O'Malley reports to Jake Cee and

20   Jake Cee reports directly to me.  So I oversee Kevin

21   in his department.

22       Q.    In 2018 there was an e-mail exchange

23   between Kevin O'Malley and Tiffin restaurants about

24   telephone commissions.
```

1           Were you made aware of that communication?

2      MR. CARLSON:  Object to form, scope.

3  BY MS. PRATSINAKIS:

4      Q.    You can answer.

5      A.    I do not recall if I was made aware of it

6  at that time, but I was made aware of it after.

7      Q.    Do you recall about when you were made

8  aware of it?

9      A.    I don't know the exact date.

10      MS. PRATSINAKIS:  I'd like to mark as Kokos

11  Exhibit 4 an e-mail sent by Marianne@Tiffin.com to

12  Kevin O'Malley @Grubhub.com and JakeCee@Grubhub.com.

13           (WHEREUPON, a certain document was

14            marked Kokos Deposition Exhibit

15            No. 4, for identification, as of

16            05/28/2019.)

17  BY MS. PRATSINAKIS:

18      Q.    Take a moment to review that e-mail and

19  let me know when you are ready.

20      MR. CARLSON:  Do you have a copy for me?

21      MS. PRATSINAKIS:  Oh, I'm so sorry.

22      MR. CARLSON:  While she is reviewing that,

23  Counsel, I'll just say I'm having a little bit of

24  difficulty following how this relates to the topics

Confidential - Marielle Kokos

1  for today.  This seems to me like it more goes to the

2  merits of the case which is not what the discovery is

3  about right now.  So I'll give you a little bit of

4  leeway in questions you are going to ask.  I assume

5  you are going to bring it back to arbitration, but if

6  you are going into the merits I'm going to -- I'm

7  going to stop it, because that's not within the scope

8  of what we are doing today.

9       MS. PRATSINAKIS:  Understood.

10 BY THE WITNESS:

11      A.    I am ready.

12 BY MS. PRATSINAKIS:

13      Q.    Have you seen this e-mail exchange before?

14      A.    I have, yes.

15      Q.    Do you recall around when you saw it?

16      A.    I recall that it was shortly after this.

17 Any time our legal department is involved, it would be

18 escalated to me.

19      Q.    Did you approve Kevin O'Malley's response

20 of March 15th, 2018, to Marianne@Tiffin.com letting

21 her know that the legal department would get involved

22 and at that point we would be forced to pause all of

23 our locations until the matter is -- all of your

24 locations until the matter is resolved?

Confidential - Marielle Kokos

```
 1        A.     Are you asking me if I --

 2        MR. CARLSON:  Object to form, scope.

 3             Go -- go ahead.

 4   BY THE WITNESS:

 5        A.     Are you asking me if I approved him before

 6   he sent it or approved of it after the fact?

 7   BY MS. PRATSINAKIS:

 8        Q.     I'm asking prior to him sending this

 9   e-mail if you authorized him to send this message to

10   the -- to Marianne at Tiffin?

11        A.     I did not see this message before it was

12   sent.

13        Q.     And you didn't have any conversations

14   about pausing all of Tiffin's locations until the

15   matter is resolved?

16        A.     No, I did not speak to him before this

17   e-mail was sent.

18        Q.     So remind me, at what point were you made

19   aware of the complaint by Tiffin?

20        A.     After this e-mail was sent.

21        Q.     Around when, do you recall?

22        A.     Let's say within a day or two.

23        Q.     Okay.

24             And did you touch base with the legal
```

1    department of Grubhub.com at Grubhub?

2         MR. CARLSON:  Object.  That's a yes or no.

3    BY THE WITNESS:

4         A.    Yes.

5    BY MS. PRATSINAKIS:

6         Q.    Did you speak to your direct supervisor

7    Mr. Kevin Kearn?

8         A.    He was not my director at the time.

9         Q.    Who was your director at that time?

10        A.    Stan Chia.

11        Q.    Were you promoted in between the time of

12   this e-mail and today?

13        A.    No.

14        Q.    Is Stan Chia still with Grubhub?

15        A.    No, he is not.

16        Q.    And what did you and Mr. Chia discuss in

17   connection with this e-mail exchange?

18        A.    I did not discuss this e-mail exchange

19   with Stan Chia.

20        Q.    Did you speak with anyone outside of the

21   legal department with respect to this e-mail exchange

22   with Tiffin?

23        A.    No.

24        Q.    So going back to your LinkedIn resume, one

1    of your colleagues stated about you, and I'm

2    paraphrasing, but that you fight to move Grubhub

3    forward and advocate for Grubhub customers and that

4    you proactively address projects and challenges and

5    provide solutions.

6              Is that an accurate opinion of you?

7         MR. CARLSON:  Object to form.

8    BY THE WITNESS:

9         A.    Yes, I would agree that that is an

10   accurate depiction of me.  That's also her opinion.

11   BY MS. PRATSINAKIS:

12        Q.    And another colleague stated that you've

13   made a huge impact at Grubhub and that you know how to

14   get the job done.

15             Is that a correct statement about you?

16        MR. CARLSON:  Object to form.

17   BY THE WITNESS:

18        A.    I would agree that that's an accurate

19   statement and, again, their opinion.

20   BY MS. PRATSINAKIS:

21        Q.    So were you offered a promotion or

22   additional compensation for your role in this matter?

23        A.    Are you asking in the role of this

24   specific to Tiffin?

```
1          Q.     In -- given your participation as a

2     witness or a designee in this matter, were you offered

3     a promotion for your participating?

4          A.     No.

5          Q.     Were you offered any additional

6     compensation or bonus?

7          A.     No.

8          Q.     So you state in your LinkedIn resume that

9     you:

10                "Restructured a customer service

11    department into an extremely productive inside sales

12    team that focuses on client retention and driving

13    revenue."

14                Is that accurate?

15         A.     That is accurate.

16         Q.     And by "client retention," you are

17    referring to restaurants, is that correct?

18         A.     That is correct.

19         Q.     And you also stated that you:

20                "Produce an annualized 98 percent

21    retention rate of over 85,000 restaurants in over 1500

22    national markets."

23                Is that correct?

24         A.     I believe the LinkedIn profile today says
```

1  over a hundred thousand restaurants, but other than

2  that, yes, that is accurate.

3      Q.    So is it fair to say that one of your

4  responsibilities is to ensure that restaurants

5  continue using Grubhub's services?

6      A.    Correct.

7      Q.    And in your position as the Senior

8  Director of Restaurant Success, are you generally

9  familiar with how a restaurant operates?

10     A.    Yes.

11     Q.    And so you're -- are you familiar with the

12  different roles of restaurant employees in a

13  restaurant?

14     A.    I believe every restaurant is different

15  and has different roles, but I am generally familiar

16  with most restaurants and -- and different positions

17  within them.

18     Q.    And can you give me an overview of your

19  understanding of what some of these roles in a

20  restaurant are for -- excuse me.  Strike that.

21          What are some of the roles of restaurant

22  employees in your experience?

23     A.    Some of the roles would be a general

24  manager who is in charge of the restaurant.  Sometimes

1    the owner is there, sometimes they are not.  There are

2    people that are cooking the food.  There could be a

3    host or a hostess.  And there could also be people

4    that are dedicated specifically to their third-party

5    online orders, for example, Grubhub, DoorDash, Uber

6    Eats, et cetera.  There -- larger restaurants tend to

7    have more of, like, a marketing person or marketing

8    presence.  Smaller restaurants don't.

9        Q.    And in your experience do these employees

10    have the authority to bind a restaurant to a contract?

11        MR. CARLSON:  Object to form.

12    BY THE WITNESS:

13        A.    Generally the sales reps who would be

14    signing up our restaurants would be working with

15    owners or managers that the owners have deemed as a

16    primary contact and someone able to sign a contract.

17    BY MS. PRATSINAKIS:

18        Q.    And so, for example, a cashier or someone

19    who works a third party ordering system doesn't have

20    the authority to bind a restaurant owner to a

21    contract, is that correct?

22        MR. CARLSON:  Object to form.

23    BY THE WITNESS:

24        A.    They would not be the people that are

1  signing the contracts with Grubhub.

2  BY MS. PRATSINAKIS:

3      Q.    So does someone at a restaurant need to

4  man the Grubhub ordering system during all hours of

5  operation?

6      A.    If the restaurant has a tablet or is using

7  Grubhub for Restaurants, someone would be manning it

8  to confirm orders.  They could also not and get their

9  orders via fax or e-mail.

10     Q.    And if not through a tablet, how would a

11  restaurant access Grubhub for Restaurants?

12     A.    They would just go to any device that

13  connects to the internet and type in

14  Restaurant.Grubhub.com.

15     Q.    So is it fair to say that any employee

16  working at a restaurant could, say, have access to

17  Grubhub for Restaurants while during the hours of

18  operation?

19     A.    No.  You have to have a specific login to

20  access Grubhub for Restaurants.

21     Q.    So after a restaurant logs in to Grubhub

22  for Restaurants, can any employee use it?

23     A.    If someone is not monitoring the tablet,

24  sure, a person could walk by the tablet and have

1    access to it, but their actual opening of the tablet

2    themselves, they have to have a login.

3         Q.    But couldn't anyone be given a login to

4    access a tablet?

5         MR. CARLSON:  Object to form.

6    BY THE WITNESS:

7         A.    If the restaurant owner --

8         MR. CARLSON:  Just give me one moment to -- to

9    object if I need to.

10               Object to form.

11               Go ahead.

12    BY THE WITNESS:

13         A.    If a restaurant owner decided to share a

14    login.

15    BY MS. PRATSINAKIS:

16         Q.    Is it necessarily a restaurant owner who

17    has an account with Grubhub?

18         A.    The restaurant owner could have an

19    account, a restaurant manager could have an account,

20    and the person confirming the orders would generally

21    have a basic account which does not give them access

22    to all things on the website.

23         Q.    And what about a third-party operator of a

24    restaurant, are they given accounts?

```
 1        A.     Could you define what you mean by a

 2   third-party operator?

 3        Q.     Sure.

 4               So a separate entity that runs a

 5   restaurant for the owner?

 6        A.     Such as a management company or...?

 7        Q.     Such as a restaurant operator.

 8        A.     If your --

 9   MR. CARLSON:  Object to form.

10               Go ahead.

11   BY THE WITNESS:

12        A.     If the restaurant owner would like them to

13   have a login, they could, but generally the restaurant

14   owner is the person that is choosing who has log-ins.

15   The person who signs the contract is choosing that.

16   BY MS. PRATSINAKIS:

17        Q.     Right.  But the person using it may be

18   different from the person authorized to create it,

19   isn't that correct?

20        MR. CARLSON:  Object to form.

21   BY THE WITNESS:

22        A.     Correct.

23   BY MS. PRATSINAKIS:

24        Q.     So let me give you an example.  Pizza Hut
```

Confidential- Marielle Kokos

```
1    corporate office will enter into a contract with
2    Grubhub, correct?
3         A.    Correct.
4         Q.    And the different franchises that operate
5    Pizza Huts all over the country, are they to enter
6    their own separate agreement with Grubhub?
7         A.    It would depend on what the contract is,
8    so a franchisee could enter into their own contract if
9    that's what their corporate agreement says.  Their
10   corporate agreement could say that they can't and they
11   would have to follow what corporate agreement allows
12   the franchisee to do.  So they are all different.
13        Q.    And so if a Pizza Hut in Wisconsin
14   franchise owner went to Grubhub and said, I need a
15   login for all Pizza Huts, would you provide that
16   infor- -- that login?
17        MR. CARLSON:  Object to form.
18   BY THE WITNESS:
19        A.    No, we would not provide that login.
20   BY MS. PRATSINAKIS:
21        Q.    Because they are not authorized, correct?
22        MR. CARLSON:  Object to form.
23   BY THE WITNESS:
24        A.    Correct.
```

1   BY MS. PRATSINAKIS:

2       Q.    And they don't have the authority to bind

3   Pizza Hut Corporation, right?

4       MR. CARLSON:  Object to form, calls for a legal

5   conclusion.

6   BY THE WITNESS:

7       A.    They would only be speaking on behalf of

8   their Pizza Hut location.

9   BY MS. PRATSINAKIS:

10      Q.    Does a login screen on the Grubhub tablet

11  appear the same as the login screen on a computer?

12      A.    The layout --

13      MR. CARLSON:  Object to form.

14          Go ahead.

15  BY THE WITNESS:

16      A.    The layout of the login screen for Grubhub

17  for Restaurants today, whether you access it on a

18  tablet, a phone or a website, is the same.

19  BY MS. PRATSINAKIS:

20      Q.    And so the login screen on the tablet will

21  appear exactly as the login screen on the computer?

22      A.    Correct.

23      Q.    And you mentioned that that's true today.

24  Was that not true prior to today?

```
 1        A.      When the tablet was first introduced, the

 2   platform on the tablet was app based and it was called

 3   OrderHub.  That was only app based.  You could not

 4   access it from a website.

 5               When we transitioned to GrubCentral and

 6   now Grubhub for Restaurants it became a web-based and

 7   app-based platform, where you would be able to access

 8   it from a computer.

 9        Q.      And so Grubhub for Restaurants, which

10   we've been referring to as GFR, is synonymous with

11   GrubCentral, correct?

12        A.      Yes.

13        Q.      It was just a change of name?

14        A.      A change of name, yes, a branding

15   function -- there is a couple of functionalities

16   added.

17        Q.      Do you recall if those functionalities

18   included the addition of links to terms of use or

19   anything of that nature?

20        A.      GrubCentral to Grubhub for Restaurants had

21   terms -- excuse me -- terms of use on every page.

22        Q.      And do you recall the timeframe of those,

23   of that -- of the terms of use on GrubCentral.com?

24        A.      When it was --
```

Confidential - Marielle Kokos

```
 1        MR. CARLSON:  Object to form.

 2   BY THE WITNESS:

 3        A.    -- rolled out.

 4   BY MS. PRATSINAKIS:

 5        Q.    Okay.  So you are saying during the

 6   transition between GrubCentral to GFR, GrubCentral

 7   always had a link for terms of use?

 8        MR. CARLSON:  Object to form, misstates

 9   testimony.

10   BY THE WITNESS:

11        A.    Correct.

12        MR. CARLSON:  Oh, I thought...

13   BY MS. PRATSINAKIS:

14        Q.    And so when you were operating

15   GrubCentral, the web-based app program, you were able

16   to see all of the information available on, say, an

17   iPad or a cell phone or a computer that you could on

18   the tablet, is that correct?

19        A.    Yes, that's correct.

20        Q.    So if you are on the Grubhub tablet, you

21   could see statements, is that correct?

22        A.    Yes, that is correct.

23        Q.    And you could see receivables?

24        A.    You are able to see transactions, if
```

1    that's what you mean by receivables, and deposits.

2        Q.    Okay.  Is there any information on a

3    tablet that -- strike that.

4             So there is no information on a tablet

5    that isn't accessible by computer and vice versa,

6    correct?

7        A.    That's correct.

8        Q.    And if an account was associated with

9    multiple restaurants and someone logged in from a

10   tablet, on the tablet you could get the information

11   for multiple restaurants, is that correct?

12       A.    You can.  You would need to pick a

13   specific drop down where the locations are listed.

14       Q.    Does Grubhub have a policy requiring

15   restaurants to fill food orders within a particular

16   timeframe?

17       A.    There is no specific policy around what a

18   restaurant's estimated time of delivery should be.  We

19   give suggestions on what we know diners would

20   appreciate, but we are -- we don't force the

21   restaurants into that.

22       Q.    So what -- what sort of guidelines do you

23   provide to restaurants so that they can process

24   Grubhub orders, in terms of the timing?

1      A.    We would say, you know, based on the

2  market you are in, on average an ETA, which would mean

3  estimated time of arrival of the food, is, let's say

4  for this example it's 35 to 45 minutes and -- and we

5  would suggest to restaurants that that's ideal to --

6  to follow so that you -- diners want to order from

7  you.

8      Q.    Okay.  So from the time a diner orders

9  food and it gets transmitted to the Grubhub tablet,

10  the restaurant has -- has 35 to 45 minutes to process

11  that order, cook that food and deliver it to that

12  client, is that correct?

13      A.    No.

14      MR. CARLSON:  Object to form.

15          Just give me a second to object if I need

16  to.

17  BY THE WITNESS:

18      A.    No.

19      MR. CARLSON:  And make sure she finishes her

20  quest -- her question.

21  BY THE WITNESS:

22      A.    That's not correct.  That was an example I

23  gave you.

24  BY MS. PRATSINAKIS:

Confidential - Marielle Kokos

```
 1      Q.     Sure.

 2             But is it fair to say that when an order

 3      comes in to a restaurant it is in Grubhub's best

 4      interest for the order to be processed as quickly as

 5      it can be?

 6      MR. CARLSON:  Object to form.

 7      BY THE WITNESS:

 8      A.     No.  I believe it is in the restaurant's

 9      best interest to process the food as quickly as

10      possible so that they have happy diners.

11      BY MS. PRATSINAKIS:

12      Q.     Okay.  So it is in the restaurant's

13      interest to process the orders as quickly as they can,

14      correct?

15      MR. CARLSON:  Object to form.

16      BY THE WITNESS:

17      A.     They would want to process the food in a

18      quick manner but also so that the food is cooked

19      correctly and that they can deliver it on time.

20      BY MS. PRATSINAKIS:

21      Q.     Okay.  And does Grubhub have a policy of

22      requiring restaurant owners to provide restaurant

23      employees specific IDs so that you know who is using

24      the tablet at what day and time?
```

Confidential - Marielle Kokos

```
1        A.    We do not have a specific policy around

2   that.  It -- it is a best practice that we offered to

3   the restaurants so that they can see who is accessing

4   the tablet and making what changes.

5        Q.    And do you generally -- do restaurants

6   generally take you up on that offer to create

7   employees -- their ID?

8        A.    Yes, they generally have employees that

9   are dedicated to running the tablet and they would

10  give them a basic login which does not give them

11  access to transactions.

12       Q.    But Grubhub also has many restaurants that

13  don't do that, is that correct?

14       A.    I'm sure that we do.  I cannot speak to

15  how many would not do that.

16       Q.    But there are restaurants that do not

17  request or take you up on your offer for

18  employee-issued IDs, is that correct?

19       A.    There could be restaurants that do -- that

20  have sharing IDs.

21       Q.    So if a restaurant is using a shared ID

22  amongst all of its employees, does Grubhub have any

23  way to know who is on a tablet on a particular date

24  and time?
```

```
 1        MR. CARLSON:  Object to form.

 2   BY THE WITNESS:

 3        A.    What Grubhub would have access to is that

 4   specific login and the actions they've taken.

 5   BY MS. PRATSINAKIS:

 6        Q.    Let me reask my question.

 7              So if a restaurant is using a shared ID

 8   amongst all of its employees, does Grubhub have any

 9   way to know who, I'm -- i.e., meaning the person or

10   employee, that is using the tablet on a particular

11   date and time?

12        MR. CARLSON:  Object to form; asked and

13   answered.

14   BY THE WITNESS:

15        A.    Grubhub would know the specific login

16   that's being used.

17   BY MS. PRATSINAKIS:

18        Q.    Okay.  But Grubhub would not know the

19   specific employee, is that correct?

20        MR. CARLSON:  Object to form, asked and

21   answered.

22   BY THE WITNESS:

23        A.    They would know the -- only the specific

24   login that's being used.
```

Confidential - Marielle Kokos

```
 1    BY MS. PRATSINAKIS:

 2        Q.    When requesting an account from Grubhub,

 3    how does Grubhub verify that a person seeking the

 4    account is authorized to do so?

 5        A.    When you say "account," do you mean to

 6    just in general sign up for Grubhub.com or an account

 7    for Grubhub for Restaurants?

 8        Q.    Good question.  I'm talking about a

 9    restaurant account ID.

10              How does Grubhub verify whether the party

11    requesting a Grubhub restaurant ID is an authorized

12    party?

13        A.    The sales reps are the ones that are out

14    in the field and/or on the telephone speaking to the

15    owners and managers.  We are also required to get

16    corporate entity names and voided checks and proof of

17    existence for the restaurants to know that they are a

18    real restaurant brick and mortar location and that the

19    owners are providing the corporate entity names and

20    the -- the checks.

21        Q.    And do you also receive 1099 forms?

22        A.    We I don't believe are required to -- to

23    gather 1099 forms.

24        Q.    Well, how do you know who to pay if you
```

1  are not gathering 1099 forms?

2      A.    The restaurant, to my knowledge, is

3  providing, like I said, the corporate entity name and

4  the address for the restaurant and then we do --

5  excuse me -- the F -- the tax identification number,

6  FEIN, we have software that checks that against the

7  corporate entity name.

8      Q.    And is there some sort of tax form that's

9  required so that you can report to the government how

10  much you've paid to a given entity?

11     A.    Just --

12     MR. CARLSON:  Object to -- object to form,

13  scope.

14          You can answer.

15  BY THE WITNESS:

16     A.    Just simply the FEIN.

17  BY MS. PRATSINAKIS:

18     Q.    So you've never requested a 1099 form from

19  a restaurant?

20     MR. CARLSON:  I object to form.  Do you mean her

21  personally?

22  BY MS. PRATSINAKIS:

23     Q.    I'm sorry.  I mean your department in

24  setting up accounts doesn't request 1099 forms?

Confidential - Marielle Kokos

1    A.    For my departments specifically, we do not

2  set up accounts.  That would be the sales department.

3    Q.    Oh, I'm sorry.  I thought Kevin O'Malley

4  was -- you -- you managed him, and he was in the sales

5  department?

6    A.    No.

7    Q.    Okay.  Thanks for clarifying.

8         So is it Grubhub's regular practice to

9  track restaurants' use and activities on Grubhub for

10 Restaurants?

11   MR. CARLSON:  Form.

12 BY THE WITNESS:

13   A.    It is not a regular practice that we would

14 be constantly looking into, but we have a database

15 that tracks activities on the website in case a

16 mistake were to be made we could always go back and

17 fix things.

18 BY MS. PRATSINAKIS:

Confidential- Marielle Kokos

8    BY MS. PRATSINAKIS:

9        Q.    Is there someone at your company who would

10   know the answer to that?

11       MR. CARLSON:  Object to form, scope.

12   BY THE WITNESS:

13       A.    There could be someone in the -- the tech

14   department that would know that.

15   BY MS. PRATSINAKIS:

16       Q.    Would Michael Young know the answer to

17   that?

18       A.    He could very possibly be someone that

19   knows the answer to that.

20       Q.    So, you testified earlier that it is not a

21   regular practice of Grubhub to track specific account

22   use, is that correct?

23       MR. CARLSON:  Object to form.

24   BY THE WITNESS:

Confidential - Marielle Kokos

 1      A.    That is correct.

 2    BY MS. PRATSINAKIS:

 ▮        ▮        ███████████████████████████

 ▮    ████████████████████████████████████████

 ▮    ██████████

 ▮        ▮        ███████████████████████████

 ▮    ██████████

 ▮        ▮        ████████████████████████

 ▮        ▮        ███████████

10      Q.    Okay.  I'd like to turn to your first

11    declaration in this matter of March 6th, 2019.

12      MS. PRATSINAKIS:  Pass this out.

13    BY MS. PRATSINAKIS:

14      Q.    We are going to mark one as an

15    exhibit just to have, but you are free to use the one

16    you brought with you.

17      MS. PRATSINAKIS:  I'd like to mark this as Kokos

18    Exhibit 4.

19      MR. CARLSON:  I think it might be 5.

20      MS. PRATSINAKIS:  Court reporter, are we on 5?

21      THE COURT REPORTER:  Yes.

22      MS. PRATSINAKIS:  Okay.  Thank you.

23      MR. CARLSON:  I'm here to help.

24                  (WHEREUPON, a certain document was

```
 1              marked Kokos Deposition Exhibit

 2              No. 5, for identification, as of

 3              05/28/2019.)

 4  BY MS. PRATSINAKIS:

 5      Q.   So if you can turn -- well, let me ask.

 6  Do you have a Bates numbered copy in front of you?

 7              Are there numbers on the lower right?

 8      A.   No.

 9      Q.   Okay.  So we -- we should probably use

10  that one then.

11      A.   That's fine.

12      Q.   It will probably be easier.

13              But I'm going to direct your attention

14  first to Grubhub 1456.

15              Take a look at that document and let me

16  know when you are ready to proceed.

17      A.   Yes, I am ready.

18      Q.   Okay.  And can you tell me what this

19  document is?

20      A.   Sure.  This is the signup form for Tiffin

21  Indian Mount Airy.  It was signed up by Jason Bartlett

22  who was the sales rep.

23      Q.   And on what date was this document signed?

24      A.   Um, it is 4/26/2011.
```

1          Oh, excuse me.  4/21/2011, they had such

2    an activation date of 4/26.

3          Q.    It is a little bit difficult to read,

4    isn't it?

5          MR. CARLSON:  Object to form.

6    BY THE WITNESS:

7          A.    No, I don't believe so.

8    BY MS. PRATSINAKIS:

9          Q.    Okay.

10         A.    I just didn't read that sentence.

11         Q.    Okay.  So do you want to -- okay.  So

12   let's use this version.  It's -- if you find it

13   legible, I'm happy to use this version.

14              Are you familiar with the terms in this

15   contract?

16         A.    Yes, I am familiar with the terms.

17         Q.    And anywhere in this document is there an

18   arbitration clause?

19         A.    There isn't --

20         MR. CARLSON:  Object to form.

21   BY THE WITNESS:

22         A.    There is not an arbitration clause in this

23   specific 2011 signup.

24   BY MS. PRATSINAKIS:

1    Q.    If you could turn to Grubhub 1458.  Take a

2 moment to look at the document, let me know when you

3 are ready to proceed.

4    A.    Yes, I am ready.

5    Q.    Can you read for me the third bullet point

6 on -- in the middle of the page.

7    A.    The third bullet point down begins with:

8         "I agreed to pay the advertising fee

9 circled," I believe "above," and that is as far as I

10 can read on that third bullet point.

11    Q.    So would you agree that this signup form

12 is illegible?

13    MR. CARLSON:  Object to form.

14 BY THE WITNESS:

15    A.    This signup form specifically is a scanned

16 copy of what was used on the date that it was signed

17 up, so I believe that this is a bit illegible because

18 of the version that we have scanned into our file

19 server.

20    Q.    And is the quality of this signup form of

21 similar quality as the one we just looked at,

22 Grubhub 1456?

23    MR. CARLSON:  Object to form.

24 BY THE WITNESS:

```
1        A.    They are both scanned copies.  You can

2   also see above that Jason Bartlett, the sales rep,

3   wrote in answers and was physically in the restaurant

4   himself.  So I do believe that they were much easier

5   to read in person and our scanning capabilities in

6   2011 were not great.

7   BY MS. PRATSINAKIS:

8        Q.    See, but I can see Jason's name clearly in

9   all -- sorry -- in all his markings.  What I can't see

10  is the form itself.

11             Do you see that?

12       MR. CARLSON:  Object to form.

13  BY THE WITNESS:

14       A.    I can see that, but Jason's name is also

15  much larger than the form font itself.

16  BY MS. PRATSINAKIS:

17       Q.    Okay.  So in -- are you testifying that

18  you know one way or the other if the quality of the

19  copy presented to the restaurant in 2011 was of this

20  quality or are you testifying that it was better?

21       MR. CARLSON:  Object to form.

22  BY MS. PRATSINAKIS:

23       Q.    Or do you know one way or the other?

24       MR. CARLSON:  Objection.
```

1   BY THE WITNESS:

2       A.    I was not at the company in 2011.  I can

3   tell you that I -- I've seen versions of this specific

4   contract that were handed to a restaurant to write in

5   answers and sign up and I know that they were clear.

6   I also know that the scanned in versions become a

7   little blurry.

8   BY MS. PRATSINAKIS:

9       Q.    Okay.  So you don't know one way or the

10  other if this blurry version was the one handed to

11  Tiffin Mount Airy for review and signature, correct?

12      MR. CARLSON:  Object to form, mischaracterizes

13  the testimony.

14  BY THE WITNESS:

15      A.    Correct.  I was not there in person.

16  BY MS. PRATSINAKIS:

17      Q.    Okay.  And with respect to Grubhub 1458,

18  that's the contract between Grubhub and Tiffin Elkins

19  Park.

20          You don't know one way or the other if

21  this blurry version was the version that was provided

22  to the restaurant when they signed up one way or the

23  other, correct?

24      MR. CARLSON:  Object to form.

Confidential - Marielle Kokos

```
 1   BY THE WITNESS:

 2       A.    Correct.  I was not there in person.

 3   BY MS. PRATSINAKIS:

 4       Q.    Is Jason still at Grubhub?

 5       A.    No, Jason is not at Grubhub still.

 6       Q.    And do we know which Jason we are

 7   referring to?

 8       A.    His name was Jason Bartlett.

 9       Q.    Bartlett.

10             And when did he leave Grubhub?

11       A.    I honestly cannot say.  He was on the

12   sales team.

13       Q.    Did you look through Jason's files in --

14   to search for a better copy of either one of the

15   contracts?

16       MR. CARLSON:  Object to form.

17             Her personally -- she -- her personally?

18   BY MS. PRATSINAKIS:

19       Q.    Did someone at Grubhub to your knowledge

20   look through Jason's files to determine if there was a

21   better copy available?

22       MR. CARLSON:  Object to form.

23   BY THE WITNESS:

24       A.    The copies we have are the ones that are
```

1    scanned in to our file server.

2    BY MS. PRATSINAKIS:

3        Q.    Did anyone look through Jason's files to

4    see if there was a better copy?

5        MR. CARLSON:  Object to form.

6    BY THE WITNESS:

7        A.    There are no specific Jason files.  Every

8    contract that's been submitted by a sales rep is

9    scanned into a file server and saved that way.

10   BY MS. PRATSINAKIS:

11       Q.    Okay.  So, to your knowledge, no one

12   actually went to find a hard copy file that belonged

13   to Jason to search that, is that correct?

14       MR. CARLSON:  Object to form, mischaracterizes

15   testimony.  And asked and answered.

16   BY MS. PRATSINAKIS:

17       Q.    Can you answer the question?

18       A.    The file copies we have available at

19   Grubhub are scanned copies, like this one, that is

20   saved on a file server.

21       Q.    Can you turn your attention to

22   Grubhub 1459.

23       A.    Yes.

24       Q.    Can you tell me what this document is?

1    A.    This is an additional page to the signup

2  where we would build a specific, what we used to call

3  as nitrosite but a -- a website that helps with SEO

4  function for the restaurant.

5              (Reporter clarification.)

6  BY THE WITNESS:

7    A.    That helps with SEO function for the

8  website.

9  BY MS. PRATSINAKIS:

10    Q.    And when was this contract between Tiffin

11  Elkins Park and Grubhub signed?

12    A.    On April 21st of 2011.

13    Q.    And is there an arbitration clause set

14  forth in the terms of this agreement?

15    MR. CARLSON:  Object to form.

16  BY THE WITNESS:

17    A.    This specific agreement does not have an

18  arbitration clause listed on it.

19  BY MS. PRATSINAKIS:

20    Q.    And going back to Grubhub 1458, the signup

21  form between Grubhub and Elkins Park, is there an

22  arbitration clause anywhere within this agreement?

23    MR. CARLSON:  Object to form.

24  BY THE WITNESS:

Confidential - Marielle Kokos

```
 1       A.      This specific agreement does not have an

 2   arbitration clause listed on it.

 3   BY MS. PRATSINAKIS:

 4       Q.      Since these three contracts are a little

 5   difficult to read, we are going to go to Exhibit C

 6   attached to your declaration, that's Grubhub 1461

 7   through Grubhub 1464.  So I'm going to start with the

 8   first agreement with Mount Airy.

 9               Was there a URL reference in this

10   contract?

11       A.      There was.  If you look at the

12   third-to-the-last bullet, it says:  "Please see

13   Grubhub's terms of use at www.Grubhub.com/legal."

14       Q.      So "/legal," correct?

15       A.      Correct.

16       Q.      And how about in the next contract, is

17   there a specific URL that's referenced?

18       A.      Yes.  It would be the same URL.  It is in

19   the last bullet that says:

20               "Please see Grubhub's website at

21   www.Grubhub.com/legal.  The terms and conditions are

22   subject to change by Grubhub upon 30 days' advance

23   notice.  After notice and the expiration of 30 days, I

24   acknowledge that continuing participation and receipt
```

```
1    of orders shall bind my restaurant to any new terms

2    and conditions."

3          MS. PRATSINAKIS:  Okay.  I'd like to mark as

4    Kokos, wait, 6.

5                    (WHEREUPON, a certain document was

6                     marked Kokos Deposition Exhibit

7                     No. 6, for identification, as of

8                     05/28/2019.)

9    BY MS. PRATSINAKIS:

10         Q.    Take a moment to look at this document and

11   let me know when you are ready.

12         A.    Yes, I'm ready.

13         Q.    So I'm -- the document that I provided to

14   you is a snapshot taken from the Wayback Machine of

15   the URL Grubhub.com/legal taken on February 21st,

16   2011.

17               Do you agree?

18         MR. CARLSON:  Object.  Object to form.

19   BY THE WITNESS:

20         A.    I agree.

21   BY MS. PRATSINAKIS:

22         Q.    And you've now looked at every single

23   page of this document.

24               Were you able to find an arbitration
```

Confidential - Marielle Kokos

1    clause in this document?

2         A.    In this 2011 version of our terms of use

3    there is not a specific arbitration clause.

4         Q.    To your knowledge, have the terms and

5    conditions located at Grubhub.com/legal ever included

6    an arbitration clause?

7         A.    Yes.  They currently include an

8    arbitration clause.

9         Q.    Did they include an arbitration clause in

10   2016?

11        A.    It does include a link to our terms of use

12   which has an arbitration clause.

13        Q.    My question is:  Do any of the terms and

14   conditions set forth at the URL Grubhub.com/legal in

15   2016 include an arbitration clause?

16        MR. CARLSON:  Object to form, asked and

17   answered.

18   BY THE WITNESS:

19        A.    The Grubhub.com/legal URL clicks to our

20   privacy policy as of 2016, which then also has an URL

21   to our terms of use that would have the arbitration

22   clause in it.

23   BY MS. PRATSINAKIS:

24        Q.    But that's not in the content of the terms

```
 1    and conditions on that URL, correct?

 2         MR. CARLSON:  Object to form, asked and

 3    answered.

 4    BY THE WITNESS:

 5         A.    I would say it is in the content because

 6    there is a link to it directly in Grubhub.com/legal.

 7    BY MS. PRATSINAKIS:

 8         Q.    Okay.  So other than the tiny link on the

 9    bottom right-hand side of the screen, is there any

10    discussion in the 2016 version of the terms and

11    conditions at Grubhub.com/legal that references

12    arbitration?

13         MR. CARLSON:  Object to form.

14    BY THE WITNESS:

15         A.    The link within Grubhub.com/legal has a

16    link to our terms of use and that would be where the

17    arbitration clause is located.

18    BY MS. PRATSINAKIS:

19         Q.    But your --

20         MS. PRATSINAKIS:  Strike that answer.

21    BY MS. PRATSINAKIS:

22         Q.    You need to answer my question, which is:

23              In the terms and conditions set forth at

24    Grubhub.com/legal in 2016, did any of those terms and
```

1    conditions within the four corners of the words "the

2    terms and conditions" on that URL specifically, did

3    they contain an arbitration clause?

4         MR. CARLSON:  Object to form, she did answer

5    your question, asked and answered.

6    BY THE WITNESS:

7         A.    The "/legal" website that you are

8    referring to contains our privacy policy.  Within the

9    privacy policy there is a link to our terms and

10   conditions and that is where the arbitration clause is

11   located.

12   BY MS. PRATSINAKIS:

13        Q.    But, again, I'm asking you specifically

14   about the terms and conditions set forth at

15   Grubhub.com/legal, is the word "arbitration"

16   anywhere --

17             You know what, strike that.  I'm going to

18   show you a copy.  Exhibit -- Kokos Exhibit 7.

19             (WHEREUPON, a certain document was

20             marked Kokos Deposition Exhibit

21             No. 7, for identification, as of

22             05/28/2019.)

23        THE WITNESS:  Thank you.

24   BY MS. PRATSINAKIS:

Confidential - Marielle Kokos

1    Q.    So I'm representing to you that this is

2    the terms and conditions set forth at Grubhub.com/ --

3    /legal as of December 30th, 2016 and this was taken

4    from the Wayback Machine.

5              Is that correct?

6         A.    Yes, it is taken from the Wayback Machine

7    on December 30th.

8         MR. CARLSON:  Object to form.  Sorry.

9    BY MS. PRATSINAKIS:

10        Q.    So this is a depiction of the terms and

11   conditions at Grubhub.com/ -- /legal on

12   December 30th, 2016, is that correct?

13        MR. CARLSON:  Object to form.

14   BY THE WITNESS:

15        A.    Yes, that is correct.

16   BY MS. PRATSINAKIS:

17        Q.    Does the word "arbitration" appear in this

18   document?

19        MR. CARLSON:  Object to form.

20   BY THE WITNESS:

21        A.    The word "arbitration" does not appear in

22   this specific document.

23   BY MS. PRATSINAKIS:

24        Q.    And so earlier you were testifying that

Confidential - Marielle Kokos

1  there is a link to your terms of use.  Can we count

2  how many pages into this content you would have to go

3  to find that link that you testified about?

4      MR. CARLSON:  Object to form.  The document

5  speaks for itself.

6  BY THE WITNESS:

7      A.    It is towards the back.

8  BY MS. PRATSINAKIS:

9      Q.    And how many pages down would that be?

10     MR. CARLSON:  Object to form.  It is a printed

11 document, a printed version of a website.  It is not a

12 representation of the website, so I don't think that's

13 really a question that makes any sense.

14          Answer it if you can.

15 BY MS. PRATSINAKIS:

16     Q.    In the printout of the URL

17 Grubhub.com/legal taken as a snapshot from

18 December 30th, 2016, how many pages into this printout

19 does one need to go to find the link you were

20 referring to earlier?

21          So it is one, two, three, four, five, six,

22 it is at the bottom of the sixth page, is that

23 correct?

24     A.    It is at the bottom of the sixth page in

1  this document, yes.

2      Q.    And so just to recap, the word

3  "arbitration" does not appear in any of the three

4  contracts with Tiffin and does not appear -- excuse

5  me -- Tiffin Elkins Park and Mount Airy, and does not

6  appear at the URL Grubhub.com/legal, is that correct?

7      MR. CARLSON:  Object to form, asked and

8  answered.

9  BY THE WITNESS:

10     A.    That is correct.  The link that is

11  provided is the Grubhub.com/legal link that takes you

12  to our privacy policy as well as the terms of use on

13  the bottom of our printed out version of Page 6.

14     MS. PRATSINAKIS:  I'd like to mark as Kokos

15  Exhibit 8.

16              (WHEREUPON, a certain document was

17              marked Kokos Deposition Exhibit

18              No. 8, for identification, as of

19              05/28/2019.)

20  BY MS. PRATSINAKIS:

21     Q.    This document, it's a privacy policy

22  located at the URL Grubhub.com/legal and it has an

23  effective date of June 4th, 2018, is that correct?

24     A.    Yes, that is correct.

Confidential - Marielle Kokos

```
 1      Q.    Does the word "arbitration" appear

 2  anywhere in this document?

 3      MR. CARLSON:  Object to form.

 4  BY THE WITNESS:

 5      A.    This specific document contains our

 6  privacy policy, which would not have the word

 7  "arbitration" in it, but there is a link to our terms

 8  of use where the arbitration clause is located.

 9  BY MS. PRATSINAKIS:

10      Q.    So to confirm, the word "arbitration" does

11  not appear in the terms and conditions at this URL

12  Grubhub.com/legal, correct?

13      MR. CARLSON:  Object -- object to form, asked

14  and answered.

15  BY THE WITNESS:

16      A.    That is correct, in our privacy policy

17  listed here it does not say the word "arbitration."

18  It would say it in the link provided in the second

19  paragraph.

20  BY MS. PRATSINAKIS:

21      Q.    When did Grubhub add this link to its

22  terms of use in the second paragraph of its privacy

23  policy?

24      A.    We added the link in the second paragraph
```

Confidential - Marielle Kokos

1    in June of -- 4th of 2018.

2        Q.    So if I were a diner going onto your diner

3    website, Grubhub.com and went to Grubhub.com/legal, I

4    would see this second paragraph in this document on

5    June 4th, 2018?

6        A.    That is correct.

7        Q.    What about prior to June 4th, 2018, was

8    this link referenced in the second paragraph available

9    prior to then in the second paragraph of this privacy

10   policy?

11       A.    No, it was not located in the second

12   paragraph.

13       Q.    Okay.  So as before, it was just at the

14   very bottom right-hand side of the Grubhub.com/legal

15   website, correct?

16       A.    Before 2000 -- or excuse me.

17             Before June 4th, 2018, it was located in

18   the privacy policy at the end of the document.

19       Q.    If you could just set this document to the

20   side for now.

21             When restaurants enter into contracts with

22   Grubhub for services, is it Grubhub's practice to

23   collect contact information from the restaurants?

24       A.    Yes, that is correct.

1      Q.    And so what kind of contact information

2  does Grubhub have with respect to each of the

3  restaurants with whom it does business?

4      A.    On our contracts we would collect the

5  owner/manager, as in the primary contact, for that

6  restaurant, and then they are able to list a secondary

7  contact as well.

8      Q.    And so does Grubhub collect the e-mails of

9  the primary and secondary contact?

10     A.    We would collect the phone number and

11  e-mail if provided by the restaurant.

12     Q.    Does Grubhub request the e-mail from the

13  restaurant?

14     A.    If the restaurant has one available, we

15  would ask for it, but it is up to their discretion to

16  provide it.

17     Q.    And so of the more than 100,000

18  restaurants that Grubhub does business with, about how

19  many of those have provided e-mails?

20     A.    I would not be able to say how many

21  specifically have offered e-mails at this time.

22     Q.    Okay.  When you send e-mails out to

23  restaurants in the scope of your job, do you have any

24  metrics on how many e-mails go out?

Confidential - Marielle Kokos

```
 1          MR. CARLSON:  Object to form.

 2   BY THE WITNESS:

 3      A.    When my team specifically sends e-mails,

 4   we have a website that's able to help us track how

 5   many are sent and how many are clicked on.

 6   BY MS. PRATSINAKIS:

 7      Q.    And do you have a recollection of -- of

 8   how many e-mails are sent to your distribution list?

 9      A.    I would not have any idea of how many

10   e-mails have been sent over six years.

11      Q.    I'm sorry.  I mean recipients, how many

12   recipients you have on your distribution list.

13      A.    Oh, I do not know specifically how many

14   e-mail addresses we have.  Some restaurants have

15   multiple contacts and multiple e-mails that they have

16   given us.

17      Q.    So it could be hundreds of thousands of

18   e-mails?

19      A.    It could be, yes.

20      Q.    Okay.  And does Grubhub collect the

21   mailing address for each of the restaurants with whom

22   it contracts?

23      A.    We would collect the restaurant's physical

24   address as well as a corporate entity address.
```

1    Q.    And does Grubhub collect fax numbers for

2    the restaurants with which it does business?

3    A.    If the restaurant has a fax number that

4    they are willing to give us, it could be something we

5    collect.

6    Q.    Okay.  Is it Grubhub's general practice to

7    notify restaurants of changes to its food ordering

8    system?

9    A.    I believe it -- it depends on what the

10   change is.  We are constantly testing our website, so

11   it would be tough to give every single change.

12   Q.    So say a major change is made to the

13   system, does Grubhub have a practice of notifying its

14   restaurants?

15   MR. CARLSON:  Object to form.

16   BY THE WITNESS:

17   A.    It is -- it's not my decision of -- of who

18   and when we make those notifications to restaurants.

19   That would be more of our executive level team, but we

20   do not always give notice, that is, something has

21   changed.

22   BY MS. PRATSINAKIS:

23   Q.    But Grubhub has sent e-mail notifications,

24   has it not, to its restaurants when there was an

```
 1   important upgrade made?

 2        MR. CARLSON:  Object to form.

 3   BY THE WITNESS:

 4        A.    We have sent notices of changes or

 5   enhancements to the website in the past, yes, but I --

 6   I cannot say that those are -- it's every single

 7   change.

 8   BY MS. PRATSINAKIS:

 9        Q.    And the primary mode of notifying

10   restaurants of these enhancements and changes, is that

11   by e-mail?

12        MR. CARLSON:  Object to form.

13   BY THE WITNESS:

14        A.    No, it -- it is not only by e-mail.  I

15   would say if an e-mail was warranted, an e-mail was

16   sent.  We also communicate with restaurants via

17   banners and popups and things that maybe they will be

18   right in their face to help -- help us with

19   communicating.

20   BY MS. PRATSINAKIS:

21        Q.    So your primary method of communication

22   with restaurants you're saying is not by e-mail?

23        A.    I don't think our primary use of

24   communicating with restaurants is by e-mail.  I think
```

1   we have to have a variety of different ways to

2   communicate with restaurants because they meet us in

3   different places.  They -- they are busy owners and we

4   have to find the best way to communicate with them.

5       Q.   Okay.  So what is the best way to

6   communicate with the restaurants?

7       A.   I think each restaurant is different and

8   we have -- that's why we have a variety of different

9   ways to communicate with them because each restaurant

10   owner and staff are very different.

11       Q.   So when you're seeking to drive revenue

12   for the company by offering additional services to

13   restaurants, you do a popup?

14       A.   Sometimes we have, yes.

15       Q.   Okay.  And when was that popup?

16   MR. CARLSON:  Object to form.

17   BY MS. PRATSINAKIS:

18       Q.   Do you recall when you've done a popup --

19       A.   I --

20       Q.   -- campaign?

21       A.   -- recall when we've done popups topics,

22   but on specific dates, I would not be able to remember

23   that.

24       Q.   And where was this popup of -- of -- that

```
 1   you recall?

 2       MR. CARLSON:  Object to form.

 3   BY THE WITNESS:

 4       A.   We have done popups within Grubhub for

 5   Restaurants.

 6   BY MS. PRATSINAKIS:

 7       Q.   You have.

 8            So you have the ability to --

 9       MR. CARLSON:  Wait, wait.

10   BY MS. PRATSINAKIS:

11       Q.   -- do a popup on Grubhub for Restaurants?

12       A.   Recently, yes, we have the ability to do

13   popups.

14       Q.   Oh, I'm sorry.  When were your marketing

15   service popups, around what time did you initiate

16   those popup campaigns for your marketing services?

17       MR. CARLSON:  Object to form.

18   BY THE WITNESS:

19       A.   I would say probably within the last,

20   like, six to 12 months.

21   BY MS. PRATSINAKIS:

22       Q.   Okay.  So prior to the last six to

23   12 months, what was the primary way that Grubhub

24   communicated with restaurants?
```

Confidential - Marielle Kokos

```
 1        MR. CARLSON:  Object to form, asked and

 2   answered.

 3   BY THE WITNESS:

 4        A.    Again, depending on the topic, we would

 5   communicate with them a variety of different ways.

 6   BY MS. PRATSINAKIS:

 7        Q.    Okay.  Let's go through them.

 8              So first method?

 9        A.    As you mentioned, we have e-mail.

10        Q.    Second method?

11        A.    We have the telephone.

12        Q.    Third method?

13        A.    Snail mail.

14        Q.    Any other methods?

15        A.    We've done banners on our website.

16        Q.    And when you say "website," what website

17   are you referring to?

18        A.    Grubhub.com.

19              We've also done popups within our mobile

20   app and on Grubhub.com.

21        Q.    So on Restaurants.Grubhub.com have you

22   ever done a banner?

23        A.    We have done a banner.

24        Q.    In the last six to 12 months?
```

 1      A.    I cannot specifically recall the last time

 2 we've done a banner.

 3      Q.    So it's been a while?

 4      MR. CARLSON:  Object to form.

 5 BY THE WITNESS:

 6      A.    I'm not -- I can't answer that.  I don't

 7 know the specific date of when we've done a banner.

 8 BY MS. PRATSINAKIS:

 9      Q.    How -- do you recall if you've ever in

10 your position as Director of Restaurant Success, did

11 you -- have you ever done a -- a banner ad on the

12 GrubCentral.com website?

13      A.    Not to my knowledge of when it was branded

14 as GrubCentral.

15      Q.    Do you recall whether you've ever done a

16 banner advertisement at -- when GrubCentral rebranded

17 to Grubhub for Restaurants?

18      A.    We have done a banner before on

19 Restaurant.Grubhub.com.

20      Q.    So it had to be at least since

21 January 2018 after the rebranding, correct?

22      A.    Sure.  Yes, that's correct.

23      Q.    Okay.  So you communicate with restaurants

24 through e-mails, telephone, snail mail and from time

1    to time banners and popups, is that correct?

2         A.    That would be correct.

3         Q.    Okay.  Have you ever used any of those

4    methods, let's go with -- let's start with e-mails.

5              Have you ever used e-mail to communicate

6    Grubhub's desire to enter into an arbitration

7    agreement?

8         MR. CARLSON:  Object to form.

9    BY MS. PRATSINAKIS:

10        Q.    To restaurants?

11        A.    We have not used an e-mail.

12        Q.    And have you ever used the telephone and

13   told your team to call all restaurants and let them

14   know that Grubhub wants an arbitration agreement?

15        MR. CARLSON:  Object to form.

16   BY THE WITNESS:

17        A.    We have not used the telephone.

18   BY MS. PRATSINAKIS:

19        Q.    So no e-mail campaigns, no telephone

20   campaigns.

21              How about mail campaigns, have you sent

22   out mailers to the restaurants identifying that

23   Grubhub would like to enter into an arbitration

24   clause -- agreement?

```
1          MR. CARLSON:  Object to form.

2     BY THE WITNESS:

3          A.    We have not used the mailers.

4     BY MS. PRATSINAKIS:

5          Q.    Okay.  Is it Grubhub's general practice to

6     notify restaurants of changes to contracts with

7     restaurants?

8          MR. CARLSON:  Object to form.

9     BY THE WITNESS:

10         A.    The restaurants' contracts, the ones that

11    in 2011, as well as the most recent ones now, are --

12    are essentially serving as notice when you are signing

13    up with -- with Grubhub.  So we are asking within

14    those contracts that you are checking back on the

15    terms of use occasionally.

16    BY MS. PRATSINAKIS:

17         Q.    The -- so the terms at the specific URL

18    Grubhub.com/legal, is that correct?

19         A.    When you are reading that URL, you are

20    able to see that there is a specific terms of use

21    link.

22         Q.    Have you ever delivered a direct notice to

23    each of your restaurant clients letting them know that

24    Grubhub wants to enter into an arbitration agreement?
```

```
 1         MR. CARLSON:  Object to form.

 2    BY THE WITNESS:

 3         A.    We have not individually delivered a

 4    notice.  We don't feel that we need to.  There is a

 5    link on the contracts that these restaurants have

 6    signed with us that gives them notice that they can

 7    check the terms of use.

 8    BY MS. PRATSINAKIS:

 9         Q.    So you don't need to notify restaurants of

10    the fact that you want to arbitrate with them?

11              Strike that question.

12              So -- so Grubhub's policy is that it

13    doesn't feel that it -- it needs to notify restaurants

14    directly of its desire to arbitrate with them, is that

15    correct?

16         MR. CARLSON:  Object -- object to form.

17    BY THE WITNESS:

18         A.    Again, the companies that are working with

19    us are working with a digital online platform for

20    ordering.  There is a website that's provided to them

21    within their contracts as well as on Grubhub.com as

22    well as in Restaurants.Grubhub.com that have the terms

23    of use available to them.  And one of the advantages

24    to the restaurant is they don't actually have to
```

1    continue working with us if they don't -- they don't

2    want to.  They can read those terms of use and decide

3    how they want to proceed.

4        MS. PRATSINAKIS:  I'd like to mark as Kokos

5    Exhibit 9 --

6        MR. CARLSON:  I don't know where you are headed.

7    But if you've been moving on, we've been going for

8    about 65 minutes.  Can we take a break?

9        MS. PRATSINAKIS:  Why don't we continue on one

10    more exhibit and then we'll break.

11        MR. CARLSON:  Well, let me just ask the witness.

12            Are you okay to go one more?

13        THE WITNESS:  Yes, that's fine.

14                (WHEREUPON, a certain document was

15                 marked Kokos Deposition Exhibit

16                 No. 9, for identification, as of

17                 05/28/2019.)

18    BY MS. PRATSINAKIS:

19        Q.    So what I'm showing you is what's marked

20    "Important Update."  It is dated 2/12/2019.  It was

21    sent by Grubhub to its restaurants, including

22    Marianne@Tiffin.com.

23            Is all that accurate?

24        A.    Yes, I see that at the top.

1      Q.    Okay.

2      MR. CARLSON:  Counsel, this doesn't have a Bates

3   on it.

4          Do you know where this came from?

5      MS. PRATSINAKIS:  This is Exhibit No., I

6   believe, 3 of the Marianne --

7      MR. CARLSON:  Okay.

8      MS. PRATSINAKIS:  -- Kelly declaration, filed

9   previously in this matter.

10     MR. CARLSON:  Okay.

11     MS. PRATSINAKIS:  But don't hold me to the

12   number because it's from memory.

13     MR. CARLSON:  But what you are representing is

14   the -- this is -- this was a --

15     MS. PRATSINAKIS:  Previous exhibit to a

16   declaration.

17     MR. CARLSON:  A declaration, okay.

18   BY MS. PRATSINAKIS:

19     Q.    So my first question is:  Why would

20   Grubhub feel the need to send this type of update

21   given that it's a website and one of the advantages to

22   the restaurant is that they don't actually have to

23   keep working with us if they don't want to, they can

24   read these terms and decide how they want to proceed

```
 1    and they can just go onto a website to get

 2    information?

 3         MR. CARLSON:  Object to form.

 4         MS. PRATSINAKIS:  That was a bad question.  I'm

 5    going to strike it.

 6    BY MS. PRATSINAKIS:

 7         Q.   Why was Grubhub compelled to send this

 8    important update to restaurants --

 9         MR. CARLSON:  Object to form.

10    BY MS. PRATSINAKIS:

11         Q.   -- but not --

12         MR. CARLSON:  I'm sorry.

13    BY MS. PRATSINAKIS:

14         Q.   -- feel the need to send a notice that

15    Grubhub wanted to arbitrate with restaurants?

16         MR. CARLSON:  Object to form.

17    BY THE WITNESS:

18         A.   This specific update was discussed with

19    our legal team and our care team to decide what and

20    how we wanted to communicate a policy change for

21    failed orders.

22    BY MS. PRATSINAKIS:

23         Q.   Well, what made a policy change on failed

24    orders more necessary to directly communicate to
```

1  restaurants than a request by Grubhub to arbitrate

2  claims?

3      MR. CARLSON:  Object to form.

4  BY THE WITNESS:

5      A.   I would not be able to -- to speak on what

6  made this more or less important to anything.  This

7  was just a -- a decision made by our legal team and

8  our care team.

9  BY MS. PRATSINAKIS:

10     Q.   Okay.  And were you part of any

11 discussions on whether a direct notice about a request

12 by Grubhub to arbitrate its claims with restaurants

13 should be sent?

14     MR. CARLSON:  And in answering that question, I

15 instruct you not to reveal any privileged information.

16 BY MS. PRATSINAKIS:

17     Q.   Well, let -- let's start with did you have

18 a conversation about that, without going into the

19 contents of that conversation, did -- did you ask the

20 legal department or others at your firm about whether

21 to send a notice about Grubhub's desire to arbitrate

22 its disputes with restaurants?

23     A.   I personally was not involved in a

24 conversation around that.  Our legal team would have

1    been working on that.

2        Q.    Who on your legal team supports your --

3    your team?

4        A.    Specifically to date, it would be Katie

5    Armistead who is in the room with us and a woman named

6    Nina Sobierajski -- Katie, correct me if that's really

7    her last name, I can't pronounce it correctly -- and

8    then there is a woman named Kathleen Perrell that

9    would work with us today.

10        Q.    And so I'd like to draw your attention to

11    the third page of this document and it is a reflection

12    of an e-mail that Grubhub sent to its restaurants on

13    September 20th, 2017, and it was also sent to

14    Marianne@Tiffin.com.

15            And what was this notification about?

16        A.    This specific notification was about the

17    merger of Foodler and Grubhub.

18        Q.    And so why not just throw a banner out on

19    the diner website Grubhub.com to notify restaurants of

20    the Foodler merger?

21        A.    Not all of the restaurants that were on

22    Foodler.com were on Grubhub.com.  Those that were

23    would have been able to see that banner, but not all

24    of them were on Grubhub.com yet.

1      Q.    And so if you turn to the next page, it's

2   an e-mail dated March 6th, 2018, from Grubhub to its

3   restaurants including Marianne@Tiffin.com and the

4   title -- the subject of it is:  "Important Changes to

5   Your Orders and Payments."

6            You see that?

7      A.    I do see that.

8      Q.    And what was that e-mail about?

9      A.    This specific e-mail, again, is regarding

10  a merger with Eat24, a platform that -- another

11  platform that Tiffin was on and how they are merging

12  with Grubhub.

13     Q.    Okay.  If you could go to two pages over,

14  I'm looking at an e-mail from Grubhub to its

15  restaurants dated June 27, 2017, and it was sent to

16  all of its restaurants including Marianne@Tiffin.com

17  and the subject of that e-mail is:  "Manage your

18  orders better using these new features."

19            Do you see that?

20     A.    I do see that.

21     Q.    And what was this notification from

22  Grubhub about?

23     A.    It seems to be referring to changes that

24  we have made to the Grubhub for Restaurants where it's

1    new features added and teaching the restaurants how to

2    use them.  This would have been sent to only

3    restaurants that are using Grubhub for Restaurants.

4         Q.    So Grubhub has sent to review, Grubhub has

5    sent notification to all -- to all of its restaurants

6    about policy changes regarding failed orders, it has

7    sent notifications to all of its restaurants about

8    mergers with Foodler, and it has sent notifications

9    about new features on the Grubhub for Restaurants

10   system, is that correct?

11        MR. CARLSON:  Object to form.

12   BY THE WITNESS:

13        A.    That is what these e-mails are referring

14   to, yes, and they would have been sent to a specific

15   subset of restaurants that they applied to.

16   BY MS. PRATSINAKIS:

17        Q.    And so what do you mean by that?

18        A.    Well, you just keep saying all restaurants

19   and that's not the case.  They're send -- they would

20   have sent the Foodler e-mail to only restaurants that

21   were also on Foodler or Eat24.  And then, again, this

22   one that's about the updates to Grubhub for

23   Restaurants, it would have been sent to restaurants

24   that are actually using Grubhub for Restaurants.

1      Q.    So if a restaurant -- can a restaurant

2   contract for Grubhub services without signing up for

3   Grubhub for Restaurants?

4      A.    They are automatically given a login to

5   use the site, but they are not required to use the

6   site.  They could receive orders a different way.

7      Q.    Okay.  But still you -- you asked for

8   their e-mails, correct?

9      A.    Correct.  We would ask them to provide an

10  e-mail if they have one.

11     Q.    And so you -- you provide all restaurants

12  with an account, and so is it fair -- and you asked

13  all restaurants for your e-mail addresses, so is it

14  fair to assume when you send out this type of

15  notification you are trying to reach everyone or as

16  many people as you can that -- that contract --

17  restaurants that contract with Grubhub?

18     MR. CARLSON:  Object to form.

19  BY THE WITNESS:

20     A.    Yeah, we would be trying to reach

21  restaurants that are using Grubhub for Restaurants,

22  yes.

23  BY MS. PRATSINAKIS:

24     Q.    Okay.  On the next page it's an e-mail

1   notification sent by Grubhub to its restaurants that

2   are on Grubhub for Restaurants, dated June 12th, 2018,

3   and the recipient of this e-mail is

4   Marianne@Tiffin.com.

5           And can you tell me what this restaurant

6   notification is about?

7       A.    This e-mail is asking them to write down

8   their user name and password because we've made some

9   type of update to the tablet -- or to the website and

10  for that update to get pushed to the tablet the user

11  will have to be force logged out where they will need

12  to log back in.

13      Q.    Okay.  And the depiction here on the page,

14  is that a depiction of the Grubhub for Restaurants

15  login screen?

16      MR. CARLSON:  Object to form.

17  BY THE WITNESS:

18      A.    No.  This is just a portion of the login

19  screen.

20  BY MS. PRATSINAKIS:

21      Q.    Okay.  And what's missing?

22      A.    There is a copyright missing in the left

23  corner and on the bottom right corner there are links

24  to the terms of use and the privacy policy.

1      Q.    Okay.  So in this specific notification

2   sent to all restaurants that are on Grubhub for

3   Restaurants, you've provided a login screen but didn't

4   provide the terms of use link in this e-mail, is that

5   correct?

6      MR. CARLSON:  Object to form.

7   BY THE WITNESS:

8      A.    That is correct, the terms of use login

9   does not necessarily apply to what this e-mail is

10  trying to get them to do.

11  BY MS. PRATSINAKIS:

12     Q.    And so let me ask you, when you put in

13  your user name and your password and you click the box

14  "remember me," does that auto populate both of those

15  fields when you login to Grubhub for Restaurants?

16     A.    I believe it auto populates both fields

17  for the restaurant when you say "remember me" or you

18  would have to un-click it or log out for a new user to

19  log in.

20     Q.    So if a restaurant logs in, puts in their

21  password and clicks "remember me," then the next time

22  they login all they have to do is hit enter, they

23  don't have to sit there and type their information in,

24  is that correct?

Confidential - Marielle Kokos

1      A.    If it was the same user, that could be a

2  practice that they used.  If it's a different user,

3  they would log in with their different login.

4      Q.    Assuming there even it is a different user

5  for that restaurant, right?

6      A.    Every restaurant is different, yes.

7      Q.    Right.

8            So if it's auto populated and saved and it

9  is the same user, it would take all of what, a second

10  to enter the Grubhub for Restaurant platform?

11      A.    Yes.

12      Q.    Okay.  So the last communication in this

13  document is an all-restaurant e-mail sent to Grubhub

14  for Restaurant -- Grubhub for Restaurant members dated

15  July 18th, 2017, and what is the topic of this e-mail?

16      A.    This e-mail is specifically talking about

17  a rebrand.  GrubCentral previous used to be called "My

18  Account" and it was -- we were testing My Account

19  versus GrubCentral from a branding standpoint, so this

20  e-mail is simply saying that you are being switched

21  from that older platform to now the current Grubhub

22  for Restaurants platform.

23      Q.    And what is that a screen shot of?

24      MR. CARLSON:  Which part are you looking at?

Confidential - Marielle Kokos

```
 1    BY MS. PRATSINAKIS:

 2        Q.    I'm looking at the page, there is a

 3    picture of a screen, is that wrong?

 4        A.    Are you talking about the picture of the

 5    women and the man in the corner?

 6        Q.    I'm --

 7        A.    You are just holding a page in front of

 8    me.

 9        Q.    I'm sorry.

10        A.    Are you talking about this picture right

11    here?

12        Q.    This -- this to me looks like a screen

13    shot.  Am I wrong?

14        A.    Yeah, that's not a screen shot, no.

15        Q.    Okay.  So it's actually a --

16        A.    It is a marketing --

17        Q.    -- designed marketing e-mail?

18        A.    Yes.

19        Q.    Okay.  And there is a copyright date on

20    there, correct?

21        A.    Correct, yes.

22        Q.    And there is no terms of use link on

23    there, correct?

24        A.    Within this specific e-mail, no.
```

1     Q.    Do you recall if in any of your e-mail

2   notifications, the one that your group is personally

3   responsible for, if you ever notified restaurants of

4   the existence of terms of use?

5     MR. CARLSON:  Object to form.

6   BY THE WITNESS:

7     A.    My specific team would not be talking

8   about the terms of use.  They are listed in the

9   contract for the restaurants.

10  BY MS. PRATSINAKIS:

11    Q.    So to your knowledge has any other team at

12  Grubhub sent an e-mail notification alerting

13  restaurants to its terms of use?

14    MR. CARLSON:  Object to form.

15  BY THE WITNESS:

16    A.    To my specific knowledge, I can only speak

17  to my team.  The sales team are the ones that are

18  signing up the restaurants where they are going

19  through the contract with them.

20  BY MS. PRATSINAKIS:

21    Q.    But to your knowledge, such an e-mail does

22  not exist, is that correct?

23    MR. CARLSON:  Object to form, asked and

24  answered.

```
 1   BY THE WITNESS:

 2        A.    To my knowledge, I have not, nor has my

 3   department, sent an e-mail.  I cannot speak for other

 4   departments.

 5   BY MS. PRATSINAKIS:

 6        Q.    Well, in that -- in connection with the

 7   declaration you submitted to the court, did you search

 8   for such an e-mail?

 9        MR. CARLSON:  Object to form.

10   BY THE WITNESS:

11        A.    I am not aware of searching for a specific

12   e-mail in -- in any of the Grubhub e-mails that are

13   not my -- my department.

14   BY MS. PRATSINAKIS:

15        Q.    Well, who -- well, who at your corporation

16   would know the answer to that question?

17        A.    I'm not sure anyone specifically would

18   know the answer to that question unless we searched

19   all e-mails throughout Grubhub employees for that

20   specific topic.

21        Q.    But haven't you searched all G -- Grubhub

22   e-mails for the phrase "terms of use"?

23        MR. CARLSON:  Object to form.

24   BY THE WITNESS:
```

1    A.    We have searched all Grubhub e-mails in

2    relation to the Wayback Machine and Archive --

3    Archive.org.

4    Q.    But you didn't look in your own e-mails?

5    MR. CARLSON:  Object to form.  I don't think

6    this is within her scope to testify about the search

7    parameters and things we did for the production.  I

8    don't -- I think that's beyond the scope of what she

9    is prepared to testify about.

10   BY MS. PRATSINAKIS:

11   Q.    Do you know one way or the other if you

12   searched any e-mails for the phrase "terms of use"?

13   A.    I specifically did not search.

14   Q.    Are you aware of anyone else at your

15   company who did that search?

16   A.    I cannot give any answer of a name of

17   someone at our company that searched "terms of use."

18   Q.    So you don't know whether someone searched

19   the phrase "terms of use" in -- in Grubhub e-mails, is

20   that correct?

21   A.    Again, I didn't -- I did not specifically

22   and I do not know a name of a person that has done it

23   specifically.

24   Q.    Are you aware of the activity having taken

```
 1   place without specifically identifying a person?

 2       MR. CARLSON:  Object to form.

 3   BY THE WITNESS:

 4       A.    I cannot tell you that a specific action

 5   happened.  I -- I know that I can speak to me and --

 6   and what I did and I did not specifically search for

 7   an e-mail that.

 8   BY MS. PRATSINAKIS:

 9       Q.    So I'm going to try one final time and

10   I -- I swear we'll move off the topic.

11           But do you have any general awareness of

12   anyone at your company running a search for the phrase

13   "terms of use" in their -- in the Grubhub e-mail

14   accounts?

15       MR. CARLSON:  And again, I am going to object --

16   BY MS. PRATSINAKIS:

17       Q.    I understand that you personally did not

18   and I understand that you don't pers -- specifically

19   know anyone that did.  But are you generally aware if

20   that search was conducted?

21       MR. CARLSON:  I'm just going to object to the

22   scope.  I think this is outside of the topics which

23   may be why we were having this problem because it's a

24   matter of what the witness was prepped on and what she
```

Confidential - Marielle Kokos

```
 1   is aware of.

 2          So she can answer -- she can answer your

 3   question, but --

 4       MS. PRATSINAKIS:  Right.

 5       MR. CARLSON:  -- I think the reason you're -- we

 6   are getting confused is because of the scope question.

 7       MS. PRATSINAKIS:  Sure.

 8   BY THE WITNESS:

 9       A.    I mean, I believe I have answered the

10   question.  I am not aware of that specific action

11   taking place.

12   BY MS. PRATSINAKIS:

13       Q.    Okay.  Okay.

14       MR. CARLSON:  Can we take a break?

15       MS. PRATSINAKIS:  Yeah, that's fine.

16       THE VIDEOGRAPHER:  We are going off the record

17   at 12:09.

18              (WHEREUPON, a recess was had

19               from 12:09 to 12:24 p.m.)

20       THE VIDEOGRAPHER:  We are back on the record at

21   12:24.

22   BY MS. PRATSINAKIS:

23       Q.    Mr. Kokos, to your knowledge, is it

24   Grubhub's policy to amend contracts through terms on a
```

Confidential- Marielle Kokos

```
 1   website?

 2       MR. CARLSON:  Object to form.

 3   BY THE WITNESS:

 4       A.   To my knowledge we have different versions

 5   of our contracts over time and the link to

 6   Grubhub.com/legal is -- has always been in them.  So I

 7   guess I'm not sure what you mean by amend a contract.

 8   BY MS. PRATSINAKIS:

 9       Q.   So Grubhub has written contracts with each

10   of its restaurants, correct?

11       A.   Correct.

12       Q.   And that's a sign-up form or the website

13   form that we were looking at earlier, at Exhibit A

14   and B of your prior declaration, is that correct?

15       A.   There is a -- also a self service option

16   today where your restaurant can sign in on their own,

17   sign up for Grubhub on a website.

18       Q.   Okay.  But if you don't use that recently

19   available -- made available option, it would have been

20   you sign these contracts and that's how Grubhub would

21   contract with restaurants, correct?

22       A.   That is correct, yes.

23       Q.   And so the position of the company is that

24   it could post terms on a website, Grubhub.com, that's
```

1    used by diners to amend those written contracts, is

2    that correct?

3          MR. CARLSON:  Object to form.

4    BY THE WITNESS:

5          A.    The link to the terms of use on the

6    Grubhub.com website are there for diners and

7    restaurants.  There is also a link listed in the

8    contract terms and conditions where the restaurant can

9    find the terms of use.

10         MS. PRATSINAKIS:  This is not working.

11               Okay.  Okay.

12   BY MS. PRATSINAKIS:

13         Q.    But is it Grubhub's position that posting

14   links on a website alters the written contracts that

15   it entered with restaurants?

16         MR. CARLSON:  Object to form.

17   BY THE WITNESS:

18         A.    Our position is that the terms of use are

19   subject to change and we reserve the right to change

20   them and the restaurants have the ability to check

21   them in a variety of different places to see what has

22   been updated or changed.

23   BY MS. PRATSINAKIS:

24         Q.    And what do you mean by "a variety of

1    different places"?

2         A.    As you mentioned, there is a link to the

3    terms of use at the bottom of Grubhub.com, on a -- on

4    many different pages there, there is a link every

5    single page on Grubhub for Restaurants where you are

6    able to access the terms of use, and then there is

7    also a link within the contracts that the restaurants

8    sign that directs them to go to that website.  It asks

9    them to go to that website.

10        Q.    To the URL Grubhub.com/legal, is that

11   correct?

12        A.    Correct.

13        Q.    Okay.  So -- so is -- is it your -- is it

14   Grubhub's position that in order to amend a contract,

15   it can change the terms in any of these locations

16   and -- and -- and that will modify an express written

17   contract that's signed by both parties?

18        MR. CARLSON:  Objection; asked and answered.

19   BY THE WITNESS:

20        A.    Correct.  We have asked in the contracts

21   that the restaurants are physically signing, whether

22   that be self service and/or with a -- a hand contract,

23   a paper printed out contract, that they continuously

24   check back on the terms of use.

1              And then, again, as I mentioned previous,

2    their -- their contract with Grubhub is completely up

3    to them.  If they're -- they read the terms of use and

4    they don't like something that they see, they are

5    actually able to cancel their contract at any time.

6         Q.    So is that the only way that Grubhub

7    amends existing restaurant contracts?

8         A.    The only other thing we would do as far as

9    a contract would go would be, let's say a restaurant

10   was sold to another owner where we would ask for a new

11   contract for that restaurant.

12        Q.    And so Grubhub has never asked its

13   SalesForce to approach existing restaurants who have

14   previously contracted with Grubhub and invited them or

15   incentivized them in some way to sign a modified

16   contract?

17        MR. CARLSON:  Object to form.

18   BY THE WITNESS:

19        A.    For restaurants that are currently signed

20   with Grubhub on a Grubhub contract, there has been no

21   reason to go back and ask them for a new contract as

22   the -- the contracts state that the terms of use can

23   adjust.

24   BY MS. PRATSINAKIS:

1        Q.    So -- so, can you turn to -- back to your

2   declaration, if you can go, please, to -- that's

3   Exhibit No. 5.  And I'd like you to turn to

4   Grubhub 1469, and this is a -- an August 18, 2014

5   contract between Grubhub and Tiffin Bistro that is

6   signed by Brian Pizzi.

7             Is that correct?

8        A.    Correct, that is who has signed the

9   contract.

10       Q.    All right.  And the -- I want to direct

11  you to some language in the middle of Section 5 on

12  Grubhub 1469 which states:

13            "This agreement can only be modified in

14  writing signed by both parties."

15            Do you see that?

16       A.    Yes, I see that.

17       Q.    And so would you agree that in order to

18  modify these 2014 contracts that Grubhub would --

19  needed to get a signed writing consent from the

20  restaurant in order to add an arbitration clause?

21       MR. CARLSON:  Object to form, asks for a legal

22  conclusion.

23  BY THE WITNESS:

24       A.    I'm sorry.  I'm just reading the rest of

1    this.

2              Could you repeat the question?

3    BY MS. PRATSINAKIS:

4        Q.    Sure.

5                  (WHEREUPON, there was a short

6                   interruption.)

7    BY MS. PRATSINAKIS:

8        Q.    The question was:

9                  "So would you agree that in order to

10   modify these 2014 contracts that Grubhub would need to

11   get a signed writing consent from the restaurant in

12   order to add an arbitration clause?"

13       MR. CARLSON:  Object to form, asks for a legal

14   conclusion, misstates document.

15                 Answer if you can.

16   BY MS. PRATSINAKIS:

17       Q.    What -- let me ask it a different way.

18       A.    Sure.

19       Q.    What do you think that quest -- that

20   sentence means in that contract if not that you need

21   to get signed permission before modifying a contract

22   with the restaurant?

23       MR. CARLSON:  Object to form, asks for a legal

24   conclusion.

1    BY THE WITNESS:

2        A.    When I read this, my interpretation would

3    be to the sentence previous of:

4            "All parties submit to the exclusive

5    jurisdiction of Newark County and agree that they have

6    voluntarily and intentionally waived any and all right

7    to trial by jury and any right to participate in a

8    class action.  For clarity, one party may bring a suit

9    against another in a party's individual capacity."

10           So I'm taking that as the agreement.

11   BY MS. PRATSINAKIS:

12       Q.    Does it say "arbitration" in that

13   paragraph?

14       MR. CARLSON:  Object to form.

15   BY THE WITNESS:

16       A.    I do not see the word "arbitration"

17   specifically in this paragraph.

18   BY MS. PRATSINAKIS:

19       Q.    So would you agree that Grubhub has an

20   obligation to obtain a restaurant's signed written

21   consent before adding an arbitration clause to these

22   2014 contracts?

23       MR. CARLSON:  Object to form, calls for a legal

24   conclusion, misstates document.

Confidential - Marielle Kokos

1    BY THE WITNESS:

2       A.    It is not my agreement that the

3    arbitration clause would fit into this paragraph.  So

4    when we are talking about the agreement of signed

5    parties, I am -- I think that it applies to the above

6    sentence.

7    BY MS. PRATSINAKIS:

8       Q.    So you don't think it applies to the

9    entire agreement?

10      MR. CARLSON:  Object to form, calls for a legal

11   conclusion.

12   BY THE WITNESS:

13      A.    I did not specifically write this.  Of

14   course our legal team did.  This is just what my

15   interpretation is while -- while reading it with you.

16   BY MS. PRATSINAKIS:

17      Q.    And I know we -- I've asked you some --

18   you can put this down.

19      A.    Okay.

20      Q.    I know I've asked you some questions about

21   this already, but I just want to confirm a few points.

22            To your knowledge, has Grubhub sent

23   restaurants an e-mail notifying them that by using

24   Grubhub's services that they were bound by a set of

1    terms located on a diner website?  And I specifically

2    am requesting if an e-mail was sent notifying

3    restaurants.

4         MR. CARLSON:  Object to form.

5    BY THE WITNESS:

6         A.    You are correct, there was not a specific

7    e-mail sent.  Any notification that -- that we did in

8    2016 was with a banner and a popup.

9    BY MS. PRATSINAKIS:

10        Q.    Has Grubhub ever sent restaurants a letter

11   notifying them about the existence of terms and

12   conditions located on the diner website that

13   restaurants were consenting to by using Grubhub's

14   service?

15        MR. CARLSON:  Object to form.

16   BY THE WITNESS:

17        A.    There has not been a specific letter sent

18   about the terms of use on Grubhub.com to restaurants.

19   BY MS. PRATSINAKIS:

20        Q.    And has Grubhub ever sent restaurants a

21   fax notifying them about the fact that a restaurant's

22   use of Grubhub's services would subject them to terms

23   and conditions located on the diner website?

24        MR. CARLSON:  Object to form.

Confidential - Marielle Kokos

```
1   BY THE WITNESS:

2        A.    Grubhub has not sent a fax specifically to

3   the restaurants about the terms of use on Grubhub.com.

4   BY MS. PRATSINAKIS:

5        Q.    When Grubhub sends a tablet to a

6   restaurant, does it include its terms and conditions

7   in the packaging with the tablet?

8        MR. CARLSON:  Object to form.

9   BY THE WITNESS:

10       A.    When the tablet was branded OrderHub in

11  2011 through 2013, when -- when the tablets were sent

12  to the Tiffin Plaintiffs, you had to log into the

13  tablet on the OrderHub login screen and then the very

14  next screen it took you to was the terms of use at

15  that time and you had to actually accept them before

16  you could continue using the tablet itself.

17  BY MS. PRATSINAKIS:

18       Q.    And what was that period of time you were

19  just referencing?

20       A.    So that was the OrderHub functionality,

21  and that was 2011 to early 2016 when GrubCentral

22  specifically was rolled out and it became a web-based

23  platform.

24       Q.    Previously you said 2011 through 2013?
```

Confidential - Marielle Kokos

```
 1      A.    I said in 2013 when the Tiffin Plaintiffs

 2   received their tablets.  So I was notifying that they

 3   received tablets in 2013.  OrderHub functionality and

 4   technology was in existence until we rebranded and

 5   changed to GrubCentral.

 6      Q.    Do you have any proof of this procedure

 7   that you've outlined that when someone logs into

 8   OrderHub for the first time they are taken to the

 9   terms and conditions and asked to hit the word

10   "accept"?

11      A.    Yes, we have what we call, like, user

12   guides that are restaurant facing that we would have

13   sent to restaurants to help them use the tablet and

14   log in to the tablet.

15      MS. PRATSINAKIS:  Counsel, have you produced

16   those user guides?

17      MR. CARLSON:  We have.

18      MS. PRATSINAKIS:  Were -- were those contained

19   in the documents produced recently the other night?

20      MR. CARLSON:  I believe at least one of them was

21   a document that we sent on Sunday, I believe.

22   BY MS. PRATSINAKIS:
```

███    ███  ████████████████████████████████

███  ██████████████████████████████

Confidential - Marielle Kokos

5        MR. CARLSON:  Are you asking --

6   BY THE WITNESS:

7        A.   I don't know.  You were looking at him.

8   I'm sorry.  I didn't know you were asking me.  Yes, we

9   have provided it.

10       MS. PRATSINAKIS:  Counsel, do you know what

11  Bates number that information was provided in?

12       MR. CARLSON:  I don't have it, unless it is on

13  her...

14       THE WITNESS:  Oh, let me look.

15       MS. PRATSINAKIS:  And was that also a document

16  recently produced Sunday night?

17       MR. CARLSON:  No.  I think that was produced as

18  part of the Friday production.

19            I believe it is Grubhub 0002267.

20  BY MS. PRATSINAKIS:

21       Q.   So if you didn't use a tablet, you weren't

22  prompted to log in and accept the terms as you've

23  described?

24       A.   Core -- correct.  If you were not

1   specifically using a tablet, your visual to the terms

2   would have been on your actual contract where you

3   signed and it said "Grubhub.com/legal."

4       Q.    Did you attach -- strike that.

5           Why -- did -- did Grubhub provide a paper

6   copy of terms and conditions when it entered into a

7   written contract with the restaurant?

8       A.    There are smaller paragraphs of terms and

9   conditions on the contract and then the actual terms

10  of use were located in that web link.

11      Q.    I'm asking you if the terms of use that

12  you keep referring to were -- were handed over in a

13  physical paper copy to the restaurant at the time of

14  contracting?

15      A.    They were not handed over to the

16  restaurant at the time of contracting because they are

17  subject to change at any time, so we kept them in

18  digital form.

19      Q.    Okay.  But the contracting wasn't in

20  digital form, correct, it was in paper form?

21      A.    Correct, the contracts were paper form.

22      Q.    Did Grubhub inform restaurants about the

23  existence of the URL Grubhub.com/legal/terms-of-use?

24      MR. CARLSON:  Object to form.

Confidential - Marielle Kokos

```
 1   BY MS. PRATSINAKIS:

 2        Q.    Specifically that URL.

 3        A.    No, Grubhub did not specifically inform of

 4   that URL.  It was listed within the URL they already

 5   had.

 6        Q.    You mean the small pet phrase "terms of

 7   use" at the bottom right-hand side of the terms and

 8   conditions set forth at that URL, correct?

 9        MR. CARLSON:  Object to form.

10   BY THE WITNESS:

11        A.    Correct, it was located within the privacy

12   policy as of 2016 at the Grubhub.com/legal.

13   BY MS. PRATSINAKIS:

14        Q.    In the bottom right-hand corner of the

15   website, correct, not within the content of the

16   privacy policy?

17        MR. CARLSON:  Object.  Object to form.

18   BY THE WITNESS:

19        A.    Correct.  The other place you would have

20   seen -- or been able to access that would have been

21   from the banner we posted as well as the popup that

22   had kind of buttons that said "click to learn more"

23   and restaurants had the ability to click that and it

24   would have taken them to the updated terms of use.
```

Confidential - Marielle Kokos

1   BY MS. PRATSINAKIS:

2       Q.    So it's Grub -- it's Grubhub's position

3   that you amended the terms on the diner website on

4   April 6th, 2016, to include a mandatory arbitration

5   clause, is that correct?

6       MR. CARLSON:  Object to form.

7   BY THE WITNESS:

8       A.    Correct.  The terms of use that are

9   located on Grubhub.com were amended to include an

10  arbitration clause as of April 6th, 2016.

11  BY MS. PRATSINAKIS:

12      Q.    And did you send a notification to

13  restaurants directly about the modification on

14  April 6th, 2016?

15      A.    We did not send a -- a notification

16  directly.  What we did is we included a banner on the

17  Grubhub.com website as well as a popup on our mobile

18  app that let restaurants and diners know that our

19  terms of use were being updated.

20      Q.    And can you tell me when you contend that

21  banner went live on Grubhub.com and where specifically

22  what pages it was posted?

23      A.    The banner launched on March 7th of 2016

24  and it could have been on the bottom or top of pages.

Confidential - Marielle Kokos

```
 1   It was on the homepage as well as subsequent pages

 2   after that and it ran for 30 days notifying people

 3   that there was a change to our terms of use as of

 4   April 6th, 2016.

 5        Q.   When you say "homepage," what specific URL

 6   are you referring to?

 7        A.   www.Grubhub.com.

 8        Q.   And you also noted subsequent pages.

 9             What specific subsequent pages are you

10   referring to?

11        MR. CARLSON:  Object to form.

12   BY THE WITNESS:

13        A.   On the website itself, it would have shown

14   on pages after that, like within the search page,

15   that's specific to the banner.

16   BY MS. PRATSINAKIS:

17        Q.   I'm sorry.  I didn't understand that.

18        A.   There are two different forms of

19   notification we did in 2016.  So specific to the

20   banner, it was on the homepage and the other ordering

21   pages after that on W -- on Grubhub.com.

22        Q.   What do you mean by "the other ordering

23   pages"?

24        A.   After you enter in an address, you would
```

1    be taken to a search page that shows you a variety of

2    different restaurants to order from.

3         Q.    Was it located anywhere else?

4         A.    To my knowledge, it was located on the

5    homepage and the search pages.

6         Q.    Okay.  And previously you testified that

7    it could have been at the top or the bottom.

8              Do you know one way or the other?

9         A.    I know, for example, we've produced a

10   screen shot where on the homepage it was located at

11   the bottom.  I think it was based on the layout of the

12   page of where they -- the designers and the tech team

13   put it.

14        Q.    And what page was that?  Was that the

15   homepage or was that one of the ordering pages?

16        A.    The -- the screen shot we produced was the

17   homepage on Grubhub.com.

18        Q.    Okay.  And was that a screen shot of the

19   actual banner that was running at the time on

20   March 7th, 2016, or thereafter during that 30 days?

21        A.    I would want to look to be specific and

22   correct in what the exact screen shot was.

23        MS. PRATSINAKIS:  I'd like to mark as the next

24   exhibit, I think we are on 10, Kokos No. 10.

Confidential - Marielle Kokos

```
 1                    (WHEREUPON, a certain document was

 2                    marked Kokos Deposition Exhibit

 3                    No. 10, for identification, as of

 4                    05/28/2019.)

 5   BY MS. PRATSINAKIS:

 6        Q.    This is a -- I'm showing you a screen shot

 7   at Grubhub 338, that's the Bates number.

 8        A.    Yes.

 9        Q.    Is this the screen shot you are referring

10   to?

11        A.    This is the screen shot I'm referring to.

12        Q.    Okay.  But isn't this a screen shot of

13   someone's computer?

14        A.    Yes, this is a screen shot of someone's

15   computer.

16        Q.    And so are you testifying that on -- on

17   the date of the bottom screen there, on April 7, 2016,

18   someone went onto the Grubhub.com website "/let's eat"

19   and saw this banner and that this was a -- a live

20   running banner?

21        A.    Yes, that is correct.

22        Q.    Okay.  What is the Wayback Machine

23   Internet Archive?

24        A.    The Wayback Machine Internet Archive is
```

Confidential - Marielle Kokos

1   essentially an internet crawler that has taken screen

2   shots of websites and that is what we used to produce

3   some of our terms and conditions from 2011.

4        Q.   Did you go onto the Wayback Machine to

5   determine if your homepage contained this banner on

6   April -- on any of the 30 days between March 7th and

7   April 6th?

8        A.   I personally was not the person that found

9   the -- or went onto the Wayback Machine.

10       Q.   But are you aware if someone conducted

11  that search?

12       A.   I'm aware that people conducted searchs on

13  Wayback -- Wayback Machine, yes.

14       Q.   And did anyone look for this banner that

15  you testified or declared in your declaration was --

16  was running between March 7th and April 6th?

17       A.   Did someone confirm that it was running?

18       Q.   Yeah, so --

19       A.   Is that what you are asking me?  I'm

20  sorry.

21       Q.   Right.  Did anyone go to the Wayback

22  Machine to confirm -- or to cross-check your sworn

23  statement that this banner was running for 30 days

24  from March 7th to April 6th?

Confidential - Marielle Kokos

1      A.    I cannot confirm or deny if they went to

2   the Wayback Machine to search for that.  I know

3   that -- that they were able to produce a screen shot

4   from when we were running this banner.

5      Q.    So to your knowledge, no one checked the

6   Wayback Machine to support your testimony that this

7   banner was running for 30 days prior to April 6th?

8      MR. CARLSON:  Object to form, mischaracterizes

9   testimony, beyond the scope.

10  BY THE WITNESS:

11     A.    I cannot confirm either way if someone

12  specifically checked that.

13  BY MS. PRATSINAKIS:

14     Q.    Did -- did you think that before you were

15  signing a declaration making that statement that

16  someone should check being as though you did rely on

17  the Wayback Machine for other reasons?

18     A.    I can see a screen shot and we have e-mail

19  evidence of it being built and when it was running and

20  when it was live, so that is what my -- my declaration

21  was based off of.

22     Q.    Okay.  So I'd like to direct your

23  attention to the screen.  It is the Wayback Machine.

24  And I have searched the URL Grubhub.com.  And you had

1   stated that from March 7th to April 6th the banner was

2   running on the home screen, correct?

3        A.    Correct.

4        Q.    And so these are snapshots of that home

5   screen between the timeframe that you testified to,

6   and I'd like to go to a couple of those.

7        THE VIDEOGRAPHER:  It's -- we have it on here,

8   not on there.

9                  (WHEREUPON, there was a short

10                  interruption off stenographic

11                  record.)

12       MS. PRATSINAKIS:  Pardon me.  I don't have my

13   glasses on, so I need someone to type in the URL for

14   me as I ask my questions.  So it is the

15   web.archive.org.  Oh, wait you're -- you're already on

16   there.  I'm sorry.  It is Grubhub.com.

17                  Is that 2016?  I'd like you to go to the

18   2016 year.

19       THE VIDEOGRAPHER:  It's up.

20   BY MS. PRATSINAKIS:

21       Q.    Okay.  And, Ms. Kokos, do you want to pick

22   a date where you believe that that banner would be

23   reflected on the screen shot?

24       MR. CARLSON:  Object to form.

Confidential - Marielle Kokos

```
 1    BY THE WITNESS:

 2        A.   I mean, March 7th is when it began

 3    running, so can we pick March 7th.

 4    BY MS. PRATSINAKIS:

 5        Q.   Sure.  How about we pick the next day so

 6    that in case it was posted on a late hour.

 7        MR. CARLSON:  I'll just note for the record it

 8    appears that there is not a screen shot available for

 9    March 7th because there was no bubble over it, like

10    several of the days.

11    BY MS. PRATSINAKIS:

12        Q.   So can you pick the very next, the closest

13    date to March 6th.

14        THE VIDEOGRAPHER:  It's looking.

15        MS. PRATSINAKIS:  Let the record reflect Jones

16    Day is on dialup.  That was a joke.

17             Can you refresh.

18    BY MS. PRATSINAKIS:

19        Q.   Ms. Kokos, would you expect to see the

20    banner ad on one of these archived pages between

21    March 7th and April 6th?

22        MR. CARLSON:  Object to form.

23    BY THE WITNESS:

24        A.   Yes, I would expect to see it on one of
```

1    the pages.

2    BY MS. PRATSINAKIS:

3        Q.    And, Ms. Kokos, if we were able to click

4    on to these websites and you didn't see the banner

5    there, would that cause you to question whether or not

6    it was live on those dates?

7        MR. CARLSON:  Object to form.

8    BY THE WITNESS:

9        A.    No, I -- I don't think that I would

10   question whether it was live.  I mean, I could not

11   speak specifically to why it was not showing in that

12   date on this website, but I do know that we have

13   e-mail proof in -- in this screen shot that it was

14   live and it was running and then we also have the

15   popups as well.

16   BY MS. PRATSINAKIS:

17       Q.    Okay.  Let's just focus for a second,

18   these are screen shots of Grubhub.com and there was

19   many of them as you saw.  And so if none of those

20   screen shots between March 7th and April 6th contain a

21   banner ad, you wouldn't question whether or not it was

22   running live?

23       MR. CARLSON:  Object.  Object to form.  We

24   haven't looked at the screen shots.  You haven't

1  established any foundation that the witness has any

2  idea --

3       MS. PRATSINAKIS:  Okay.

4       MR. CARLSON:  -- of how the Wayback Machine

5  works.  And objection.

6  BY MS. PRATSINAKIS:

7       Q.   Okay.  Ms. Kokos, we are looking at the

8  screen.  I believe the date -- can you tell us the

9  date?

10      A.   The date is March 9th, 2016.

11      Q.   I'm sorry.  Apologies.

12           Okay.  So that's March 9th, 2016.  And is

13 that the homepage of Grubhub.com?

14      A.   That's the top of the homepage, yes.

15      MS. PRATSINAKIS:  Okay.  Sir, can you scroll

16 down to the bottom.

17 BY MS. PRATSINAKIS:

18      Q.   Can you identify if on this screen that

19 you are looking at, the screen shot of the homepage of

20 Grubhub.com on March 9th, 2016, if you see a banner

21 anywhere on the screen, either the top or the bottom?

22      MR. CARLSON:  Object to form.  It is not a

23 screen shot.  It's a pull from the Wayback Machine.

24 You haven't established any foundation that the

Confidential - Marielle Kokos

1   witness knows how the Wayback Machine works or

2   anything about the Wayback Machine.

3          Answer if you can.

4   BY MS. PRATSINAKIS:

5      Q.   I was just asking if you saw your banner

6   on this -- on this depiction of the home screen of

7   Grubhub.com?

8      MR. CARLSON:  Same objection.

9   BY THE WITNESS:

10     A.   I do not see the banner on this depiction

11  of the home screen from the Wayback Machine.

12     MS. PRATSINAKIS:  Okay.  Can we go to a

13  subsequent day.  If you just click that arrow pointing

14  to the right, it will take you to the next capture.

15  BY MS. PRATSINAKIS:

16     Q.   Is -- is the Internet Archive reliable

17  enough for you to use in a declaration?

18     MR. CARLSON:  Object to form.

19  BY THE WITNESS:

20     A.   The Internet Archive is what we used to be

21  able to gather our terms and conditions of 2011 to

22  make sure that we could produce them here.

23  BY MS. PRATSINAKIS:

24     Q.   And so do you have any reason to doubt

1  that that's an accurate depiction of your 2011 terms

2  of use --

3      MR. CARLSON:  Object.

4  BY MS. PRATSINAKIS:

5      Q.   -- on the Wayback Machine?

6      MR. CARLSON:  Object to form.

7  BY THE WITNESS:

8      A.   I would not be able to give a specific

9  reason why it would not be reliable.

10 BY MS. PRATSINAKIS:

11     Q.   Okay.  We are now looking at the Wayback

12 Machine's capture of the Grubhub.com homepage,

13 correct?

14     A.   Correct.

15     Q.   And we're --

16     MS. PRATSINAKIS:  Sir, could you scroll down.

17 BY MS. PRATSINAKIS:

18     Q.   Can -- my question is going to be:  Do you

19 see the banner ad that you were referencing earlier at

20 Exhibit Kokos 10?

21     MR. CARLSON:  Object to form.

22 BY THE WITNESS:

23     A.   I do not see the specific banner on this

24 screen shot from the Wayback Machine.

1    BY MS. PRATSINAKIS:

2        Q.    Okay.  So we've now looked at March 8th

3    and March 11th?

4        A.    9th.

5        Q.    Pardon me.  March 9th and March 11th.

6        MS. PRATSINAKIS:  Can we go to the next one,

7    please.

8    BY MS. PRATSINAKIS:

9        Q.    Okay.  So you're looking at the

10   March 13th, 2016 capture of Grubhub.com's homepage,

11   correct?

12       A.    Correct.

13       Q.    And do you see the banner that you've

14   testified about at Kokos No. 10 anywhere on that

15   screen?

16       MR. CARLSON:  Object to form, same objection.

17   Objection.

18   BY THE WITNESS:

19       A.    No.  The banner is not shown in this

20   screen shot from the Wayback Machine.

21       MS. PRATSINAKIS:  Okay.  Can you go to the next

22   capture.

23   BY MS. PRATSINAKIS:

24       Q.    And while that's loading, I just want to

Confidential - Marielle Kokos

```
 1    read for you the banner ad in the banner in -- at

 2    Kokos No. 10.  It's -- is it true that it states:

 3              "On April 6th, we are updating some very

 4    important terms in our Terms of Use."

 5              Do you see that?

 6        A.    I see it.

 7        Q.    What are the "very important terms" being

 8    referenced in that banner?

 9        MR. CARLSON:  Object to form.

10    BY THE WITNESS:

11        A.    The terms of use were being updated in

12    2016 alongside a large Grubhub.com rebrand and within

13    the terms of use there were updates made, but

14    specifically there was an arbitration clause added in

15    2016.

16    BY MS. PRATSINAKIS:

17        Q.    And is the arbitration clause a "very

18    important term"?

19        MR. CARLSON:  Object to form.

20    BY THE WITNESS:

21        A.    Our legal team and our tech team wrote

22    this banner and the -- the words within this banner.

23    They would be the ones that would determine what they

24    meant by "very important terms."
```

Confidential - Marielle Kokos

1    BY MS. PRATSINAKIS:

2        Q.    But you are here as a corporate designee,

3    and so as Grubhub's corporate designee, does Grubhub

4    believe that an arbitration clause is a "very

5    important term"?

6        MR. CARLSON:  Object to form, asked and

7    answered.

8    BY THE WITNESS:

9        A.    I agree that I was not the one that wrote

10   this specifically at the time of April 6th, 2016, that

11   our legal team would have been the ones determining

12   what they wanted within this banner and -- and

13   directing people to our terms of use.

14   BY MS. PRATSINAKIS:

15       Q.    I'd like to bring your attention back to

16   the Wayback Machine.  This is a screen depiction from

17   March 15, 2016 of Grubhub's homepage, is that correct?

18       A.    Yes, that is the date at the top.

19       Q.    Is that Grubhub's homepage?

20       A.    That is Grubhub's homepage, yes.

21       Q.    Okay.  And if you scroll down, do you see

22   the banner at Kokos No. 10?

23       MR. CARLSON:  Object to form.

24   BY THE WITNESS:

Confidential - Marielle Kokos

```
 1        A.    The banner is not listed in this screen

 2   form from the Wayback Machine.

 3   BY MS. PRATSINAKIS:

 4        Q.    So is -- does it state anywhere on this

 5   page that we are updating some very important terms in

 6   our terms of use?

 7        MR. CARLSON:  Object to form.

 8   BY THE WITNESS:

 9        A.    By "this page," do you mean the Wayback

10   Machine page?

11   BY MS. PRATSINAKIS:

12        Q.    I mean the Grubhub.com homepage on the

13   Wayback Machine dated March 15, 2016?

14        A.    There is no banner that states that.

15        Q.    And does that language appear anywhere on

16   that page?

17        MR. CARLSON:  Object to form, asked and

18   answered.

19   BY MS. PRATSINAKIS:

20        Q.    So the language I want to refer to, again,

21   is, "we are updating some very important terms in our

22   terms of use."

23              Does that language appear anywhere on that

24   screen?
```

Confidential - Marielle Kokos

```
 1       A.    Not in this screen shot from the Wayback

 2   Machine.

 3       Q.    Of Grubhub.com's homepage, correct?

 4       A.    Of Grubhub.com's homepage on March 15th,

 5   2016.

 6       Q.    So I'm curious, we've now looked at

 7   multiple shots and captures of Grubhub.com's

 8   homepage and not once did we see a banner, is that

 9   correct?

10       MR. CARLSON:  Object to form.

11   BY THE WITNESS:

12       A.    Yes, that is correct, we have not seen it

13   on the screen shots of Grubhub.com on the Wayback

14   Machine.

15   BY MS. PRATSINAKIS:

16       Q.    Uh-huh.  If a banner were running across

17   the screen, do you know if it would be captured on

18   this site?

19       MR. CARLSON:  Object to form, calls for

20   speculation.

21   BY THE WITNESS:

22       A.    I would not know if it would be captured

23   on this site.

24       MS. PRATSINAKIS:  Okay.  Can we go to
```

1    Tiffin.com?

2       MR. CARLSON:  We had discussed taking a break

3    around 1:00 for lunch.  It is now 1:10.  I don't know

4    where you are headed with your line of questioning,

5    but we should make -- is now a good time to take a

6    break or do you want to go for a couple more minutes?

7       MS. PRATSINAKIS:  Just one moment.

8           Oh, I'm so blind.

9           Can you go back and spell it

10   T-i-f-f-i-n -- can you go to the Wayback Machine and

11   insert the URL Tiffin.com.  So in the search box where

12   we have Grubhub.com, if you could just put in

13   Tiffin.com.

14          Okay.  Go to 2016, please.  And can you

15   scroll down.  Can you -- just pick any of the dates

16   in, say, October.

17          While that's loading, I'd like to get it

18   moving a little faster so we can get to lunch.  I'm

19   going to be marking as Exhibit --

20      THE COURT REPORTER:  11.

21      MS. PRATSINAKIS:  Thank you.

22          -- a document Bates numbered Grubhub 351.

23              (WHEREUPON, a certain document was

24                marked Kokos Deposition Exhibit

```
 1                    No. 11, for identification, as of

 2                    05/28/2019.)

 3    BY MS. PRATSINAKIS:

 4        Q.    I'd like you to take a look at this

 5    document and let me know when you are ready.

 6        MS. PRATSINAKIS:  It is just terrible.  You know

 7    what, you can take the Wayback Machine down and maybe

 8    during a break you can talk to your IT people about

 9    the connection in this room.

10        MR. CARLSON:  I don't think it is the

11    connection.  I think the Wayback Machine just loads

12    very slowly in my experience.  I don't think there is

13    anything wrong with our internet.

14        MS. PRATSINAKIS:  Okay.  Well, we'll check it

15    because it -- it does seem to be having a little more

16    difficulty loading in this room than it did on my

17    laptop at home or in the office, so.  Just asking to

18    check.

19        MR. CARLSON:  Okay.  Well, we can talk about it

20    on the break.

21    BY MS. PRATSINAKIS:

22        Q.    Okay.  Let me know when you are ready.

23        A.    I am ready.

24        Q.    So what are we looking at here?
```

1    A.    Throughout this specific document there

2  are tickets submitted for our tech team regarding

3  building the link -- or the banner --

4    Q.    Uh-huh.

5    A.    -- as well as what then the terms of use

6  would look like when you click on it.

7    Q.    Uh-huh.

8    A.    And our legal team and tech team are going

9  back and forth on content and when it should be

10  posted.

11    Q.    Uh-huh.  And so I -- I've never seen

12  communications presented quite like this.

13        Is this a specific program to Grubhub?

14    A.    There is a ticketing program.  I don't

15  believe it's specific to Grubhub, but then there are

16  also e-mails.

17    Q.    Uh-huh.  And is this ticketing program

18  essentially how any request is made to, like a

19  modification on Grubhub for Restaurants website or

20  Grubhub.com -- the Grubhub.com diner website?

21    A.    It would have been at the time in 2016.

22  We do not use it today.

23    Q.    Do you use something in its place today?

24    A.    Yes.  We would use a different program in

1    its place, still a ticketing system.

2          Q.    And what is that program called?

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

7          Q.    Okay.  And so is it correct to say -- to

8    say that any modification that is done on either of

9    the websites would have to be -- there would have to

10   be a ticket for it, correct?

11         A.    I don't specifically work in the tech

12   department, but I do know that's how they operate as

13   far as prioritizing work and understanding the notes

14   and feedback from the work of what they are doing.

15         Q.    Okay.  So would you say it would be

16   unusual if a ticket isn't created for a modification

17   to a Grubhub website?

18         A.    I would not say it's not unusual.  I --

19   again, I don't -- I don't work in their department.  I

20   don't know if they would make changes by simply

21   speaking to each other, but I know work is begun

22   generally with a ticket.

23         Q.    Uh-huh.  And what is this ticket number?

[REDACTED]



21      Q.    Even though we didn't find a single screen

22  yet on the Wayback Machine that showed your banner?

23      MR. CARLSON:  Object to form.

24  BY THE WITNESS:

1      A.    I cannot confirm specifically how the

2   Wayback Machine pulls its screen shots.

3   BY MS. PRATSINAKIS:

4      Q.    Okay.  So was this very important term

5   communicated any other way?  I know we've touched on

6   it earlier, but was it communicated any other way with

7   restaurants?

8      MR. CARLSON:  Object to form.

9   BY THE WITNESS:

10     A.    It was communicated through a banner, as

11   we've discussed, as well as a popup.

12   BY MS. PRATSINAKIS:

Confidential - Marielle Kokos



19      Q.      Uh-huh.   And what in this -- about this

20   document gives you the assurance that this banner

21   actually went live on Grubhub.com?

22      MR. CARLSON:   Object to form.

23   BY THE WITNESS:

24      A.      The assurance that this banner is live is

Confidential - Marielle Kokos

```
 1   not located in this specific document.

 2   BY MS. PRATSINAKIS:

 3        Q.    Okay.  So do you recall what specific

 4   document you looked at when you felt reassured that

 5   the banner on April -- the banner that we've been

 6   talking about went live on Grubhub.com?

 7        A.    I do.  It would be, I believe, in our

 8   responses, and it was an e-mail communication.  It

 9   might also be an exhibit in my original declaration.

10   If you give me a second, I could find it for you.

11        Q.    Well, let me ask you a question.

12        A.    Sure.

13        Q.    What do you recall the e-mail stating?

██        ██      ████████████████████████████████

██    ██████████████████████████████████████████████

██    ██████████████

██        ██      ████████████████████████████████

██    ███████████████████████

██        ██      ████████████████████████████████

██    ████████████████████████████████████████

██    ██████████████████████████████

22        MS. PRATSINAKIS:  Counsel, is that the e-mail

23   that you withdrew for containing privileged

24   information --
```

```
 1          MR. CARLSON:  No.

 2          MS. PRATSINAKIS:  -- and replaced?

 3          MR. CARLSON:  No, it's not.

 4          MS. PRATSINAKIS:  Okay.

 5     BY MS. PRATSINAKIS:

 6          Q.   Does this look familiar, Grubhub 325?

 7          A.   I've seen that, but that's -- I don't

 8     believe that that's --

 9          Q.   Okay.

10          A.   -- specifically what I'm looking for.

11          MR. CARLSON:  I think this might be a good time

12     to take a break.

13          MS. PRATSINAKIS:  We are in the middle of

14     answering a question though.

15          MR. CARLSON:  We have been going now for a lot

16     longer than we said we would.

17          MS. PRATSINAKIS:  And there is a pending

18     question.

19          MR. CARLSON:  What is the pending question?  I'm

20     not even sure.

21          MS. PRATSINAKIS:  What e-mail did you rely on in

22     getting assurance that the banner ad actually went

23     live during the 30-day period prior to April 6th.

24          MR. CARLSON:  Okay.
```

```
 1        MS. PRATSINAKIS:  There is a question pending.

 2   We can't take a break until that's answered.

 3            And, frankly, I think I only have about

 4   ten more minutes on this topic, so I think it makes

 5   more sense to wait.

 6        MR. CARLSON:  If we can wrap-up in ten minutes,

 7   we can do that, but I want to try to do that.  And

 8   I...

 9        MS. PRATSINAKIS:  Okay.

10   BY THE WITNESS:

11        A.    I do have it in the responses to our first

12   set of interrogatories, but I do not have a Bates

13   number.  So I just have it on Page 18.

14            Is there --

15   BY MS. PRATSINAKIS:

16        Q.    Can you read for -- to me --

17        A.    Sure.

18        Q.    -- and direct me where you are looking at

19   so we are on the same page?

20        A.    Yes.

21            The paragraph begins with:

22            "In addition, prior to the modification to

23   the Grubhub.com terms of use in 2016, Grubhub modified

24   www.Grubhub.com such that it would display a banner
```

Confidential - Marielle Kokos

1   across all of the web pages primarily on the top but

2   in some cases on the bottom and for the mobile app a

3   timed popup.  This banner went live on March 7th,

4   2016, one month before the terms were posted and

5   effective on April 6th, 2016.  See Grubhub 329 and

6   Grubhub" -- "through Grubhub 336 ███████████████

    █ ████████████████████████████████████████████

    █ ████████████████████████████████████████████

9   The banner remained on the website and platforms for

10  over 30 days."

11              (WHEREUPON, a certain document was

12              marked Kokos Deposition Exhibit

13              No. 12, for identification, as of

14              05/28/2019.)

15  BY MS. PRATSINAKIS:

16      Q.    I am handing you what should be marked as

17  Exhibit 12.

18      A.    Thank you.

    █       █     ████████████████████████████████

    █       █     ████████████████████████████████

    █       █     ████████████████████████████████

    █     ██████████████████████████████

    █       █     ██████████████████████████

    █       █     ██████████

Confidential - Marielle Kokos



Confidential - Marielle Kokos



Confidential - Marielle Kokos





14   BY MS. PRATSINAKIS:

15       Q.    Have you located a screen shot of the

16   actual banner that was running during the timeframe of

17   March 7th and April 2016?

18       A.    The -- the screen shot that we have on

19   your exhibit Kokos 10 is a screen shot of the banner.

20   The date in the bottom shows that it was still running

21   even through on April 7th.

22       Q.    I don't -- let's agree to disagree.  I

23   don't think that it shows that it was running through.

24   I think what it shows is that someone at 6:11 a.m. on

Confidential - Marielle Kokos

```
 1    April 7th, 2016, was looking at a page with this

 2    banner running on the bottom and -- and -- and what I

 3    haven't seen yet from Grubhub is any proof that -- of

 4    the actual banner that was running 30 days prior.  So

 5    March 7th, March 8th, March 9th, I haven't seen any

 6    evidence of that.

 7           Does -- does evidence of that exist aside

 8    from this e-mail that is vague?

 9       MR. CARLSON:  Object to form, asked -- asked and

10    answered for the last 20 minutes now.

11    BY THE WITNESS:

12       A.   The evidence that exists are the ev -- are

13    the things that we've produced for you today, which

14    would be the head of tech saying that the banner is

15    live, the screen shot that is showing that it is live

16    on our website on our homepage.

17    BY MS. PRATSINAKIS:

18       Q.   So there is no other proof that this

19    banner ran for 30 days, no other proof that you know

20    of at Grubhub?

21       MR. CARLSON:  Object to form, asked and

22    answered.  We've been going about this same question

23    for a while now.

24    BY THE WITNESS:
```

```
1        A.     The -- the stuff that we have produced is

2   what we are using and agreeing to that proves that the

3   banner was live.

4   BY MS. PRATSINAKIS:

5        Q.     Okay.  But you don't have a depiction of

6   the banner running live on any other date -- any date

7   other than what is dated April 7, 2016.

8               And my question is:  A tech company like

9   Grubhub, how can it not have that?

10       MR. CARLSON:  Object to form.  It calls for

11  speculation.

12  BY THE WITNESS:

13       A.     I mean, I don't know how many more times

14  to answer it for you.  I think it's almost silly to

15  assume that we have screen shots from every single

16  change we've ever made or done or banners we've run

17  over time, but we have actually produced one that

18  shows --

19  BY MS. PRATSINAKIS:

20       Q.     Uh-huh.

21       A.     -- this banner on our homepage as well as

22  e-mail proof where people are discussing it together

23  that it is live.

24       Q.     Whose computer screen is depicted at
```

1   Kokos 10?

2       A.    I would not be able to confirm to you the

3   discovery of being able to find that screen shot.

4       Q.    You don't know where this came from?

5       A.    I know that it came from discussing with

6   our tech leads and looking through e-mails and -- and

7   for them to find all of this proof.

8       Q.    Oh, this one depiction from April 7th, you

9   don't know how your tech team came across it?

10      MR. CARLSON:  Object to form, argumentative.  We

11  are going around in circles.  We should take our

12  break.

13          You can answer the question if you can and

14  then we are going to take our break.

15  BY THE WITNESS:

16      A.    Our tech team searched through their

17  archives and documents of -- for this specific date

18  and found these e-mails as well as that screen shot.

19  BY MS. PRATSINAKIS:

20      Q.    Okay.  So up at the top of this Kokos

21  No. 10, it talks about most visited, Euro FD, Euro SC,

22  Euro PFS, Euro, maybe this banner ran in Europe?

23      A.    We actually don't have operations --

24      MR. CARLSON:  Object -- object to form.  All

```
 1    right.  We're -- let's take our break.  We can come

 2    back after lunch.

 3         MS. PRATSINAKIS:  We are going to want to know

 4    where this came from.

 5         MR. CARLSON:  Send us a request and we'll take

 6    it up -- take it under advisement.

 7         THE VIDEOGRAPHER:  We are going off the record

 8    at 1:36 p.m.

 9                   (WHEREUPON, a recess was had

10                    from 1:36 to 2:23 p.m.)

11         THE VIDEOGRAPHER:  We are back on the record at

12    2:23.

13    BY MS. PRATSINAKIS:

14         Q.    Ms. Kokos, during your break did you

15    discuss your testimony here today with anyone?

16         A.    Yes.  We discussed my testimony.

17         Q.    Pardon?

18         A.    I said, yes, we discussed my testimony.

19         Q.    And what did you discuss?

20         MR. CARLSON:  Objection.  I'll instruct the

21    witness to not answer on the grounds of privilege.

22         MS. PRATSINAKIS:  We are in the middle of a

23    deposition.  I'm entitled to ask her what she was

24    doing while on break.
```

Confidential - Marielle Kokos

```
 1        MR. CARLSON:  No, I don't -- I don't think you

 2   are.  I think that's privileged.

 3   BY MS. PRATSINAKIS:

 4        Q.    Well, did you discuss the content of your

 5   testimony?

 6        MR. CARLSON:  You -- you can answer that yes or

 7   no.

 8   BY THE WITNESS:

 9        A.    Yes.

10   BY MS. PRATSINAKIS:

11        Q.    Okay.  Were you instructed on how to

12   testify?

13        MR. CARLSON:  Object.  Objection.  I'm going to

14   instruct the witness not to answer -- not to answer.

15   She is it not coming in and trying to change any

16   testimony or do anything else, so I think what we

17   discussed was privileged.  I'm going to instruct her

18   not to answer.

19   BY MS. PRATSINAKIS:

20        Q.    Ms. Kokos, to use Grubhub's services, are

21   restaurants required to visit the diner website

22   Grubhub.com?

23        A.    The restaurants are not required to go to

24   Grubhub.com, but many of them do to check their
```

1    placement.

2         Q.    Has Grubhub ever sent an e-mail to all of

3    its restaurants asking them to visit the diner website

4    for any reason?

5         A.    Grubhub has not sent any communication to

6    restaurants asking them to visit Grubhub.com.

7         Q.    In 2011, were restaurants required to go

8    to the Grubhub.com website in connection with signing

9    up for services with Grubhub?

10        A.    No.  The restaurants are not required and

11   were not required in 2011 to go to Grubhub.com.

12        Q.    Did Grubhub ask its restaurants to visit

13   the diner website at any point in time after

14   contracting with the restaurant?

15        MR. CARLSON:  Object to form.

16   BY THE WITNESS:

17        A.    Grubhub did not ask them to visit the

18   website Grubhub.com, "them" being the restaurants.

19   BY MS. PRATSINAKIS:

20        Q.    Did Grubhub ever inform restaurants about

21   a specific URL Grubhub.com/legal/terms-of-use?

22        MR. CARLSON:  Object to form.

23   BY THE WITNESS:

24        A.    The way that Grubhub let restaurants know

Confidential - Marielle Kokos

1    that the URL for our terms of use was being updated

2    was through a banner in a popup on our site.  The

3    restaurant was able -- or diner was able to click

4    "learn more" and it would take -- took them

5    specifically to that URL.

6    BY MS. PRATSINAKIS:

7        Q.    Can you refer back to Exhibit 11.

8        A.    Yes.





Confidential - Marielle Kokos

███  ████████████████████████████████████████

███  ████████████████████████████████████████

███  ███████████████████████████████

4      Q.    So if these terms were posted on

5   Grubhub.com, assuming they were posted, it's not

6   clear, would they have also been posted on the URL

7   Grubhub.com/legal/updated-terms-of-use?

8      A.    I don't completely understand your

9   question.  Can you reask it?

10      Q.    I'm asking just as the Seamless -- just as

11   the updated terms on Seamless went to a sub website --

12      A.    Okay.

13      Q.    -- that's qualified by

14   updated-terms-of-use, would that have been the same

15   for the Grubhub.com website if, in fact, this was

16   on -- posted on the website?

17      A.    Correct.

18      Q.    Okay.  And you testified earlier that

19   there was a small link on the bottom of certain web

20   pages, the phrase "terms of use" is used.

21           Do you know if on March 7th if you clicked

22   that link would you have been taken to this updated

23   version or to the old terms of use?

24      A.    To -- my understanding, the -- unless you

Confidential - Marielle Kokos

1  clicked on the "learn more" or the banner or the popup

2  that you would have been taken to the old terms of use

3  that were not technically in effect until April 6th.

4      Q.    Okay.  So the banner ad was notifying

5  diners and users about that subfolder or sub

6  page updated-terms-of-use?

7      A.    Correct.  The -- the banner was updating

8  diners and restaurants of the updated terms of use.

9      Q.    Do you track restaurants' usage of your

10  diner website?

11      MR. CARLSON:  Object to form, scope.

12  BY MS. PRATSINAKIS:

13      Q.    Or does Grubhub monitor or track

14  restaurants use of Grubhub.com?

15      MR. CARLSON:  Object to form, scope.

16  BY THE WITNESS:

17      A.    I personally do not have any recollection

18  of tracking that as restaurants go to the website all

19  of the time.  The reason I know they do is because

20  they call me and want to talk about where their --

21  their menu is placed and how it looks.

22  BY MS. PRATSINAKIS:

23      Q.    Uh-huh.  And so you say "all of the time."

24          Couldn't you see someone's information on

```
1    Grub -- Grubhub for Restaurants?

2         A.    I'm confused by your question.

3         Q.    Could -- could you see -- see the same

4    information?  Like if you were going to click into

5    Grubhub for Restaurant and -- and get to your

6    restaurant account, wouldn't you see the menu and the

7    comments by clients and much of the same information

8    you would see on the diner website?

9         A.    You can, but you would not necessarily see

10   where your restaurant is placed within our search

11   page.

12        Q.    Okay.  So is there any other reason why a

13   restaurant would go to the diner website?  I mean, it

14   is primarily to order food, would you agree?

15        MR. CARLSON:  Object -- wait.  Object to form.

16   BY THE WITNESS:

17        A.    No, I would not agree that restaurant

18   owners are generally going on our website to order

19   food.

20   BY MS. PRATSINAKIS:

21        Q.    So -- I'm sorry.

22              Other than checking to see what order they

23   fall into, is there any other reason why a restaurant

24   would want to vinit -- visit the diner website?
```

1      MR. CARLSON:  Object to form.

2   BY THE WITNESS:

3      A.   Yes.  The restaurants -- there are

4   restaurants that don't specifically use Grubhub for

5   Restaurants even though they have access, so they

6   would go to the website to look to see where their --

7   their restaurant is located or within placement and

8   then they would click on their menu, call us, ask

9   questions.  They maybe even are checking out some

10  competitors' menus, calling us and asking questions

11  and wanting to know, you know, how can they compete

12  better, how can they get more orders.  So they go to

13  the Grubhub.com for a variety of different reasons.

14  BY MS. PRATSINAKIS:

15     Q.   But they are not required to do so,

16  correct?

17     A.   Correct, they are not required to go to

18  Grubhub.com.

19     Q.   And you don't track their usage of that

20  website, correct?

21     MR. CARLSON:  Object to form, scope.

22  BY MS. PRATSINAKIS:

23     Q.   Excuse me, when I say "you," I do mean

24  Grubhub.

1      A.    Grubhub would be tracking --

2      MR. CARLSON:  Same objection.

3            Sorry.  Same objection.

4            Go ahead.

5  BY THE WITNESS:

6      A.    Grubhub is tracking user traffic and

7  clicks, but I cannot give you a specific answer on

8  whether they are tracking a restaurant owner's

9  specific behavior on Grubhub.

10  BY MS. PRATSINAKIS:

11     Q.    Would you say that restaurants visit

12  Restaurants.Grubhub.com more so than they visit

13  Grubhub.com?

14     MR. CARLSON:  Object to form.

15  BY THE WITNESS:

16     A.    I can't give you a solid answer on what

17  they visit more.  I can answer that they have more

18  functionality on Restaurants.Grubhub.com.

19  BY MS. PRATSINAKIS:

20     Q.    And so there's more business reasons to go

21  onto that website versus the diner website, is that

22  correct?

23     MR. CARLSON:  Object to form.

24  BY THE WITNESS:

```
 1        A.    If they choose to use it, yes.

 2   BY MS. PRATSINAKIS:

 3        Q.    Uh-huh.  Is the terms of use link posted

 4   on Restaurants.Grubhub.com?

 5        A.    Yes.  It is actually posted on every page.

 6        Q.    On every page.

 7              And when did that posting -- when was that

 8   posted?

 9        A.    So, to my understanding, it was on every

10   page since -- since branded as GrubCentral.

11        MS. PRATSINAKIS:  What number are we on?

12        THE COURT REPORTER:  13.

13                  (WHEREUPON, a certain document was

14                   marked Kokos Deposition Exhibit

15                   No. 13, for identification, as of

16                   05/28/2019.)

17        THE WITNESS:  Thank you.

18   BY MS. PRATSINAKIS:

19        Q.    Look over this document and let me know

20   when you are ready.

21        MR. CARLSON:  Counsel, this doesn't have any

22   Bates on it.  Can you tell me where it came from?

23        MS. PRATSINAKIS:  It was an exhibit to an

24   earlier declaration.
```

```
 1        MR. CARLSON:  Okay.

 2   BY MS. PRATSINAKIS:

 3        Q.    So, this document was created from Grubhub

 4   for Restaurants' website, the HTTPS is

 5   Get.Grubhub.com, and we printed out every page on that

 6   site and could not locate the phrase "terms of use"

 7   anywhere.

 8             Do you see that?

 9        MR. CARLSON:  Object to form.  I don't think

10   that a printout is a reliable way to look at what a

11   website looks like when a user is using it, so I'm

12   going to object to this as an exhibit.

13   BY MS. PRATSINAKIS:

14        Q.    Do you see the phrase "terms of use"

15   anywhere in this document?

16        A.    This is not the Grubhub for Restaurants

17   website.  This is Get.Grubhub.com which is used by our

18   restaurants that are looking to sign up for -- for

19   Grubhub and it has a variety of different pieces of

20   information, but this is not the Grubhub for

21   Restaurants platform that a restaurant would be going

22   to to do their activities.

23        Q.    So this is where a restaurant would go if

24   they were considering to use Grubhub services, is that
```

1    correct?

2         A.    Considering for the most part, yes, also

3    could go just for gather more information about

4    Grubhub.

5         Q.    Uh-huh.  Or to learn about Grubhub for

6    Restaurants itself, correct?

7         A.    Yeah, it could go to learn more about what

8    is available to restaurants by partnering with

9    Grubhub.

10        Q.    And you see up in the first page up at the

11   top where it says:  "Solutions, resources, blogs, sign

12   in, contact us, sign up."

13             So what is that signing into?

14        A.    They would have to click on the sign-in

15   that would redirect them to the actual platform for

16   Grubhub for Restaurants.

17        Q.    Okay.  And so that's how you access

18   Grubhub for Restaurants, you click that sign-in

19   button?

20        A.    On this specific website, but it is not

21   how restaurants would access it normally.

22        Q.    Understood.

23             And then that phrase "sign up," you could

24   just click that on that and sign up for a restaurant

Confidential - Marielle Kokos

```
1    account with Grubhub for Restaurants?

2        A.    That would be where it takes them to our

3    self-service signup.  They could also request that

4    someone call them back as well.

5        Q.    Okay.

6              And what is the purpose of having this

7    information compiled here on the Get.Grubhub.com?

8        A.    Quite a few of our 'net new restaurant

9    signups come from inbounds of restaurants seeking out

10   Grubhub specifically to sign up.  So this is a place

11   for them to find the information they need.

12       Q.    In order to determine whether they want to

13   sign up for your serve -- Grubhub services?

14       A.    Yes, it could be used as a -- a source of

15   information for them to decide.

16       Q.    Why aren't the terms of use on any of

17   these pages?

18       MR. CARLSON:  Object to form.

19             Again, I don't think a printout is a

20   reliable snapshot of the website, so I'm going to

21   object to the exhibit, but answer if you can.  Excuse

22   me.

23   BY THE WITNESS:

24       A.    I don't have a specific answer as I didn't
```

Confidential - Marielle Kokos

```
 1   build the website, but my guess would be they are not

 2   signed up with us.

 3   BY MS. PRATSINAKIS:

 4       Q.   Okay.  I'd like to direct you to the

 5   screen.  In order to resolve an objection that's been

 6   made that this is not a reliable source, I'd like to

 7   direct you to the live website of Grubhub for

 8   Restaurants at Get.Grubhub.com.

 9       THE VIDEOGRAPHER:  We will go off record for

10   just one second.

11            Going off the record at 2:43.

12                 (WHEREUPON, a recess was had

13                  from 2:43 to 2:46 p.m.)

14       THE VIDEOGRAPHER:  We are back on the record at

15   2:46.

16   BY MS. PRATSINAKIS:

17       Q.   Ms. Kokos, I'm showing you my laptop where

18   there is a live image of the Grubhub for Restaurants

19   website Get.Grubhub.com, and what I'd like you to do

20   is surf these pages and direct me to anywhere you find

21   the phrase "terms of use."

22       MR. CARLSON:  I'm going to object.

23            But go ahead and...

24   BY THE WITNESS:
```

Confidential - Marielle Kokos

1       A.      Underneath the section that's titled

2   "Learn More" at the bottom of the page, you can click

3   on our privacy policy, which would then, of course,

4   take you to the privacy policy and also show you the

5   website to Grubhub.com/legal/terms-of-use.

6           Oh, yay.

7   BY MS. PRATSINAKIS:

8       Q.      You can look up there.

9       A.      And I hadn't -- didn't get a chance to

10  actually click on it, but my second option would have

11  been to look at the FAQs underneath "Learn More."

12      Q.      Do you want to try that?

13      A.      Sure.

14          It's the same.  So the policy -- excuse

15  me.  Privacy policy is also located at the end of that

16  page as well.

17      Q.      Okay.  Thank you.

18          So there is no direct link to terms of use

19  on any of these pages, correct?

20  MR. CARLSON:  Object to form.  The site speaks

21  for itself.

22  BY MS. PRATSINAKIS:

23      Q.      What I mean is, you have to click a couple

24  of times to get to the terms of use, not just -- it is

1    not just present right on the screen or --

2         A.    Correct.

3         Q.    -- by clicking once?

4         A.    You have to click twice.

5         Q.    Okay.  So if someone wasn't on your

6    website when Grubhub purports to have run this banner

7    ad preceding the April 6th modification, how would

8    they have known about -- how would they have been

9    notified about this update?

10        A.    When you say weren't on our site, do you

11   just simply mean a contracted restaurant did not visit

12   our site or someone was not contracted with us?

13        Q.    Say someone didn't see the banner at all,

14   would they have had notice of this arbitration clause

15   that was added?

16        MR. CARLSON:  Object to form.

17   BY THE WITNESS:

18        A.    The restaurant is officially on notice by

19   signing a contract and within the contract it states,

20   even in the 2011 contract, that Grubhub.com/legal, to

21   check it.  One says we reserve the right to change at

22   any time, one says that we have 30 days before they

23   can go into effect, but the expectation is that, you

24   know, the restaurant has the ability to check the

1    Grubhub.com/legal website which could show them the

2    updated terms of use at any time.

3    BY MS. PRATSINAKIS:

4         Q.    So if a restaurant didn't happen to

5    stumble across a banner ad that ran for 30 days on a

6    diner ordering system website, would they have been

7    given 30 days notice?

8         MR. CARLSON:  Object to form, asked and

9    answered.

10   BY THE WITNESS:

11        A.    Yes, the terms of use clearly did not go

12   into effect until April 6th.

13   BY MS. PRATSINAKIS:

14        Q.    But what I'm saying is if a restaurant

15   didn't see your banner, would you have -- would you

16   consider them notified of that change in terms?

17        A.    Yes, we would consider them notified as

18   being on notice by signing a contract and asked to

19   check the terms of use on a regular basis.

20        Q.    But the contract requires you to give

21   30 days notice to the restaurant, and so if the

22   restaurant does not see your banner, what 30-day

23   notice did Grubhub provide?

24        A.    The notice is simply by signing the

1    contract and having the website available to you at

2    any time, one of the contracts specifically stated

3    that we needed 30-day notice and we could not enforce

4    them for 30 days.  The other web -- or the other

5    contract said we had no notice, as well as the

6    OrderHub terms and conditions said we have no notice.

7        Q.    So the notice for the modification is the

8    original contract, in your view?

9        MR. CARLSON:  Object to form, mischaracterizes

10   testimony.

11   BY THE WITNESS:

12       A.    The notice is that they signed a contract

13   which directs them to a website that they have the

14   ability to check at any time.

15   BY MS. PRATSINAKIS:

16       Q.    Let's move on to Exhibit 14.

17            (WHEREUPON, a certain document was

18             marked Kokos Deposition Exhibit

19             No. 14, for identification, as of

20             05/28/2019.)

21       THE WITNESS:  Thank you.

22   BY MS. PRATSINAKIS:

23       Q.    Please take a look at the document and let

24   me know when you are ready to discuss it.

Confidential - Marielle Kokos

1          MR. CARLSON:  Counsel, was this also attached to

2    a declaration previously?

3          MS. PRATSINAKIS:  Yes, sir.

4    BY MS. PRATSINAKIS:

5          Q.    What you are looking at is a printout of

6    the microsite for the Tiffin Mount Airy location.

7                Do you have any reason to dispute that?

8          MR. CARLSON:  Object to form.

9    BY THE WITNESS:

10         A.    No, I do not dispute that.

11   BY MS. PRATSINAKIS:

12         Q.    Now, there is quite a bit of content on

13   this microsaw -- microsite, do you agree?

14         A.    I would agree that they have a very long

15   menu, yes.

16         Q.    So there is one page of menu, two page,

17   three, four, five.  So five pages of menus and then

18   they have their address and then 809 ratings start

19   right there at the bottom of six of 14 and those are

20   the reviews for Tiffin and then that goes on for

21   pages.

22                And in any of the pages you are looking at

23   that we are reviewing together, do you see the phrase

24   "terms of use"?

Confidential - Marielle Kokos

1          A.     I do at the very last page.

2          Q.     Other than the last page, do you see it on

3    any of the other multiple pages we've just gone

4    through?

5          MR. CARLSON:  Object to the form.  Again, this

6    is a printout of a website.  There are things cut off

7    at the bottom.  This is not a reliable exhibit, I

8    object.

9               But answer if you can.

10   BY MS. PRATSINAKIS:

11         Q.     All right.  Let's take a look at it.

12         A.     I mean, I agree, it is a website and you

13   would be scrolling down as a diner and you can also

14   see them at the end of the page, "terms of use and

15   privacy policy."

16         Q.     Right.  But one would have to go all of

17   the way to the bottom of the screen to see it.  So if

18   you had a thousand pages of reviews, one would have to

19   go to a thousand and one plus whatever other

20   information is on there, correct?

21         MR. CARLSON:  Object to form.

22   BY THE WITNESS:

23         A.     No.  We don't show all of the reviews.

24   You can click to see all of your reviews, but we do

```
1   not show them in the doc -- in the website when you go

2   to it as a diner.

3   BY MS. PRATSINAKIS:

4        Q.    Okay.

5              Oh.  I'd like to refer you to --

6        MS. PRATSINAKIS:  Did it work?  Can I go on?

7   For the love of God.  Never mind.  That's fine.

8        THE VIDEOGRAPHER:  I can get it.

9   BY MS. PRATSINAKIS:

10       Q.    So not all of the reviews will show, but

11  there is still quite a bit of content.  There is the

12  full menu, correct, you don't cut off the menu, is

13  that right?

14       A.    No, not on the website, we would not cut

15  off the menu.

16       Q.    Right.  You wouldn't have to click a link

17  to say see more to see the whole menu?

18       A.    Correct.

19       Q.    Okay.

20       A.    You would scroll down to see the whole

21  menu.

22       Q.    So if a menu is 25 pages or 30 pages, you

23  wouldn't see terms of use until Page 31 at the very

24  end?
```

```
 1        MR. CARLSON:  Object to form.

 2   BY THE WITNESS:

 3        A.    Correct.  We would need to get through the

 4   menu.  We do not have any menus that are 25 to 30

 5   pages at this time.

 6   BY MS. PRATSINAKIS:

 7        Q.    And you've looked at every menu to confirm

 8   that?

 9        MR. CARLSON:  Object -- object to form.

10   BY MS. PRATSINAKIS:

11        Q.    You can answer the question.

12        A.    No, I have not looked at all 115,000

13   menus.

14        Q.    Okay.  You can put that one to the side --

15   oh, actually, no.  One more question.

16              What is your evidence that the banner ran

17   on a microsite?

18        MR. CARLSON:  Object -- object to form.

19              Go ahead.

20   BY THE WITNESS:

21        A.    What was given to me through discovery was

22   the stuff that we gave you earlier.

23   BY MS. PRATSINAKIS:

24        Q.    So there is it no actual banner
```

Confidential - Marielle Kokos

1    notification that went on a restaurant microsaw --

2    site, is there?

3        MR. CARLSON:  Object to form.

4    BY THE WITNESS:

5        A.    Not within the production that was handed

6    to me when we were doing this earlier, putting

7    together the evidence of the banner.

8    BY MS. PRATSINAKIS:

9        Q.    Okay.  So if the banner had run on a

10   microsite of Grubhub, wouldn't that have been part of

11   the record?

12       A.    I cannot confirm to you what was done

13   during discovery to find the banner.

14       Q.    So is it fair to conclude that you

15   couldn't find or that Grubhub could not locate any

16   evidence of the banner on top of a restaurant

17   microsite?

18       MR. CARLSON:  Object to form.

19   BY THE WITNESS:

20       A.    I cannot confirm that for you either way.

21   BY MS. PRATSINAKIS:

22       Q.    Uh-huh.  Okay.

23            Now, you also testified -- you testified

24   that the banner ran across the ordering pages, is that

1    right, the ordering site?

2         A.    I said the search pages.

3         Q.    Okay.  So the search page, is that -- can

4    you give me a specific URL for that?

5         A.    I do not have it pulled up in front of me,

6    but it -- it would be off -- a sub page off of

7    Grubhub.com.

8         Q.    Okay.  Let me see if I can just look it

9    up.

10             Well, my question is going to be:  Do you

11   have any documentary evidence or evidence of any kind

12   to prove that it was on the ordering site?  Or the --

13   the search page, excuse me?

14        A.    The proof that we have are the -- the

15   tickets, the e-mails and the screen shot that we

16   produced earlier.

17        Q.    So what is the ordering site for?

18        A.    The ordering site as in Grubhub.com?

19        Q.    No.  As in the search.

20             Here, here is Grubhub.com.  Why don't you

21   show me where else you believe that banner was posted?

22        A.    You would type in your address as a diner.

23        Q.    Uh-huh.

24        A.    And this next page that is brought to you

Confidential - Marielle Kokos

```
1    is what we would call our search page.  So there is a
2    variety of restaurants listed and cuisines that you
3    can search by.
4         Q.    Okay.  So a diner looking to order food
5    would type in their address and although it still is
6    yet unconfirmed, they would -- Grubhub believes that
7    there would have been a banner there between March 7th
8    and April 6th?
9         A.    Correct, a diner or a restaurant typing in
10   an address on Grubhub.com would be taken to our search
11   page which is the second page and they would have been
12   able to see a notification there, banner notification.
13        Q.    And I know you mentioned this earlier, but
14   can you just refresh my memory about tracking on this
15   page right here whether Grubhub tracks who is
16   searching between March 7th and April 6th, do -- do
17   they keep track of the -- who is searching from where,
18   at what time, do they keep that data?
19        A.    So my specific knowledge is not around the
20   data collection of Grubhub.  I know that they track
21   users and -- and track traffic within the website, but
22   I could not give you a firm answer on what
23   specifically was tracked during those dates.
24        Q.    So, and if someone is not signed up with
```

Confidential - Marielle Kokos

1   Grubhub, they still track you, correct?

2       A.    I cannot answer that specifically.

3       Q.    Okay.  Did Grubhub send any type of

4   communication asking restaurants to go to the

5   Grubhub.com website to see this purported banner that

6   was running between April -- purportedly running

7   between March 7th and April 6th?

8       MR. CARLSON:  Object to form.  Asked and

9   answered multiple times.

10  BY THE WITNESS:

11      A.    Grubhub did not send any specific notice

12  to the restaurants to go to Grubhub.com and look for

13  the banner.  We've asked them in their contracts to

14  check back to the Grubhub.com/legal website looking

15  over our privacy policy in terms of use on a regular

16  basis.

17      Q.    Okay.  Okay.  If you could pull out

18  Exhibit 5, your declaration.

19          Other than the e-mails that you've

20  attached to your declaration of March 6th, 2019, do

21  you have any proof that suggests or shows that

22  Marianne Kelly was on a page that was running your

23  banner?

24      MR. CARLSON:  I'll just --

```
 1   BY MS. PRATSINAKIS:

 2       Q.    Excuse me, Grubhub's banner?

 3       MR. CARLSON:  I'll just object because we have

 4   done discovery responses and things since this

 5   declaration and she has not been put up as the witness

 6   on all of the tracking data.  Right?  That's

 7   Mr. Young.  So you are beyond the scope and you're on

 8   something that's before the discovery we were just

 9   doing.

10       MS. PRATSINAKIS:  I'd like the witness to

11   testify, not her attorney.

12   BY MS. PRATSINAKIS:

13       Q.    Can you answer the question?

14       A.    I have e-mails specifically from Marianne

15   to Kevin, not on March through April, but I have

16   e-mails for Exhibits F through L and -- let me make

17   sure those are accurate.  I can give you a page to

18   start.  Grubhub 1488 that -- where she is specifically

19   asking him questions --

20       Q.    Uh-huh.

21       A.    -- related to the website --

22       Q.    Uh-huh.

23       A.    -- placement --

24       Q.    Uh-huh.
```

Confidential - Marielle Kokos

```
1        A.      -- menu, where I know that she has

2   specifically visited Grubhub.com.

3        Q.      Okay.  So let's just start with 1489 in

4   this e-mail between Marianne and Kevin O'Malley.

5               Couldn't she have reviewed the

6   restaurants' microsite on Grubhub for Restaurants and

7   not have gone to the Grubhub.com microsite to give you

8   this input?

9        A.      No, she could not have.  That -- the

10  ability to check your placement or your menu on

11  Grubhub was not in GrubCentral at that time.

12       Q.      Okay.  So you're saying in July of 2016 --

13       A.      Correct.

14       Q.      -- the menu was not available on

15  GrubCentral.com?

16       A.      I did not say the menu was not available.

17       Q.      Uh-huh.

18       A.      The actual link to your menu live on

19  Grubhub.com was not in GrubCentral.  The menu and menu

20  editing function was there, but it would not show you

21  exactly what it looked like to a diner.

22       Q.      Okay.  But she is just saying make the

23  menus consistent, isn't she?

24       A.      In the beginning part of this e-mail, yes,
```

1    but in that last paragraph as:

2         "Why is the open now box checked as a

3    default?  If a customer wants to place an order before

4    our listed opening time" --

5         Q.    Uh-huh.

6         A.    -- "we don't show up on the list.  We are

7    probably losing some sales because of this.  You can

8    only see that open now check box" --

9         Q.    Uh-huh.

10        A.    -- "on the Grubhub.com website."

11        Q.    Okay.  And so -- so her one reference to

12   visiting the diner website is your evidence for her

13   having notice of the 2016 banner?

14        MR. CARLSON:  Object to form.

15   BY THE WITNESS:

16        A.    That's not what I said.  I --

17   BY MS. PRATSINAKIS:

18        Q.    I'm asking.  It's a question.  I mean --

19        A.    I'm answering.

20             What the e-mails specifically state and

21   what I have stated previously is that there are

22   e-mails throughout here through Kevin that I know that

23   she has been to Grubhub.com.

24        Q.    Uh-huh.  On a handful of occasions in an

1   eight-year relationship, is that right?

2        MR. CARLSON:  Object to form, argumentative.

3   BY MS. PRATSINAKIS:

4        Q.    I mean, the relationship with Tiffin

5   started in 2011, it is now 2019, that's eight years,

6   and in the eight years that it has been doing business

7   with you, you've found a handful of e-mails, correct?

8        MR. CARLSON:  Object to form.

9   BY THE WITNESS:

10       A.    These are the e-mails that we found

11  specifically with Marianne, yes, and I believe

12  Marianne did not join the company until 2016.

13  BY MS. PRATSINAKIS:

14       Q.    And so you didn't search for any other

15  Tiffin employee, just Marianne?

16       MR. CARLSON:  Object to form.  Be -- beyond the

17  scope.  I don't --

18  BY THE WITNESS:

19       A.    This is --

20       MR. CARLSON:  Answer to the extent you can.

21  BY THE WITNESS:

22       A.    Yeah, this is what was handed to me as far

23  as discovery and doing research and finding e-mails.

24  This is what we were looking for with this specific

```
 1    person in the e-mails.

 2    BY MS. PRATSINAKIS:

 3        Q.    Okay.  Is it fair to say that if you had

 4    found any other evidence of anyone from Tiffin

 5    visiting the microsite you would have included it as

 6    evidence in your declaration to support your

 7    allegation that they -- they go to the website?

 8        MR. CARLSON:  Object to form.  You know, we've

 9    had discovery responses since then.  We've produced

10    400 and some e-mails from Tiffin.  This is -- I don't

11    understand the question.

12            Answer if you can.

13    BY THE WITNESS:

14        A.    Again, like, there was plenty -- there was

15    lots of research done.  These are the specific ones

16    that were included within my declaration.  I can't

17    speak to what they've already produced as -- as other

18    evidence to you.

19    BY MS. PRATSINAKIS:

20        Q.    So you personally did not see any other

21    evidence but what's in here in your declaration?

22        A.    I think what's relevant is what's in our

23    responses to and objections to the interrogatories and

24    what was in my declaration.
```

1        Q.    Okay.  Did you personally see the

2   documents that are referenced in the interrogatory

3   responses?

4        A.    Yes.

5        Q.    Okay.  You personally laid eyes on each of

6   those documents?

7        A.    Yes, and signed off on them.

8        Q.    Okay.  And so just to be clear, you found

9   no other information other than what's in your rog --

10  in the rog responses and what's in your declaration?

11       MR. CARLSON:  Object to form, asked and answered

12  multiple times.

13  BY THE WITNESS:

14       A.    Correct.

15  BY MS. PRATSINAKIS:

16       Q.    Okay.  So moving on, I'd like to --

17  Exhibit 15.

18                 (WHEREUPON, a certain document was

19                  marked Kokos Deposition Exhibit

20                  No. 15, for identification, as of

21                  05/28/2019.)

22       THE WITNESS:  Thank you.

23  BY MS. PRATSINAKIS:

24       Q.    Ms. Kokos, I'm handing you a spreadsheet

1    that was produced to us the other day that's been

2    named "Activity Log" and it was -- and I can represent

3    to you that it was in a folder called "Marketing" and

4    suggest that these are various e-mails that were sent

5    for marketing purposes to restaurants.

6            Am I reading this document correctly?

7       A.   Yes, that is correct.

8       Q.   Okay.  And these are e-mails that were

9    sent to restaurants between March 29th, 2017, through

10   April 29th, 2019, is that correct?

11      A.   That is correct.  These are the dates

12   listed on this document.

13      Q.   Okay.  And are any -- I mean, I understand

14   you can't speak to each and every single e-mail that's

15   just referenced here summarily, but -- but what does

16   this represent to you?

17           Is this -- explain this restaurant

18   outreach that I'm looking at.

19      A.   Sure.

20           This restaurant outreach is from our B2B

21   marketing team, so the marketing team that is focused

22   on restaurants specifically, and these are all of the

23   different campaigns they ran through the dates that

24   you have listed.

Confidential - Marielle Kokos

```
1      Q.    Okay.  So these are not e-mails sent by

2  your group?

3      A.    That's correct.

4      Q.    This is the B2B division?

5      A.    Correct.

6      Q.    And do you have a list of the e-mails that

7  you sent en masse to restaurants?

8      A.    No, I would not have a list of all of the

9  e-mails that have been sent to restaurants.  We -- we

10  don't send to campaigns like a B2B marketing team

11  would.  We send individual communications to

12  restaurants.

13      Q.    Okay.  And does the B2B team send out

14  notifications to restaurants about terms of use or any

15  other similar types of communications that would have

16  legal ramifications for restaurants?

17      MR. CARLSON:  Object to form.

18  BY THE WITNESS:

19      A.    The B2B marketing team would -- would not

20  be sending out communications with regards to our --

21  our terms of use because they are subject to change at

22  any time and they are in digital format.

23  BY MS. PRATSINAKIS:

24      Q.    So, I'm sorry, let me understand.  The B2B
```

1    division sends out e-mails for a variety of reasons

2    for purposes of, you know, improving services to

3    restaurants or increasing engagement with restaurants

4    but has never referenced nor would reference terms of

5    use because they are on a website?

6        MR. CARLSON:  Object to form.

7    BY THE WITNESS:

8        A.    No, I'm saying they have not -- they are

9    not in an e-mail form to a restaurant.  So the B2B

10   team has not sent them in e-mail form to a restaurant.

11   They are sending exactly what you said, which would be

12   enhancements or updates product wise.

13   BY MS. PRATSINAKIS:

14       Q.    Ms. Kokos, did Grubhub locate any evidence

15   of Plaintiffs being on the website during the actual

16   time that the alleged banner ad was running?

17       MR. CARLSON:  Object to form, asked and

18   answered.

19   BY MS. PRATSINAKIS:

20       Q.    It is a simple yes or no.

21       A.    We did find evidence of them being on the

22   website and all of that is within my interrogatory

23   responses.

24       Q.    After the date that the banner ad stopped

1    running, isn't that correct?

2        A.    I would have to go back through --

3        MR. CARLSON:  Object to form.

4            Sorry.  Go ahead.

5    BY THE WITNESS:

6        A.    I would have to go back through and look

7    specifically at my declaration to be exact.

8    BY MS. PRATSINAKIS:

9        Q.    Okay.  If you had such proof, it would be

10   in this declaration, correct?

11       MR. CARLSON:  Object to form.

12   BY MS. PRATSINAKIS:

13       Q.    Do you -- can I ask, did Grubhub keep --

14            I'm sorry.  Answer that question.

15       A.    Yes, it would -- it would be in my

16   declaration and/or the responses and objections to the

17   interrogatories.

18       Q.    Okay.

19            So how would the banner ad -- did the

20   banner ad request that someone click it to acknowledge

21   it or just to -- or you just clicked it to be rerouted

22   to that URL we discussed earlier, update to terms?

23       A.    The -- the banner ad was not specifically

24   asking anyone to acknowledge it.  It just gave you an

Confidential - Marielle Kokos

```
 1   option to learn more which took you to the updated

 2   terms of use or there was an X that you could dismiss

 3   the banner ad.

 4        MR. PRATSINAKIS:  Okay.  I think this is a good

 5   time to break before we get into the next subject.

 6             Is that okay with everyone?

 7        MR. CARLSON:  Yeah.

 8        THE VIDEOGRAPHER:  We are going off the record

 9   at 3:14 p.m.

10                  (WHEREUPON, a recess was had

11                   from 3:14 to 3:35 p.m.)

12        THE VIDEOGRAPHER:  We are back on the record at

13   3:35.

14   BY MS. PRATSINAKIS:

15        Q.   Ms. Kokos, you attached to your

16   declaration a copy of -- of a popup overlaid on top of

17   the URL Grubhub.com/legal/terms-of-use.

18             I'd like to direct your attention to that

19   popup, Exhibit T of your declaration, Bates numbered

20   1583, and that is -- your declaration is Exhibit 5,

21   for the record.

22             And my question to you is:  Do you

23   recognize this page?

24        A.   I do.  This is the terms of use on
```

Confidential - Marielle Kokos

1    Grubhub.com.

2         Q.    And just to be clear, exactly what URL is

3    it found on, specifically?

4         A.    The Grubhub.com/ -- let me get it correct

5    for you.  It is Grubhub.com/legal/terms-of-use.

6         Q.    Okay.  And when did these -- for -- just

7    putting aside the popup for a second, when did the

8    terms that are labeled "effective June 4th, 2018," get

9    posted onto that URL?

10        A.    Those are the most recent terms of use

11   that went live on June 4th, 2018, and are still there

12   today.

13        Q.    Okay.  So I take it there wasn't a 30-day

14   period that preceded that with a popup, is that

15   correct, something to say, in 30 days our terms are

16   going to be amended, is that right?

17        A.    Correct.  This popup went live on

18   June 4th, 2018, when these terms also went live and it

19   is actually still on the website today.

20        Q.    Okay.  And this popup, when did this popup

21   start running over top of the June 4th, 2018 terms of

22   use which you testified were loaded onto the URL on

23   June 4th, 2018?

24        A.    The popup went live on June 4th, 2018.

1      Q.    Was there a work order for this popup?

2      A.    I do not specifically remember a work

3    order for this popup, but I have to assume that our

4    tech team had a similar



Confidential - Marielle Kokos



Confidential - Marielle Kokos

███ ███ ████████████████

███ ██████████████████

███ ████████████

4      Q.    Ms. Kokos, are you familiar with the

5   reason why the terms were updated on June 4th, 2018?

6      A.    That would have been our legal team

7   deciding that they needed to update the terms of use.

8   They are assessing it on a regular basis.

9      Q.    And was it your understanding that it had

10  nothing to do with the Tiffin complaint?

11     MR. CARLSON:  Object, object to the form.

12  BY THE WITNESS:

13     A.    Again, it would have been strictly our --

14  our legal team making those decisions of when they

15  want to update our terms of use.

16  BY MS. PRATSINAKIS:

17     Q.    My question is:  Do you have an

18  understanding of whether or not the Tiffin complaint

19  contributed to the amendment of the terms of use?

20     MR. CARLSON:  And -- and I'll instruct you to

21  answer that only if you can without revealing any

22  privileged communications.

23  BY MS. PRATSINAKIS:

24     Q.    I mean, I asked for your understanding,

Confidential - Marielle Kokos

```
 1    not your communication with counsel.
 2         MR. CARLSON:  Well -- well, if you want to treat
 3    it as a yes or no, do you have an understanding of --
 4    well, strike that.  I'm not going to ask questions.
 5              I'll instruct you not to reveal privileged
 6    communications.  If your communication was with a
 7    lawyer, I instruct you not to reveal that.  If you
 8    have some other reason to understand why the terms
 9    were amended, you can give that.
10    BY THE WITNESS:
11         A.   No, I was not involved in any decision to
12    amend our terms of use.
13    BY MS. PRATSINAKIS:
14         Q.   My question was different.
15              Do you have an understanding of whether or
16    not the Tiffin complaint contributed to the amendment
17    of the terms of use?
18         A.   No.
19         Q.   Okay.
20         A.   I was not involved.
21         Q.   Okay.  And you met with legal specifically
22    about the Tiffin complaint?
23         A.   Yes, I met with -- with our internal legal
24    and then outside counsel.
```

Confidential - Marielle Kokos

 1     Q.    And that was soon after Kevin O'Malley's

 2   March e-mail?

 3     A.    The inside counsel with Katie would have

 4   been soon after.  Jones Day would not have been until

 5   recent.

 6     Q.    Okay.  Is Ken O'Malley still at the

 7   company?

 8     A.    He is still at the company.

 9     MS. PRATSINAKIS:  Okay.  Well, I will represent

10   to you that I don't have a JIRA ticket for this 2018

11   amendment to the terms of use and would like the

12   company to produce that to the extent it exists.

13     MR. CARLSON:  I will take it under advisement.

14     MS. PRATSINAKIS:  Or just some clarity as to

15   whether or not --

16     MR. CARLSON:  Right.

17     MS. PRATSINAKIS:  -- one even exists.  And if

18   one doesn't exist, what I would like to request is the

19   documents that led to the IT department adding this so

20   I have some clarity on exactly what it was added.

21     MR. CARLSON:  Okay.  Well, we've already tried

22   to respond to the discovery requests looking for that

23   type of information.  So I think we've probably

24   already given you what we have.  But we'll --

1      MS. PRATSINAKIS:  So there is no work ticket.

2      MR. CARLSON:  Now, I am not -- I am not making

3   representations one way or another because I don't

4   know the extent of everything --

5      MS. PRATSINAKIS:  Okay.

6      MR. CARLSON:  -- right here.

7      MS. PRATSINAKIS:  Sure.

8      MR. CARLSON:  What I'm saying is we will

9   consider it and we can get back to you if we have got

10  anything else to put up.

11     MS. PRATSINAKIS:  Okay.  So just to be clear, I

12  want to see the JIRA work ticket for the popup and I

13  want to see the JIRA work ticket for the new updated

14  content added to the website at

15  Grubhub.com/legal/terms-of-use to the extent there are

16  two separate ones.

17     MR. CARLTON:  It will probably be easier if you

18  follow up after the deposition in writing and issue us

19  an e-mail saying what you want.

20     MS. PRATSINAKIS:  I just told you what I wanted.

21     MR. CARLSON:  I'm just asking you to put it in

22  an e-mail so it is clear because I'm not sure what --

23  what exactly you are talking about.

24  BY MS. PRATSINAKIS:

1    Q.    I'd like to direct you back to 1583.

2          This popup is a popup notifying a user

3    about an update to terms of use, correct?

4    A.    Correct.

5    Q.    But the popup is sitting on top of and

6    overlaid over the actual terms of use, so how would

7    one know about the amendment on June 4th if they

8    didn't go directly to this URL?

9    A.    So from a restaurant specifically, we are

10   telling them that they should, you know, look at the

11   terms of use on a regular basis.  And, again, this

12   popup is actually still here today, so it is showing

13   anyone that's coming to this terms of use page to take

14   note of the fact that there has been an -- an update

15   as of June 4th, review that before you are continuing

16   to use the website.

17   Q.    But with the banner you claim -- or

18   Grubhub claims that it was running on the homepage,

19   why did this popup not get placed on the homepage?

20   A.    Again, that would have been our -- our

21   legal team's choice of where they wanted the banner

22   and/or popup to go and for this specific change they

23   chose to leave it on the terms of use page.

24   Q.    Okay.  So other than on the terms of use

1    page, this popup appeared nowhere else on

2    Grubhub.com's URLs or sub URLs or sub sub sub URLs?

3         A.    This specific popup did not.

4         Q.    Okay.  So you could dismiss this popup by

5    clicking "got it" or the "X," correct, up at the

6    right-hand screen?

7         A.    That is correct.  To be able to continue

8    reading the page, you have to click "got it" or X out

9    of the -- the popup itself.

10        Q.    Okay.  And so do you track -- does Grubhub

11   track, excuse me, the clicking of the "X"?

12        A.    Grubhub is not specifically tracking the

13   clicking of the "X" or -- or the "got it."  It is

14   there.  And you cannot see or use the site unless you

15   dismiss the box.

16        Q.    Okay.

17              Does -- so I understand that Grubhub

18   doesn't track whether the "X" is clicked versus the

19   "got it," is that correct?

20        A.    Correct.

21        Q.    Does Grubhub know that this popup has been

22   dismissed, regardless of how it was dismissed?

23        A.    No.  To my understanding, Grubhub is not

24   tracking clicks on this popup in any form.

1      Q.    Okay.  So the terms of use that were

2   posted behind this popup, did it have a section or a

3   paragraph explaining what had been updated, or were

4   you supposed to, like, create your own redline

5   comparison of, like, the form -- the terms prior to

6   and these terms?

7      MR. CARLSON:  Object to form.

8   BY THE WITNESS:

9      A.    The popup was encouraging you to read the

10  ent -- terms of use in entirety to know what the

11  current terms of use were.

12  BY MS. PRATSINAKIS:

13     Q.    Okay.  But did it notify you of what

14  specific term had been updated?

15     MR. CARLSON:  Object to form, asked and

16  answered.

17  BY THE WITNESS:

18     A.    No.  The -- the for -- the popup and the

19  reason for the popup was just letting you know that an

20  update had happened and encouraging you to read them

21  in its entirety.

22  BY MS. PRATSINAKIS:

23     Q.    Okay.  My question is different.

24         My question is:  Did it explain to you the

Confidential - Marielle Kokos

1  difference between this version and the immediately

2  preceding version of terms of use?

3       MR. CARLSON:  Object to form, asked and

4  answered.

5  BY THE WITNESS:

6       A.   No.  The terms of use are the updated

7  version of the terms of use and we are asking that the

8  diners, drivers, restaurants, anyone using our site

9  are reading it in their entirety to know everything

10  that's in the terms of use.

11  BY MS. PRATSINAKIS:

12       Q.   And if a restaurant doesn't use your site,

13  then they are not required to read it?

14       MR. CARLSON:  Object to form, mischaracterize

15  the testimony.

16  BY THE WITNESS:

17       A.   The restaurant is already agreeing to the

18  terms of use by signing the contract.

19  BY MS. PRATSINAKIS:

20       Q.   So the word "use" qualifies the website

21  Grubhub.com, isn't it?  Isn't it about using the

22  website is what they are agreeing to, we'll agree to

23  these terms because we are using Grubhub.com, correct?

24       MR. CARLSON:  Object to form.

Confidential - Marielle Kokos

```
 1   BY THE WITNESS:

 2        A.    No, I don't agree with that.  It's the

 3   terms of use of Grubhub's products in any capacity

 4   that you are using it.  So you are -- by using

 5   Grubhub, you are agreeing to these terms of use.

 6   BY MS. PRATSINAKIS:

 7        Q.    Okay.  Maybe I'm just -- so then why have

 8   a separate set of terms of use for Rest -- for Grubhub

 9   for Restaurants if -- if this is to be interpreted

10   that way?

11        MR. CARLSON:  Object to form.

12   BY THE WITNESS:

13        A.    The terms of use within Grubhub for

14   Restaurants do have a few different paragraphs and

15   entities than this one specifically and it is for

16   restaurants using that platform, the Grubhub for

17   Restaurants platform.

18   BY MS. PRATSINAKIS:

19        Q.    Okay.  Just walk me through this, why not

20   just have it all in one place, if -- if -- if this is

21   to be interpreted the way you are interpreting it,

22   that it is about using anything and all things

23   Grubhub, then why not take whatever terms at Grubhub

24   for Restaurants that are out there and mushing them
```

1    into this?

2        MR. CARLSON:  Object to form, calls for

3    speculation, hypothetical.

4    BY MS. PRATSINAKIS:

5        Q.    If you know.

6        MR. CARLSON:  Argumentative.

7    BY THE WITNESS:

8        A.    The -- the way that the terms of use

9    are -- are written and -- and decided upon are with

10   our legal team.  So they have put terms of use for

11   Grubhub.com on Grubhub.com.

12   BY MS. PRATSINAKIS:

13       Q.    Uh-huh.

14       A.    They apply to any user that is using that

15   website or -- and those services.  They've also then

16   put together terms of use for Grubhub for Restaurants

17   that are restaurant specific because diners do not

18   access that website and there are a few different

19   types of things within that website.

20       Q.    Right.

21             So -- so one is focused on diners and the

22   other one is focused on restaurants, correct?

23       MR. CARLSON:  Object to form, mischaracterizes

24   the testimony.

```
 1   BY THE WITNESS:

 2        A.    That is -- that is not what I said,

 3   because there are --

 4   BY MS. PRATSINAKIS:

 5        Q.    I'm asking.

 6        A.    -- multiple different people that log into

 7   Grubhub for Restaurants -- or excuse me -- that log

 8   into Grubhub.com different than Grubhub for

 9   Restaurants.

10        Q.    I would like to -- you to turn your

11   attention to 1585 in your Exhibit U of your

12   declaration.

13        A.    Yes.

14        Q.    So in -- this is a -- what is this

15   document?

16        A.    This document is a representation of what

17   the sign-in page looks like for Grubhub for

18   Restaurants.

19        Q.    At what time?

20        A.    Are you asking what date specifically it

21   looked like this?

22        Q.    Yes.  So what timeframe did the sign-in

23   page look like this?  What was the -- give me a time

24   reference.
```

Confidential - Marielle Kokos

```
1      A.    To my knowledge, since it started, that it
2  looks like Grubhub for Restaurants and this is what it
3  looks like today.
4      Q.    Okay.  So since it started, it had a 2019
5  copyright?
6      A.    You are asking me about the specific
7  copyright, no.  I'm telling you that the page itself
8  where a restaurant would log in looks like this.
9      Q.    Okay.  But this specific page is
10 copyrighted 2019.
11           So is it fair to say that it couldn't have
12 come into existence in and of itself until January 1,
13 2019, or later?
14     MR. CARLSON:  Object to form.
15 BY THE WITNESS:
16     A.    For this pulling of the page, sure, it
17 happened in 2019.  I'm telling you from my experience
18 of looking at Restaurants.Grubhub.com that this
19 section is what the login section looked like for
20 restaurants.
21 BY MS. PRATSINAKIS:
22     Q.    So from around January 2018 until now, it
23 looked exactly like this?
24     A.    January 2017 is when Grubhub for
```

Confidential - Marielle Kokos

1    Restaurants rolled out.

2        Q.    Okay.  So, just so I understand your

3    testimony, from the time Grubhub for Restaurants

4    rolled out in 2017 through to today, the login screen

5    looked exactly like this but for the copyright date?

6        A.    There may have been different color

7    changes, but yes.

8        Q.    So the phrase "terms of use" at the bottom

9    corner in tiny font, that was there in 2017 and 2018?

10       A.    Correct.

11       MS. PRATSINAKIS:  Okay.  I would like to mark my

12   next exhibit -- what are we on?

13       THE COURT REPORTER:  16.

14       MS. PRATSINAKIS:  Okay.

15            (WHEREUPON, a certain document was

16             marked Kokos Deposition Exhibit

17             No. 16, for identification, as of

18             05/28/2019.)

19       THE WITNESS:  Thank you.

20   BY MS. PRATSINAKIS:

21       Q.    Take a moment to look this over and let me

22   know when you are ready.

23       A.    I am ready.

24       Q.    Okay.  So on Grubhub 50 there is a picture

1   of the login screen, Grub Central, the previous login

2   screen and the -- and now a new login screen for

3   Grubhub for Restaurants.

4            It is a before-and-after screen shot.  Do

5   you see that?

6       A.   I do, but I would not call it a screen

7   shot.  I would call it a snippet of the login specific

8   section where a restaurant needs to focus their effort

9   in logging in.

10      Q.   Okay.  But do you see whoever drafted this

11  document called it a screen shot?

12      A.   I see that, but I'm -- I'm telling you

13  that I think that there is a limited amount of space

14  on this page and they are showing you what's the most

15  important information and that the point of this is

16  how to log in.

17      Q.   So to whom was this document directed?

18      A.   This was directed to restaurants and our

19  team would have also sent it out to restaurants.

20      Q.   Uh-huh.  And so this is exactly what it

21  looked like when it went out to restaurants?

22      A.   I cannot specifically confirm that this

23  was exactly what it looked like.  It may have had

24  different heading or logo of some sort to show

1    Grubhub, but I can know that this is what was drafted.

2         MS. PRATSINAKIS:  Okay.  We would like the

3    actual, a copy of the actual e-mail sent reflecting

4    this communication regarding the rebranding of Grubhub

5    for Restaurants.

6         MR. CARLSON:  I suspect you have it already.

7         MS. PRATSINAKIS:  So the actual e-mail itself.

8    BY MS. PRATSINAKIS:

9         Q.    Ms. Kokos, do you have any screen shots of

10   the login page that is copyrighted 2017 or 2018?

11        A.    I -- what I produced is -- is what I have

12   and what I have seen.  I would not be -- I would not

13   know specifically if there was one during discovery

14   that was -- that was found.

15        Q.    So, is there a website I could search

16   right now that would -- that would -- associated with

17   this page?

18        A.    This page specifically, the -- the URL is

19   Restaurant.Grubhub.com.

20        Q.    Here we go.  I'm going back to the Wayback

21   Machine and I'm putting in

22   Restaurant.Grubhub.com/login, is that...?

23        A.    Yes, maybe.  I don't know.  I think you

24   can just get to it through Restaurant.Grubhub.com.

Confidential - Marielle Kokos

```
 1        MS. PRATSINAKIS:  Thank you to the videographer

 2   for typing that in.

 3             Oh, slightly different.

 4   BY MS. PRATSINAKIS:

 5        Q.   Does this Exhibit 16 refresh your

 6   recollection when the rebranding actually took place?

 7        A.   So the rebrand for GrubCentral to Grubhub

 8   for Restaurants was at the beginning of -- of January

 9   in 2017 and this was kind of just showing what the

10   differences were.

11        Q.   Okay.  So where it says:  "Rebranding

12   starting on 1/18," does it mean January 18th, 2017?

13        A.   Yes.  The -- the rebrand of moving to

14   Grubhub for Restaurants was at the beginning of 2017.

15        Q.   And when -- did Grubhub send an e-mail

16   notifying those who had signed up for Grubhub for

17   Restaurants notifying them of the terms of use on that

18   website?

19        A.   The terms of use for Grubhub for

20   Restaurants and/or GrubCentral, there was not a

21   specific notification to the restaurants that the

22   terms of use were there.  The terms of use had a

23   hyperlink in the -- the right-hand corner of -- of

24   most pages.
```

Confidential - Marielle Kokos

```
 1      Q.    But this link, this
 2 Restaurant.Grubhub.com/terms-of-use where Grubhub
 3 claims to have posted terms of use, that was not
 4 referenced in the agreements with restaurants, was --
 5 was it?
 6      A.    That's --
 7      MR. CARLSON:  Object to form.
 8 BY THE WITNESS:
 9      A.    That's correct.  The -- the contract is
10 referring to the Grubhub.com/legal.
11 BY MS. PRATSINAKIS:
12      Q.    Okay.  So other than a hyperlink on a
13 login screen that you have testified has been there
14 from the time it was GrubCentral until now, what other
15 notice did Grubhub provide restaurants of its terms of
16 use associated with the Grubhub for Restaurants --
17      MR. CARLSON:  Object to form.
18 BY MS. PRATSINAKIS:
19      Q.    -- platform?
20      A.    The terms --
21      MR. CARLSON:  Sorry.
22 BY THE WITNESS:
23      A.    The terms of use on this --
24      MR. CARLSON:  I thought you were done.
```

Confidential - Marielle Kokos

```
 1   BY THE WITNESS:

 2        A.    -- privacy --

 3        MR. CARLSON:  Sorry.  I had -- just let -- let's

 4   let -- we are talk -- all talking each -- over each

 5   other.

 6             Sorry.  I didn't mean to cut you off.  I

 7   apologize.

 8             Object to form.

 9             Now you can answer the question.

10   BY THE WITNESS:

11        A.    The terms of use in the privacy policy

12   link that are in the right-hand corner are actually on

13   every single page when you go to Grubhub for

14   Restaurants.  There's also an additional place to find

15   it on the profile page where it says -- there is a --

16   a bigger link that says "term and agreement" that you

17   would kick -- click on and go directly to the terms of

18   use.

19   BY MS. PRATSINAKIS:

20        Q.    Okay.  So multiple clicks to get to the

21   URL -- a different URL than the one referenced in the

22   contract?

23        A.    No, I would not say that there are

24   multiple clicks.  It is a link on every page.  So if
```

Confidential - Marielle Kokos

1    you are on Grubhub for Restaurants and you are using

2    Grubhub for Restaurants, any page that you are on you

3    could go to the bottom right-hand corner and click on

4    the terms of use.

5        Q.    Assuming you know it is there?

6        MR. CARLSON:  Object to form.

7    BY THE WITNESS:

8        A.    Assuming that you are looking at the

9    website, yes.

10   BY MS. PRATSINAKIS:

11       Q.    And -- and notice a link --

12       MR. CARLSON:  Object to form.

13   BY MS. PRATSINAKIS:

14       Q.    -- correct?

15            Well, if you don't see the link, will you

16   see the terms?

17       A.    I'm not quite --

18       MR. CARLSON:  Object to form.

19            Sorry.

20   BY THE WITNESS:

21       A.    I'm not quite sure how you could not see

22   the link.

23   BY MS. PRATSINAKIS:

24       Q.    Okay.  Well, you deal with a department

Confidential - Marielle Kokos

1    that has many one-on-one communications with

2    restaurants and -- and I'm sure in that role you've

3    dealt with restaurant complaints, correct?

4        A.    Yes, I have had restaurant complaints.

5        Q.    How many times have you been brought to

6    arbitration by a restaurant?

7        A.    Me specifically?

8        Q.    The company.

9        A.    I would not actually know the total number

10   of times we've been brought to arbitration.

11       Q.    Has it been more than five?

12       A.    Again, not to my -- I -- I don't know.

13   I've not been involved in -- in all of the

14   arbitrations that have happened.  I've only been

15   involved with this one.

16       Q.    Are you assuming that any happened?

17       A.    I -- I can't speak to it.  I have not been

18   a part of them.  I have been a part of this one.

19       Q.    So you handle complaints from restaurants

20   and are not specifically involved in any arbitrations

21   between restaurants and Grubhub, assuming they even

22   exist, correct?

23       A.    Correct.

24       Q.    Okay.

1      MS. PRATSINAKIS:  I'd like to mark the next

2  exhibit, Exhibit 17.

3              (WHEREUPON, a certain document was

4              marked Kokos Deposition Exhibit

5              No. 17, for identification, as of

6              05/28/2019.)

7      THE WITNESS:  Thank you.

8  BY MS. PRATSINAKIS:

9      Q.    Let me know when you are ready.

10      A.    I am ready.

11      Q.    Okay.  What does this document reflect?

12      A.    This document is screen shots of what the

13  Tilf -- Tiffin Elkins Park owner or primary user or

14  admin user would be able to see when they log in to

15  Grubhub for Restaurants.

16      Q.    So is this a first screen that they see?

17      A.    The very first screen you see when you log

18  in is this dashboard, correct.

19      Q.    And over to the left is a directory of

20  different types of information contained on this

21  platform, correct?

22      A.    Yes, that's correct.

23      Q.    And would you read them for me?

24      A.    The first is "dashboard," the second is

1    "orders," the third is "menu," the fourth is

2    "profile," the fifth is "hours," the sixth is

3    "delivery boundary," seventh is "reviews," eighth is

4    "promotion," nine is "financials," ten is "users."

5    There is an option to reach your drivers if you are

6    using our Grubhub delivery service, "settings,"

7    "learning center" and then a button to stop taking

8    orders for the day.

9        Q.    Okay.  When you click on "users," what

10   type of information pops out?

11       A.    The screen shot in your document at the

12   back, it shows you what users have access to that

13   specific restaurant you have pulled up --

14       Q.    Uh-huh.

15       A.    -- and if they are admins or basic, if

16   they have access to multiple restaurants, and the

17   last, login for them.

18       Q.    So whose account are we looking at when we

19   are looking at this dashboard?

20       A.    So today we would be looking at -- from a

21   super admin view which would be anyone internally at

22   Grubhub that could access the same thing as what a --

23   a admin user would see from the Tiffin location.  So

24   it would be internally specific to Grubhub.

Confidential - Marielle Kokos

```
1      Q.    So just to be clear, some admins are

2  multiple restaurant admins and some admins are

3  restaurant-specific admins, correct?

4      A.    Correct.  That would be up to the choice

5  of the restaurant, how they want to set that up.

6      Q.    And underneath in the restaurant column,

7  there is a number there, 227901, and then another

8  number under that associated with Elkins Park which is

9  also 227901.

10           What is that in reference to?

11     A.    Those two numbers are the restaurant's

12  custofer -- customer identification number within the

13  Grubhub internal system, so it is letting us know what

14  location they are assigned to.

15     Q.    And what -- what location are you

16  referring to?

17     A.    So the Elkins Park location's customer ID

18  is 227901.

19     Q.    And the one above it?

20     A.    Again, same, it would be the Elkins Park

21  location, which is 227901.

22     Q.    And both of those -- so there is two user

23  accounts specific to the Elkins Park restaurant,

24  correct?
```

```
1        A.    That is correct.

2        Q.    Do you know who uses those accounts?

3        A.    According to the first and last name

4    listed there, the first one would be Munish Narula and

5    the second would be Naran Adhikari.

6        Q.    And who inputted the first and last name

7    in reference to this column?  Was it Grubhub or was it

8    the customer?

9        A.    I would assume that it is Grubhub.  The

10   customer does have the ability to add users if they

11   are an admin to that specific location.

12       Q.    Okay.  So you tell Grubhub that you need

13   an account and Grubhub will add the first, last name

14   and the sign-in account number to you, is that

15   correct?

16       A.    In previous days, so early on in -- in

17   Grubhub for Restaurants, the only way to begin using

18   Grubhub for Restaurants was to have someone on Grubhub

19   create you an account.  Today it is actually

20   automatic.  That the minute you sign up with Grubhub,

21   you are sent a user name and password to have access

22   to Grubhub for Restaurants and you can add as many

23   users as you want.  If you can't do it or you need

24   help, you are welcome to call the Account Adviser team
```

1    or Restaurant Care to add users.

2        Q.    That self login or self account option,

3    that just only started recently, you said, in the last

4    six to 12 months, is that correct?

5        A.    No.  We've probably began sending logins

6    the minute someone signs up with Grubhub within the

7    last year.  So probably 12 months or so.  But when the

8    Tiffin restaurants were using Grubhub -- GrubCentral

9    and Grubhub for Restaurants, we probably would have

10   added the -- at least the first user.

11       Q.    Okay.  And so is it uncommon for Grubhub

12   to just add the owner of the restaurant as the name

13   associated with the account?

14       A.    We would generally ask them who they want

15   to be the admin user.  We wouldn't just assume.  We

16   would ask whoever is signing the restaurant up, who do

17   you want to have access to this website.

18       Q.    And so do you know who -- do you -- do you

19   keep recordings of conversations of these types of

20   requests?

21       A.    I know that our calls are recorded in

22   certain states, but I would not say that we are

23   regularly collecting calls around what users to add.

24   We may have specific e-mails around it, but the owners

Confidential - Marielle Kokos

1    are who are asking who can have access to the account.

2        Q.    So when you are signing up for an account,

3    is it -- is it over the phone or is it by an e-mail

4    request?

5        A.    It could be either.

6        Q.    Either one?

7        A.    Um-hum.

8        Q.    Who is Adhikari Naran?  Or Naran Adhikari?

9        A.    I would not have specific recollection of

10   who that user is, but that user would have been

11   someone that was given to us as being able to have

12   access to this account.

13       Q.    And just because an account is under a

14   person's name, does that necessarily mean that they

15   are the user of the account day-to-day?

16       MR. CARLSON:  Object to form.

17   BY THE WITNESS:

18       A.    There are two different forms of using

19   Grubhub for Restaurants.  There is the admin version

20   where you have access to many of these different

21   things on the left.

22   BY MS. PRATSINAKIS:

23       Q.    Uh-huh.

24       A.    And then there is a basic version where

Confidential - Marielle Kokos

1   you are just essentially confirming the orders.

2        Q.    Uh-huh.

3        A.    So if this person was given an admin

4   login, it's because they were -- we were told that

5   they were able to have access to those things.

6        Q.    Uh-huh.

7        A.    And then if they decide to use it, of

8   course, it is up to them as a user if they want to use

9   it or not.

10       Q.    So -- so just to be clear, it's not

11  necessarily the name on the account that's actually

12  using this admin account?

13       A.    If --

14       MR. CARLSON:  Object to form.

15  BY THE WITNESS:

16       A.    If this admin has given the login to

17  someone else, I would not be able to tell you that.

18  That's up to the admin to choose to do.

19  BY MS. PRATSINAKIS:

20       Q.    Okay.  So Grubhub can't track who is using

21  the admin account, it could be a waitress, it could be

22  cashier, it could be -- it could be anyone who was

23  given that account name and password, correct?

24       MR. CARLSON:  Object to form, calls for

1    speculation.

2    BY MS. PRATSINAKIS:

3         Q.    And I'm -- and I'm sorry.  Just to be

4    clear, I'm asking hypothetically, would you know who

5    is using it if it was given out to all of the

6    employees of the restaurant?

7         MR. CARLSON:  Object to form.

8    BY THE WITNESS:

9         A.    Grubhub would not know specifically what

10   user was using the login except for the login itself.

11   I cannot tell you whether a restaurant has given the

12   login to all of its employees, but it would definitely

13   not be in their best interests to do so with the

14   amount of information that's located in Grubhub for

15   Restaurants.

16   BY MS. PRATSINAKIS:

17        Q.    Okay.  What specifically is so

18   hypersensitive that you wouldn't give it to employees?

19        A.    Well, the access to change order minimum

20   or your fee, your delivery boundary, hours of

21   operation, but most importantly, your financials in

22   being able to see your statements and your deposits

23   and transactions, revenues associated with your

24   restaurant, that tends to be pretty sensitive

1    information.

2        Q.    But -- but, wait, we are only talking

3    about the financials of revenue associated with

4    Grubhub, we are not talking about the entire

5    restaurant operation, correct?

6        MR. CARLSON:  Object to form.

7    BY THE WITNESS:

8        A.    Correct.  These would be the orders coming

9    from Grubhub.

10   BY MS. PRATSINAKIS:

11       Q.    Okay.  But so I guess every admin can

12   decide for his or herself what they are comfortable

13   sharing and that it can be used by anyone and Grubhub

14   wouldn't know the difference, correct?

15       MR. CARLSON:  Object to form, asked and

16   answered.

17   BY THE WITNESS:

18       A.    Correct, it is the restaurant's choice.

19   BY MS. PRATSINAKIS:

20       Q.    Okay.  So earlier when we were looking at

21   Exhibit 13, this information on Exhibit 13, can you

22   access it from this page?

23            Is it -- is it synonymous with the

24   learning center?

1    A.    You are asking -- sorry.  You are asking

2  if this page on Exhibit 13 is part of the learning

3  center?

4    Q.    I'm saying if -- is the content on

5  Exhibit 13 accessible through links on the left-hand

6  side of this page?

7    A.    To -- to my understanding, it's only

8  accessible at Get.Grubhub.com but I have not

9  specifically looked at the learning center to see if

10  this is located there.  The learning center is more

11  restaurant and industry-based information for

12  restaurants that are on Grubhub.  Get.Grubhub.com is

13  its own website to access the restaurants.

14    Q.    Okay.  So they both target restaurants but

15  restaurants that have opted for different services or

16  one that hasn't opted for services and the other one

17  already has, is that correct?

18    A.    That's it, yes, that's correct.

19    Q.    Okay.  I don't see the terms of use on the

20  left-hand side here as an option.

21         Do you?

22    MR. CARLSON:  What -- which page are you on?

23  BY MS. PRATSINAKIS:

24    Q.    Exhibit 17, Grubhub 5.

```
 1              Is there any way to access, I guess, the

 2  terms of use that you -- that were reportedly posted

 3  on Grubhub for Restaurants from any link on the

 4  left-hand side?

 5      A.    Yes, there is.

 6      Q.    Okay.  Show me which link.

 7      A.    It would be the profile link.

 8      Q.    Okay.  So let's go to the profile link.

 9              So after you kick -- click "profile," what

10  comes up?

11      A.    After you click "profile" on Grubhub 12,

12  it shows you a -- pictures that are representing your

13  website as well as your logo.

14      Q.    Uh-huh.

15      A.    You have underneath "order management" a

16  variety of different ways to adjust some account

17  settings, anywhere that there is a pencil.  You can

18  click to see your public profile, which would be how

19  your menu is displaced to diners.  What's in your

20  About Us section, who your specific account contact

21  is, as in your main admin user, who your account

22  adviser is.  We have now moved on to Grubhub 13.  And

23  then right underneath the Account Adviser is a link to

24  "terms and agreement" where you can view the terms of
```

1    use.

2        Q.    And when was that posted there?

3        A.    I do not specifically know when it was

4    posted to the profile page in this manner, but it has

5    always been at the bottom right-hand corner.

6        MS. PRATSINAKIS:  Counsel, can we get the work

7    order for the addition of terms and agreement on the

8    profile page of GFR --

9        MR. CARLSON:  I don't --

10       MS. PRATSINAKIS:  -- Grubhub No. 13.

11       MR. CARLSON:  I don't think she even -- I'm not

12   sure that's consistent with the testimony, but send me

13   an e-mail after this and we'll consider it.

14       MS. PRATSINAKIS:  Well, let me ask.

15   BY MS. PRATSINAKIS:

16       Q.    Would a -- would an order have -- a work

17   order have been issued for a change to your -- to your

18   platform?

19       A.    I -- I mean, I am not in the tech team.

20   I -- I don't specifically know, but I -- I would not

21   be the one making the change to the code like that.

22       Q.    Okay.  So you don't know when it was

23   posted there.

24            Can you guesstimate, do you know that if

1    it was in there on -- in 2018?

2         A.    I don't know that specifically.  I know

3    that the profile page has been adjusted recently to be

4    able to give restaurants access to some of these

5    account settings.

6         Q.    Uh-huh.

7         A.    So I would say it's definitely -- I should

8    not say definitely.  I would guess that it has been

9    there in at least the last six to 12 months as these

10   order management and large order thresholds and things

11   have now been recently added to be editable by the

12   restaurant.

13        Q.    Uh-huh.

14        A.    The terms of use link in the -- the corner

15   has always been there.

16        Q.    That little one on the right-hand side

17   sandwiched between "all rights reserved" and "privacy

18   policies," is that what you are referring to?

19        A.    Correct, the "terms of use" link in the

20   right-hand corner.

21        Q.    Okay.  And so what was added in -- in the

22   last six or so months, you are estimating, I

23   understand, was this phrase "terms and agreement" and

24   then "view terms and agreement" right underneath that,

Confidential - Marielle Kokos

```
1    correct?

2        MR. CARLSON:  Object.  Object to form,

3    mischaracterizes testimony.

4    BY THE WITNESS:

5        A.    Correct, the addition of the profile

6    page and these editable versions is what I am -- I am

7    guessing was in the last six to 12 months.

8    BY MS. PRATSINAKIS:

9        Q.    Well, I'm asking specifically about this

10   phrase "terms and agreement" and then it says "view

11   terms and agreement," I'm asking when specifically was

12   that added.  And I thought your testimony was in the

13   last six to 12 months?

14       A.    That is correct.

15       Q.    Okay.

16             And can you click on both of these?

17       A.    Yes, but the -- the link is one hyperlink.

18   It takes you to the terms of use page.

19       Q.    Okay.

20             And I guess the one in the lower

21   right-hand corner wasn't good enough, they added

22   another one?

23       MR. CARLSON:  Object to the -- was that a

24   question?
```

```
 1                 Object to form.

 2   BY THE WITNESS:

 3       A.    Yeah, are you asking me my opinion if it

 4   wasn't good enough?  I would not be able to give you

 5   an answer on that or not.  The tech team has decided

 6   and the legal team has decided where they want to post

 7   the -- the terms of use.

 8   BY MS. PRATSINAKIS:

 9       Q.    Uh-huh.  Is that language right there,

10   "terms and agreement," more visible to you than that

11   little link on the lower right-hand corner?

12       A.    On this specific page it -- it sticks out

13   as an individual box.

14       Q.    Uh-huh.  Okay.  And if you -- if you

15   scroll up to "account contact"?

16       A.    Yes.

17       Q.    Who is Suman?

18       A.    Underneath Suman KC it states that it is

19   the owner -- he or she is the owner with a specific

20   number.  So where that comes from would be our

21   contract.

22       Q.    Uh-huh.  So Suman is the owner and it's

23   with respect to the Elkins Park restaurant?

24       A.    That's what's listed there, yes.
```

Confidential - Marielle Kokos

1      Q.    Uh-huh.  Okay.  And when, if you know, did

2  Grubhub add a mandatory arbitration provision to terms

3  on this platform?

4      A.    So that was also added in 2016.  The

5  arbitration clause was added to the terms of use, I

6  believe it was August 1st.

7      Q.    Uh-huh.  And was it updated on the

8  platform on that same day?

9      MR. CARLSON:  Object to form.

10  BY THE WITNESS:

11      A.    Were the terms of use updated on that day,

12  is that what you are asking me?

13  BY MS. PRATSINAKIS:

14      Q.    Yes.

15      A.    Yes, they went in -- they were updated on

16  the site on August 1st of 2016 to

17  Restaurants.Grubhub.com.

18      Q.    Okay.  So the commit date was in 2017?

19      MR. CARLSON:  Object to form.

20  BY MS. PRATSINAKIS:

Confidential - Marielle Kokos

███  ███████████████

███  █████████████

███  ███  █████████████████████████████

███  █████████████████

███  ███  ██████████

███  ███  ████████████████████████████████████

███  ██████████████████████

███  ███  ████████

███  ███  ██████████████

10     MS. PRATSINAKIS:  Exhibit 17?

11     THE COURT REPORTER:  18.

12     MS. PRATSINAKIS:  18.

13              (WHEREUPON, a certain document was

14               marked Kokos Deposition Exhibit

15               No. 18, for identification, as of

16               05/28/2019.)

17  BY MS. PRATSINAKIS:

18     Q.   Take a moment to review this document and

19  let me know when you are ready.

20     A.   I am ready.

21     Q.   Okay.  What is this document?

22     A.   This is an example of our Grubhub for

23  Restaurants terms of use.

24     Q.   What do you mean by example?

1      A.    This is a -- our terms of use on Grubhub

2   for Restaurants.  You can see that there is a JIRA

3   ticket at the top of this.  So this is not an actual

4   printout of the terms of use that are on the

5   page today because they would not have the JIRA

6   information on it.

7      Q.    Uh-huh.  And what is the date of this

8   update?

9      A.    This is updated as of May 29th, 2017.

10      Q.    That's the date of the terms of use, but

11   above that, what's the commit date?

12      A.    The commit date is titled 5/6/19, although

13   I don't know what commit date necessarily means.

14      Q.    Well, I thought you had testified earlier

15   that commit date is the date that one strives to

16   complete a work order?

17      A.    You asked me if I knew what it meant on a

18   JIRA ticket without showing me a JIRA ticket, and so I

19   said without seeing the context of the ticket, I would

20   guess that it's something -- a date that they are

21   trying to commit something to to complete something.

22      Q.    Uh-huh.  So do you have a different

23   understanding looking at this JIRA ticket?

24      A.    It is basically the same as if I didn't

1    look at it.  It doesn't give me much data to go off

2    of.

3         Q.    So your best understanding of this --

4    well, this is how I read it based on your testimony,

5    that these are terms that someone updated on May 29th,

6    2017, that they weren't posted to the URL

7    Restaurant.Grubhub.com/terms-of-use until this commit

8    date of May 6th, 2019?

9         MR. CARLSON:  Objection; misstates document.

10        MS. PRATSINAKIS:  How so, Counsel?

11        MR. CARLSON:  Do you want me to explain it?

12        MS. PRATSINAKIS:  Sure.

13        MR. CARLSON:  So my -- my understanding of this

14   as a document is that this was a spit out of every

15   time the terms of use would have been, sort of, edited

16   in any way on the website.

17             And so here you see at the top it says "no

18   content change, code file rename only."  They are

19   saying the code file was renamed but there wasn't any

20   content change to the document and that was done on

21   May 6th, 2019.

22        MS. PRATSINAKIS:  Okay.  Thank you.

23   BY MS. PRATSINAKIS:

24        Q.    Do you know when the terms of use dated

Confidential - Marielle Kokos

```
 1    May 29th, 2017, were actually posted onto the

 2    Restaurant.Grubhub.com/terms-of-use site?

 3        A.    Yes.  They -- they would have been posted

 4    on May 29th, 2017.  These are the most recent and

 5    current versions of the terms of use today.

 6        Q.    So are you assume -- do you have evidence

 7    of that or are you just assuming it because of the

 8    date of the document?

 9        A.    Am I assuming that that's when they were

10    posted?

11        MR. CARLSON:  Object to form.  Sorry.

12    BY MS. PRATSINAKIS:

13        Q.    Yes.

14        MR. CARLSON:  Object to form.

15    BY THE WITNESS:

16        A.    Well, I know that from the date and then

17    we also have it in our -- our responses to the

18    interrogatories.

19    BY MS. PRATSINAKIS:

20        Q.    Okay.  Is there any evidence of the date

21    that you posted these terms that are referenced in

22    your interrogatory responses?

23        A.    It would be on Page 14 of the interrog --

24    interrogatory responses where there is a -- an
```

Confidential - Marielle Kokos

1    effective date.

2        Q.    So just to be clear, effective date can

3    mean the date of a document that someone deems to go

4    effective, but you can post it on an entirely

5    different date, can't you?

6        MR. CARLSON:  Object to form.

7            There is a Bates cited there.  You can

8    look at the Bates to see if you've got an issue with

9    it.

10   BY THE WITNESS:

11       A.    These are all of the dates that we are

12   assuming that everything went live on the site --

13   BY MS. PRATSINAKIS:

14       Q.    Right, but the --

15       A.    -- effective date.

16       Q.    Uh-huh.

17            Do you have evidence of it actually going

18   on the website?

19       MR. CARLSON:  Object to form, asked and

20   answered.

21       MS. PRATSINAKIS:  Well, she testified she

22   assumes and so I'm just trying to get to, you know,

23   whether or not it is the right date.

24       MR. CARLSON:  But she pointed you to an

Confidential - Marielle Kokos

1    interrogatory response that sites a document that you

2    haven't shown her that I think if you looked at might

3    answer your question.

4         MS. PRATSINAKIS:  All right.

5              Okay.  Mark this as Exhibit 19.

6                   (WHEREUPON, a certain document was

7                    marked Kokos Deposition Exhibit

8                    No. 19, for identification, as of

9                    05/28/2019.)

10        MR. CARLSON:  Do you have any other copies?

11        MS. PRATSINAKIS:  Oh, sorry.

12        MR. CARLSON:  Thank you.

13   BY MS. PRATSINAKIS:

14        Q.   My first question to you is:  What is this

15   document?

16        A.   This is the JIRA ticket to describe

17   updated content for the specific terms of use for

18   Grubhub for Restaurants and it is dated March -- or

19   excuse me -- May 29th, 2017.

20        Q.   And the "Description of Changes" up at the

21   top, what does it say?

22        A.   "Description of Changes" at the top states

23   "updated content."

24        Q.   Do you know specifically what in here was

Confidential - Marielle Kokos

```
 1    updated?

 2         A.    I do not specifically know throughout the

 3    terms of use what was updated on this date.  I just

 4    know that this is our most recent version.

 5         Q.    And was a notification sent to the users

 6    of Grubhub for Restaurants on this date notifying them

 7    of this change term?

 8         A.    No, there was no notification sent to the

 9    restaurants on this date notifying of updated changes,

10    though the link is always present on the website for

11    them to access.

12         Q.    Okay.  And what does MYAC-2778 stand for?

13         A.    MYAC stands for My Account which was just

14    the older name of Grubhub for Restaurants.

15         Q.    And the 2778?

16         A.    I do not know specifically, but my guess

17    would be that is the ticket number for the JIRA

18    ticket.

19         Q.    And could you turn your attention -- well,

20    actually, I'll leave that right there.  I want -- do

21    you know when an arbitration clause was added to the

22    terms posted on Grubhub for Restaurants?

23         A.    Yes.

24         MR. CARLSON:  Object to form and asked and
```

Confidential - Marielle Kokos

```
 1   answered, but answer again.

 2   BY THE WITNESS:

 3        A.    August 1st, 2016.

 4   BY MS. PRATSINAKIS:

 5        Q.    August 1st, 2016.

 6              And apologies if it was asked and answered

 7   already, but just can you tell me if a notification

 8   was sent directly to restaurants on that date

 9   regarding that amendment?

10        A.    A notification was not sent to restaurants

11   on the date of August 1st, 2016.  Again, the link is

12   present for them to click on at any time.

13        Q.    Uh-huh.

14              So there was no popup on Grubhub for

15   Restaurants on that date?

16        A.    Correct, there was no popup on Grubhub for

17   Restaurants on that date.

18        Q.    And there was no banner on that date

19   either, correct?

20        A.    That is correct, there was no banner on

21   August 1st, 2016.

22        Q.    Okay.  Okay.  And do you know one way or

23   the other whether the August 2016 terms were posted on

24   the date they became effective and available for
```

1  viewing on Grubhub for Restaurants?

2      A.    If we go back to the interrogatory

3  responses on Page 14 --

4      Q.    Uh-huh.

5      A.    -- the effective date is August 1st, 2016,

6  of when they would be posted.

7      Q.    So how do you define effective date, so

8  I'm clear?

9      A.    The --

10  MR. CARLSON:  Object to form.

11  BY THE WITNESS:

12      A.    The date in which they are live on the

13  website.

14  BY MS. PRATSINAKIS:

15      Q.    Okay.  And you've noted the evidence you

16  have for that in that document, in Page -- on Page 14

17  of the interrogatory responses, correct?

18      A.    Correct.

19      Q.    Okay.  And that is Document 261 through

20  271?

21      A.    For the August 1st date, correct.

22      Q.    Do you have any evidence that Marianne --

23  the account Marianne@Tiffin.com accessed the terms of

24  use on Grubhub for Restaurants?

Confidential - Marielle Kokos

 1      A.    We do, also within the interrogatory

 2   responses.

 3      MS. PRATSINAKIS:  We might as well mark them as

 4   an exhibit since we've been looking at them, 20.

 5   Sorry.

 6                    (WHEREUPON, a certain document was

 7                     marked Kokos Deposition Exhibit

 8                     No. 20, for identification, as of

 9                     05/28/2019.)

10      THE WITNESS:  Thank you.

11      MR. CARLSON:  I'll just lodge a scope objection

12   because I think this is what we designated Mike Young

13   kind of earlier for today.

14      MS. PRATSINAKIS:  I believe it is a joint -- I

15   mean, she testified to it under oath.

16      MR. CARLSON:  Right, you can ask her about her

17   declaration, that's fine.

18      MS. PRATSINAKIS:  In the reply brief, okay.

19      MR. CARLSON:  She -- she -- she didn't verify or

20   wasn't designated on the interrogatory responses you

21   are talking about right now.

22      MS. PRATSINAKIS:  Okay.

23      MR. CARLSON:  So if you want to ask her about

24   her declaration, I have got no problem with that.

1          MS. PRATSINAKIS:  Well, why don't we -- she --

2     she responded to my question by directing me to the

3     interrogatories, so why don't we see what's she's

4     asking -- or looking at.

5     BY THE WITNESS:

6          A.    Did you -- I'm sorry.

7     BY MS. PRATSINAKIS:

8          Q.    Oh, I'm sorry.  You were looking in the

9     interrogatory responses for an answer to the question

10    of whether you have any evidence if the account

11    Marianne@Tiffin had accessed the terms of use at

12    Grubhub for Restaurants?

13         A.    So what I was responding to was the

14    Interrogatory No. 11 on Page 37.

15         Q.    Uh-huh.

16         A.    Again, this was not something that I was

17    specifically testifying to, but at my reply

18    declaration, I believe you meant of Marielle Kokos,

19    not of Marianna Kokos, which within the reply, I

20    believe it's between Pages 4 and 5, it discusses where

21    the -- the Tiffin users are -- have clicked on the

22    terms of use.

23         Q.    Do you know the actual people that clicked

24    on the terms of use?

Confidential - Marielle Kokos

```
 1        MR. CARLSON:  Object to form.

 2   BY THE WITNESS:

 3        A.    The actual people that have clicked on the

 4   terms of use are in the chart on Page 5.

 5   BY MS. PRATSINAKIS:

 6        Q.    Well, that says "user name," but you don't

 7   know who actually clicked the terms of use, you -- the

 8   name of the person using that account at the time?

 9   Like, for -- for example, many -- many of these clicks

10   are at 10:00 p.m. at night, 9:08 p.m. well after just

11   normal business hours.

12            Do you see that?

13        A.    I do.

14        Q.    And so -- and -- and all of the accounts

15   on the right-hand side are not all restaurant

16   accounts, are they?  None -- none of these are

17   multiple restaurant accounts, correct?

18        MR. CARLSON:  Object to form.

19   BY THE WITNESS:

20        A.    I'm confused what you mean by multiple

21   restaurant accounts?

22   BY MS. PRATSINAKIS:

23        Q.    So, let's look at the first one,

24   TiffinBistro222@Grub -- GrubCentral@Grubhub.com,
```

1    that's a user name?

2        A.    Okay.

3        Q.    That account is associated with only one

4    restaurant as opposed to more than one restaurant, is

5    it not?

6        MR. CARLSON:  Just -- just one second.  I would

7    suggest if you are going to use it this much, maybe we

8    mark it as an exhibit because I don't think it is an

9    exhibit right now.

10        MS. PRATSINAKIS:  Okay.

11        MR. CARLSON:  The reply.

12        MS. PRATSINAKIS:  Do you want a copy, is that

13    why?

14        MR. CARLSON:  Probably because I want a copy,

15    yeah.

16        MS. PRATSINAKIS:  I thought so.  Okay.  Let's

17    mark it as Exhibit 21.

18                (WHEREUPON, a certain document was

19                 marked Kokos Deposition Exhibit

20                 No. 21, for identification, as of

21                 05/28/2019.)

22        MR. CARLSON:  Sorry to interrupt you.  Go ahead.

23    BY MS. PRATSINAKIS:

24        Q.    So on Page 5, Grubhub 1750 underneath --

Confidential - Marielle Kokos

1   within Paragraph 11 of the Reply Declaration of

2   Marielle Kokos, it lists a number of user names, and

3   my question to you, are any of those user names

4   associated with more than one restaurant?

5       A.   I would need to look the user names up to

6   see how many restaurants they are associated with.

7       Q.   Okay.  Well, turn to the next page and I'd

8   like to direct you to the chart in the middle that has

9   user name Marianne@Tiffin.com and girard@tiffin.com.

10          Do you see those two accounts?

11      A.   I do.

12      Q.   And do you see how next to it says

13  "multiple restaurants," "multiple restaurants"?

14      A.   I do.

15      Q.   Okay.  Would you be surprised to learn

16  that those are the only two multiple restaurant

17  accounts of Tiffin?

18      A.   I'm not necessarily surprised to learn

19  that, just from this specific screen shot not all of

20  the restaurants are in the drop down.  It is only for

21  this specific location.

22      Q.   Uh-huh.

23      A.   So I -- I would not know without looking

24  at all of the different locations how many have

1    multiple restaurants.

2        Q.    Okay.  Well, let's look at the one below

3    the multiple restaurant account, the mtairy@tiffin.com

4    user name.

5        A.    Yes.

6        Q.    Do you see that?

7        A.    I do.

8        Q.    And that's associated with one restaurant,

9    correct?

10       A.    Correct.

11       Q.    Okay.  And that restaurant number is

12   68625, correct?

13       A.    That is correct.

14       Q.    And that restaurant account,

15   mtairy@tiffin.com, if you flip back to Page 5, that

16   account accessed the terms of use on the same day

17   within seconds of each other at -- or -- or so this

18   chart says.  I -- I can't verify one way or the other,

19   but at 10:12 p.m. and then at 12 -- 10:12 p.m., So

20   within four seconds, it just got double clicked by

21   someone late in the evening at this restaurant,

22   correct?

23       MR. CARLSON:  Object to form, argumentative.

24   BY MS. PRATSINAKIS:

1      Q.    I'm asking is that what this reflects,

2   your chart?

3      A.    It's re --

4      MR. CARLSON:  Object -- object to form.

5   BY THE WITNESS:

6      A.    It's reflecting that this user accessed

7   them.  I don't know where their placement was, if they

8   were at the restaurant or at home.

9   BY MS. PRATSINAKIS:

10     Q.    Uh-huh.  And then if you go to

11  December 14th, 2018, again, it shows Mount Airy,

12  again, around the same time, 10:10 p.m.

13        Do you see that?

14     A.    I do.

15     Q.    Okay.  And you don't know who was pressing

16  the -- clicking the button at 10:10 p.m. on

17  December 14th, 2018, correct?

18     MR. CARLSON:  Object.  Object to form.

19     MS. PRATSINAKIS:  What's wrong with the form?

20     MR. CARLSON:  She has asked and answered this

21  question several times about --

22     MS. PRATSINAKIS:  No.  We are talking about a

23  different line item.  Can we stop prompting the

24  witness.

Confidential - Marielle Kokos

```
 1          MR. CARLSON:  It is also argumentative.

 2          MS. PRATSINAKIS:  Why is it argumentative?

 3          MR. CARLSON:  You don't know, blah, blah, blah.

 4     That's argumentative.

 5     BY MS. PRATSINAKIS:

 6          Q.    Okay.  Do you know the name of the person

 7     who was using the mtairy@tiffin.com account on

 8     December 14th, 2018, at 10:10 p.m.?

 9          A.    I know the name that's associated to the

10     Mount Airy login, which would be Munish, and that is

11     the login that we would be able to know that accessed

12     the -- the terms of use.

13     BY MS. PRATSINAKIS:

14          Q.    Do you know the name of the person who --

15     forget the name on the admin file that was added by

16     Grubhub.  I'm asking about the name of the person who

17     accessed this account at 10:10 p.m. on December 14th,

18     2001, give me the name of the person?

19          MR. CARLSON:  Object to form, asked and

20     answered.

21     BY THE WITNESS:

22          A.    I -- I --

23     BY MS. PRATSINAKIS:

24          Q.    Do you know?
```

1    A.    My answer to you would be the name that's

2    associated with the login because that's what we gave

3    them and that's what he has used.

4    Q.    Okay.  So Munish Narula, the CEO of a

5    company that owns ten restaurants, at 10:00 p.m. at

6    night was on a single restaurant account checking the

7    terms of use, is that your theory?

8    MR. CARLSON:  Object to form.

9    BY THE WITNESS:

10    A.    Why would I have anything different to

11    offer.  This is what the data is showing, that this

12    login, which is assigned to Munish, sorry if I

13    pronounced that wrong before, clicked on the terms of

14    use for 68625 at 10:10 p.m.

15    BY MS. PRATSINAKIS:

16    Q.    See, I -- we could debate this to the

17    court, but the reality is you don't know the person

18    who was actually using that account.  You are just

19    assuming it's the name of the admin on the account,

20    isn't that right?

21    MR. CARLSON:  Object to form, asked and answered

22    several times.

23    BY THE WITNESS:

24    A.    I know who the user is on this login and

1    if that user chose to give the login to someone else,

2    I can't comment on that.  That was their decision.

3    BY MS. PRATSINAKIS:

4        Q.    Okay.  So based on this chart at

5    Paragraph 11, you don't have any instance of

6    Marianne@Tiffin.com logging in or clicking onto the

7    terms of use on Res -- Grubhub for Restaurants, is

8    that correct?

9        A.    For Marianne's specific login, no, I do

10   not have it in this chart.

11       Q.    And -- well, did she access the terms of

12   use and you didn't put it in the chart?

13       A.    For her login, I do not have a record of

14   her accessing the terms of use.

15       Q.    Okay.  Not just in this chart, but in any

16   of the data that was pulled for you, correct?

17       A.    Correct.

18       Q.    And do you have any -- do you see

19   girard@tiffin.com on this chart?

20       A.    I do not see that specific login, no.

21       Q.    And so is it fair to conclude that

22   girard@tiffin.com did not log into Grubhub for

23   Restaurants and ever clicked terms of use?

24       MR. CARLSON:  Object to form.

Confidential – Marielle Kokos

```
1    BY THE WITNESS:

2         A.    For that specific login, I do not see that

3    person logging in with that login, clicking on the

4    terms of use.

5    BY MS. PRATSINAKIS:

6         Q.    Okay.  And those two log-ins, just to

7    confirm, from Page 6, are the -- are multiple

8    restaurant account log-ins, correct?

9         A.    Correct.
```

Confidential - Marielle Kokos

███  ███  ████████████████

███  ██████████████████████

███  ████████████████████████

███  ████████████████████████

███  ████████

6    Q.    Can you tell from your data or Grubhub --

7    can Grubhub tell from its data whether these clicks

8    reflected on Page 5, Grubhub 1750, were these clicks

9    associated with a click on a tablet or a click on some

10   other device?

11       MR. CARLSON:  Object to form, scope.

12   BY THE WITNESS:

13       A.    Again, I cannot speak specifically to the

14   data pulled by looking at this screen shot and what's

15   accessible in the user tab, it does not indicate to

16   you where the -- the look was on a tablet and/or a

17   regular website.

18   BY MS. PRATSINAKIS:

19       Q.    Uh-huh.  But could we add another column

20   and find that information and add it here to this

21   chart?  I mean, does that information exist, whether

22   the terms of use click was on the tablet used in the

23   restaurant by the restaurant versus a computer?

24       MR. CARLSON:  Object to form, scope.

Confidential - Marielle Kokos

```
 1   BY THE WITNESS:

 2       A.    Again, I would not be the one that's able

 3   to tell you any -- what data is available.

 4   BY MS. PRATSINAKIS:

 5       Q.    I -- okay.  So you don't know one way or

 6   the other if that data point exists?

 7       A.    Correct.

 8       Q.    Okay.  Did you ask if that data point

 9   existed?

10       MR. CARLSON:  Object to form.

11   BY THE WITNESS:

12       A.    I did not ask if that data point existed.

13   I used all of the information that was provided to me

14   for my declarations and the responses.

15   BY MS. PRATSINAKIS:

16       Q.    Okay.  So you didn't specifically say, I

17   want the date, time, ID and user name of people that

18   accessed terms of use, someone provided it to you and

19   you said, okay, let me sign a declaration.

20             Is that what happened?

21       MR. CARLSON:  Object to form, argumentative.

22   BY MS. PRATSINAKIS:

23       Q.    Well, did you do anything to validate that

24   this information was accurate and truthful?
```

```
 1          MR. CARLSON:  Object to -- object.

 2    BY THE WITNESS:

 3          A.    I have spoken with the other person that's

 4    deposing today.

 5    BY MS. PRATSINAKIS:

 6          Q.    Okay.

 7          A.    I understand that he was the one that

 8    helped pull the data, some of the data, and I have

 9    used everything that was gathered to present as well

10    as make the declarations and add to the responses for

11    the interrogatories.

12          Q.    Did your eyes see the -- the actual data

13    pulls before this chart -- or -- or did you only see

14    this chart?

15          A.    I have seen the specific stuff that was

16    handed to me for the declaration and the responses.

17          Q.    Was that the data pulls or was that just

18    this chart?

19          A.    I have what was specifically in my

20    declaration and in the responses.

21          Q.    Okay.  So the responses to the extent they

22    cross-reference the data pull, do you recall one way

23    or the other if you looked at those?

24          A.    All I can tell you is that I looked at the
```

1    stuff that was provided to me to be able to add to my

2    declaration and the responses.

3         Q.    That's fine.  My question is different.

4               My question is:  Do you recall what you

5    looked at specifically?

6         MR. CARLSON:  Object.  Object to form, asked and

7    answered.

8         MS. PRATSINAKIS:  I -- I mean, she didn't answer

9    my question, so I get to ask it again.

10        MR. CARLSON:  No, I think she has answered your

11   question several times.

12        MS. PRATSINAKIS:  Well --

13        MR. CARLSON:  I'm not even sure what you are

14   getting at.  You want to know what she looked at.

15        MS. PRATSINAKIS:  I'm just saying did she --

16        MR. CARLSON:  She is saying she looked at what

17   she was given to her.

18   BY MS. PRATSINAKIS:

19        Q.    Did you look at an Excel spreadsheet of

20   data, let's start there, did you -- did someone fold

21   open an Excel spreadsheet of data and -- and you

22   reviewed it?

23        A.    No, I did not look at an Excel spreadsheet

24   of data.  I looked at all of the data that was pulled

1  specifically for me on the interrogatories I was

2  responding to.

3      Q.    So let's go to that interrogatory so that

4  I can fully understand what you relied on when you

5  signed and swore to this --

6      A.    Uh-huh.

7      Q.    -- reply declaration.

8           What -- where are we, where are you

9  looking?

10     A.    The same page we have been on.

11     Q.    Oh, so on 14?

12     A.    On -- well, where we were discussing is in

13  my reply declaration on Page 5.  That's the data we've

14  been discussing for the past 20 minutes.

15     Q.    Um-hum.

16     MR. CARLSON:  I think there was some --

17  BY MS. PRATSINAKIS:

18     Q.    I -- I'm sorry.  We are looking at two

19  different documents.  You keep referring to your

20  responses to interrogatories.  So I'm now on

21  Exhibit 20 and my question to you is if you could turn

22  to -- reference what documents you specifically

23  reviewed before you signed this reply declaration to

24  satisfy yourself that this data was accurate?

Confidential - Marielle Kokos

1            And you said, I looked at documents

2    referenced in the responses to the rogs.  So I'm just

3    asking you to point me to which response you are

4    referring to.

5        A.    I'm res -- referring to page -- oh, not

6    there, it doesn't start there.  I believe it is

7    farther in to Page 37.

8        Q.    Um-hum.

██        ██        ████████████████████████████████████

██    ████████████████████████████████████████████████

██    ████████████████████████████████████████

12       Q.    Okay.  Can you just specifically point to

13   the document you saw with your own eyes before you

14   signed your reply declaration?

15       MR. CARLSON:  I mean, I'm going to object again,

16   because the -- you are asking her to go through and

17   find a Bates.  They are just in Bates form in there at

18   that point.  I don't --

19       MS. PRATSINAKIS:  She reference --

20       MR. CARLSON:  -- I don't believe she would have

21   looked at it when she did the declaration because the

22   declaration was done before there was a production.

23   So I'm not sure -- I mean, you had an RFP that you

24   asked us to produce to you, the chart that she used to

```
 1   do the declaration which is what we did.  So I'm not

 2   sure --

 3        MS. PRATSINAKIS:  I'm --

 4        MR. CARLSON:  -- what you are getting at.

 5        MS. PRATSINAKIS:  Can you let the witness

 6   testify and stop testifying for the witness?

 7        MR. CARLSON:  I'm just telling --

 8        MS. PRATSINAKIS:  I need you to stop testifying

 9   for the witness, pause, and let the witness answer.

10   BY MS. PRATSINAKIS:

11        Q.    To the extent you remember can you point

12   me to what document you reviewed to satisfy yourself

13   that this chart on Page 5 of your reply declaration is

14   accurate and truthful?

15        MR. CARLSON:  Object to form.

16   BY THE WITNESS:

17        A.    The main thing that I remember seeing is

18   ████████████████████████ --

19   BY MS. PRATSINAKIS:

20        Q.    Uh-huh.

21        A.    -- that was pulled from a database --

22   Grubhub's database.

23   BY MS. PRATSINAKIS:

24        Q.    And how long has that database been in
```

Confidential - Marielle Kokos

```
1    existence?

2         A.    I cannot confirm a date of how long it has

3    been in existence.  I -- I don't deal with it on a

4    regular basis.  It would be more of our tech team

5    dealing with it.

6         Q.    Have you ever asked for a data pull from
```

█ ██████████

█   ███   █████

█     █████████████████

█     █████████

█ ███████████

█   ███   █████████████████████

█ ██████████████████████████

█ ████████████████████████████████

█ ████████████████████████████████

█ █████████████

█   ███   ███████████████████

█   ███   ███████████████████

█   ███   █████████████████

█   ███   █████████████

```
21        Q.    And why was this information only

22   available since -- for that limited period of time

23   going back to June 2018?

24        A.    I would not be able to -- to give you one
```

1    answer one way or another why it was only available up

2    until that date.

3        Q.    Did you ask to see additional data if it

4    were available and it wasn't available?

5        A.    Correct.  The data states here that it was

6    as far back as the data is available.

7        Q.    Uh-huh.  And you don't know the reason why

8    it wasn't available further back?

9        A.    I don't use -- like I said, I do not use

10   the platform on a regular basis.

11       Q.    Was a reason given to you by the

12   department that pulled the data?

13       A.    No, a specific reason was not given to me.

14       Q.    And do you know how long it took to pull

15   that data?

16       A.    I would not be able to tell you exactly

17   since I didn't pull it, but I am not sure how long it

18   took them to pull it.

19       Q.    Can you give me an estimate?

20       A.    I could give you an estimate, but it's not

21   going to be accurate.  I don't know what the timeframe

22   is it took them to pull the data off.

23       Q.    So when you first submitted your first

24   declaration?

Confidential - Marielle Kokos

```
1        A.    Yes.

2        Q.    Was that information available to you?  So

3   on April --

4        A.    March.

5        Q.    -- or March 6th, 2019, was that

6   information available to you at that time?

7              Sorry, answer that question and we'll go

8   to the second.  We'll get to the point, I promise.

9        A.    I believe that the information was

10  available.  I'm just trying to look through my

11  declaration to give you an exact area.

12             Actually --

13       Q.    Well, let me ask it differently.
```

■    ████████████████████████████████

■  █████████████████████████████████████

■  ███████████████████████████████████████

■  ████████████████████████████

■  █████████████████████

■    ██      ████████████████████████████

■  ██████████████████████

■    ██      █████████████████████████

■    ██      █████████████████████████

■  ██████████████████████████

```
24       Q.    Well, so my question is:  Do you recall
```

1    when the information that went into this chart was

2    given to you with respect to the date of the filing of

3    your reply brief, when you would have looked at that

4    information and data?

5              So you filed on March 6th, 2019, and may I

6    assume you didn't have the data then or you would have

7    included it on March 6th?

8         A.   Yes, I -- I would have been able to see if

9    in between the actual declaration and the reply

10   declaration, but I -- a specific date it was provided

11   to me, I do not have.

12        Q.   All right.  So you didn't have it on the

13   date of your -- of March 6th, 2019.

14             Do you recall when -- I mean -- sorry.

15   Just confirm that you didn't have it on that date.

16             Do you recall when the data was requested?

17        A.   I -- I do not because, again, I wasn't the

18   person re -- like, in charge of pulling it.  I'm not

19   the person that was requesting it.  There was a lot of

20   discovery done from multiple different people that

21   were --

22        Q.   Uh-huh.

23        A.   -- for this entire process.

24        Q.   Okay.  Do you know the corporate designee

1  who would know that or the corporate person who would

2  know the answer to that question?

3      A.    It would be Mike Young who is being

4  deposed on it right now.

5      Q.    All right.

6      MR. CARLSON:  I think maybe -- should we take a

7  break or just a few minutes?

8      MS. PRATSINAKIS:  Sure, that sounds good.

9      THE VIDEOGRAPHER:  We are going off the record

10  at 5:09.

11              (WHEREUPON, a recess was had

12               from 5:09 to 5:18 p.m.)

13              (WHEREUPON, a certain document was

14               marked Kokos Deposition Exhibit

15               No. 22, for identification, as of

16               05/28/2019.)

17      THE VIDEOGRAPHER:  We are back on the record at

18  5:18.

19  BY MS. PRATSINAKIS:

20      Q.    Ms. Kokos, you provided me with a chart at

21  the start of the deposition from a binder that you

22  brought into the room and that we've marked as

23  Exhibit 21 --

24      MR. CARLSON:  22, I think.

1    BY MS. PRATSINAKIS:

2        Q.    I'm sorry.  22.  Yes.

3              Can you -- who prepared this chart?

4        A.    My legal team sitting next to me provided

5    this timeline for me.

6        Q.    Okay.  And when did you join Grubhub

7    again?

8        A.    December of 2013.

9        Q.    December of 2013.

10             Okay.  So earlier you testified about

11   OrderHub and how terms and conditions associated with

12   OrderHub existed, and I just want to drill down a

13   little bit more into that.

14       A.    Sure.

15       Q.    Albeit you weren't at the company.  So

16   when you don't know, just let me know and -- and

17   we'll -- or provide me a name of someone who would

18   know.

19             So what is -- what is OrderHub?  Let's

20   start there.

21       A.    OrderHub is -- was our app-based system on

22   our own devices that we sent to restaurants that

23   allowed them to confirm their orders that they

24   received from Grubhub.

```
 1       Q.    Okay.  And was OrderHub a device or was it

 2  a website?

 3       A.    So it was an app that existed only on that

 4  tablet and that tablet was locked down, they -- they

 5  couldn't use the tablet for other things.

 6       Q.    Okay.  So someone with an Apple iPad

 7  couldn't access OrderHub and start accessing

 8  information on OrderHub?

 9       A.    For OrderHub specifically, that is

10  correct.

11       Q.    Okay.  So other than the Grubhub tablet,

12  there was no other way to access OrderHub?

13       A.    That is correct.

14       Q.    Okay.  And so earlier you stated that --

15  well, first, let me ask you.

16             Do you know if Plaintiffs used OrderHub?

17       A.    I do know that they used OrderHub.

18       Q.    Okay.  And specifically when did -- is it

19  noted down here on that fourth line when you believe

20  OrderHub was provided to them?

21       A.    That is correct.  Each location was

22  provided a tablet.  One, I believe it was Mount Airy,

23  that was given one earlier and then it had some

24  charging problems and they were given another one in
```

1    the November date.  So they each have been given

2    tablets at the November date.

3         Q.    Okay.  So you're testifying that Tiffin

4    Mount Airy requested and was given an OrderHub tablet

5    on February 11th, 2013, and that it was defective,

6    correct?

7         MR. CARLSON:  Object to form.

8    BY THE WITNESS:

9         A.    I -- I don't know what specific defect.

10   If I remember correctly, it was like a charging issue

11   that it maybe wouldn't keep a charge.  So we then took

12   that tablet back from them and gave them a new one so

13   that they, of course, had a device that worked

14   correctly.

15   BY MS. PRATSINAKIS:

16        Q.    And when did Tiffin enroll -- sorry --

17   Tiffin Elkins Park?

18        A.    It was -- they received a tablet in

19   November of 2013.

20        Q.    And you are sure about that?

21        A.    I am.  I looked at the data specifically

22   today within ███████ and we gave the tablets out to

23   restaurants that had hit a certain order threshold.

24   So I -- I looked back and -- and noted that they had

1    hit the order threshold, so it made sense why they

2    were receiving the tablet in November.

13    Q.    So unless the restaurant requested it, you

14    wouldn't send it upon meeting a threshold?

15    A.    For the OrderHub tablet specifically, that

16    is correct.

17    Q.    So your testimony is that Tiffin Elkins

18    Park hit a ▇▇▇▇▇▇▇▇▇▇▇ threshold and called up

19    Grubhub or communicated with Grubhub that it wanted

20    OrderHub, is that correct?

21    A.    They could have communicated that they

22    wanted OrderHub.  Their account adviser could have

23    also said, Hey, congratulations, you have hit an order

24    threshold, we would like to offer you a tablet to make

1   your accepting of orders go easier.  It could have

2   gone either way for any restaurant.  I don't

3   specifically have the communication surrounding

4   OrderHub for them, but it could have been either one.



Confidential - Marielle Kokos

█  ██████████████████████████████████

█  ████████

3      Q.    But other than that data, there is no

4   other evidence of that?

5      MR. CARLSON:  Object to form.

6   BY THE WITNESS:

7      A.    For me specifically, this is the only data

8   that I have available to see that when we sent the

9   tablets, we have tracking device -- or tracking

10  devices -- we have tracking numbers.

11  BY MS. PRATSINAKIS:

12     Q.    Freudian slip.

13     A.    Yeah.

14     Q.    All right.  Well, do you track -- you say

15  here -- or your attorney said here in this chart:

16  "Received Grubhub provided tablet and clicked 'I

17  accept' to the terms of use."

18          That's what your attorney said there,

19  right?

20     A.    Um-hum.

21     Q.    Did you personally verify that?

22     A.    We have data that was provided to us by

23  the tech team that the terms of use were clicked on.

24     Q.    And that's -- and that data, do you

Confidential - Marielle Kokos

```
1    recall -- I only have one copy, I'm afraid, but is

2    this the data you are referencing?

3         A.    May I see it?

4         Q.    Sure.  I am showing the witness --

5         MR. CARLSON:  We can mark -- we can mark it,

6    too, if you want.

7    BY MS. PRATSINAKIS:

8         Q.    -- a spreadsheet.

9         MS. PRATSINAKIS:  Well, I don't -- do you have

10   the Bates number of it?

11        MR. FORD:  It is 2267.

12   BY MS. PRATSINAKIS:

13        Q.    Okay.  I'm showing the witness

14   Grubhub 2267.

15        MR. CARLSON:  Okay.  Wait --

16        MS. PRATSINAKIS:  Produced on Friday?

17        MR. CARLSON:  Yes, I believe so.

18   BY THE WITNESS:

19        A.    Yes, this is the data I'm referring to.

20   BY MS. PRATSINAKIS:

21        Q.    Okay.  Other than that sheet, is there any

22   evidence of anyone clicked -- clicking "I accept"?

23        A.    On the terms and conditions -- or excuse

24   me -- terms of use of OrderHub, is that what you are
```

Confidential - Marielle Kokos

1    referring to?

2        Q.    Well, to validate this attorney's

3    statement in this chart?

4        MR. CARLSON:  Actually, just real quick, can we

5    just mark it as Exhibit 23 so we have got it in the

6    record since we are looking at it?

7        MS. PRATSINAKIS:  Sure.

8                (WHEREUPON, a certain document was

9                marked Kokos Deposition Exhibit

10               No. 23, for identification, as of

11               05/28/2019.)

12       THE WITNESS:  Thank you.

13   BY MS. PRATSINAKIS:

14       Q.    So my question is:  Other than that sheet

15   that you are looking at, Exhibit No. 23, is there any

16   other evidence of this assertion by an attorney that

17   when some -- when Tiffin Mount Airy and Tiffin Elkins

18   Park received -- purportedly received a Grubhub tablet

19   that they clicked "I accept" to terms of use?

20       A.    This is the specific data that shows it.

21   I also know how the tablet worked and I -- we have

22   user guides that we referred to earlier that shows

23   screen shots of how you specifically have to accept

24   the terms of use --

Confidential - Marielle Kokos

1      Q.     Uh-huh.

2      A.     -- to continue to use the tablet.  You

3   also have to watch a welcome video.

4      Q.     You are required to watch a welcome video?

5      A.     Uh-huh, for OrderHub, yes.

6      Q.     Okay.  And so -- okay.

7          Do you know who clicks "accept," the

8   person actually physically doing that, that clicking

9   of the button that you've testified is required?

10     A.     I would not know the specific person.  I

11  would know the login for that cust ID that we -- we

12  talked about before.

13     Q.     Okay.  Can you tell me based on this sheet

14  who -- what is the login for Mount Airy reflected on

15  this printout?

16     A.     This sheet specifically gives you the

17  cust ID, which is under the acceptor ID.  And when we

18  produced OrderHub there was only one login for the

19  restaurant at the time.  It didn't have any financial

20  data in it, so there was no need to have a basic and

21  an admin user.

22     Q.     Oh, so it wasn't an admin user account, it

23  was a basic account?

24     A.     It was --

Confidential - Marielle Kokos

```
1        MR. CARLSON:  Object to form.

2   BY THE WITNESS:

3        A.    -- just the only account for OrderHub.

4   BY MS. PRATSINAKIS:

5        Q.    Okay.  But can you just -- I mean, this

6   sheet is like a bunch of code to me.  I really can't

7   make it out.  So can you just kind of direct me where

8   you feel that this is evidence of either Tiffin Mount

9   Airy or Tilfin -- Tiffin Elkins Park -- first of all,

10  where -- where on this sheet does it state that it

11  relates to OrderHub?

12       A.    It -- I suppose it does not specifically

13  relate to -- to OrderHub.  It was select from terms of

14  use accepted where acceptor ID and then it gives the

15  user IDs.

16       Q.    Okay.  What were you querying?

17       MR. CARLSON:  Object to form because we did

18  designate Mr. Young on this and I think he was

19  questioned earlier today, so...

20       MS. PRATSINAKIS:  Do you know?

21       MR. CARLSON:  You can answer.  Yeah, go ahead.

22  BY THE WITNESS:

23       A.    Specifically, I was not querying anything

24  again.  That -- that was, Mike Young that produced
```

1    this data for us to know who clicked on the terms of

2    use.

3    BY MS. PRATSINAKIS:



24        Q.    Yeah.

Confidential - Marielle Kokos

```
 1        A.    -- where Mike pulled this data.

 2        Q.    So you don't know the source of this data?

 3        MR. CARLSON:  Object to form.

 4   BY MS. PRATSINAKIS:

 5        Q.    Is that correct?

 6        A.    It was pulled by someone else, not myself.

 7        Q.    But I guess my question is:  You don't

 8   know where this data came from personally, you don't

 9   know?

10        A.    I know that it came from Mike.  I do not

11   specifically where he pulled the data from.
```

■ ▮ ████████████████████████
■ ██████████
■ ███████████████████████████████
■ ██████████
■ ████████████
■ ▮ ███████████████████████
■ ██████████████████████████████████████
■ ██████████████

```
20   BY MS. PRATSINAKIS:

21        Q.    Did you purchase this data?

22        A.    I personally did not purchase this data.

23        Q.    I mean did Grubhub purchase -- when I say

24   "you," you are a corporate designee, so I really mean
```

Confidential - Marielle Kokos

1  Grubhub, but did Grubhub purchase this data?

2      MR. CARLSON:  Object to our form.  She wasn't

3  our corporate designee on the data collection and

4  tracking.  That was Mr. Young.  She told you

5  repeatedly she didn't pull this and doesn't know.  So

6  I don't know why we are still going on.

7      MS. PRATSINAKIS:  Stop testifying for the

8  witness and interrupting.

9  BY MS. PRATSINAKIS:

10      Q.    I have a question pending.  Please answer

11  it.

12      A.    My answer is I did not pull this data, so

13  I have no idea where Mike specifically pulled it and

14  whether he paid for it or not.  I was not involved in

15  any of that.

16      Q.    That's fine that you were not involved.

17          My question is:  Do you know one way or

18  the other if someone else at Grubhub paid for this

19  data?

20      A.    I would not be able to answer that one way

21  or another.

22      Q.    You don't know?

23      A.    I will not be able to answer that one way

24  or another.

Confidential - Marielle Kokos

```
1      Q.    And -- okay.  I don't mean to be cute, but
2  it just sounds like you are not clearly answering my
3  question.  You keep saying that Mike Young got the
4  data, but my question is different.  I understand Mike
5  Young got the data.
6            My question is:  Do you understand whether
7  or not data had to go -- be obtained from outside the
8  company?
9      A.    I would not know.
10     Q.    Okay.  Are these, the user IDs, the same
11 IDs in use today?
12     A.    For 68625 and 227901, yes.  Those are the
13 ones we were specifically referencing.
14     Q.    So these accounts were in use since the
15 creation date 11/22/2013?
16     A.    The cust IDs were from before when they
17 specifically signed up to use Grubhub in 2011.  Then
18 those cust IDs are associated to their Grubhub -- or
19 excuse me -- their OrderHub accounts in 2013.
20     Q.    Do you have a signup form for OrderHub
21 that someone fills out, like a piece of paper or
22 something?
23     A.    There is not a -- a signup form.  It's --
24 it's a conversation that's had with the account
```

Confidential - Marielle Kokos

1    adviser over the telephone or via e-mail.

2        Q.    Do you have recordings of telephone calls

3    from 2013?

4        A.    I know that we have very strict rules

5    around what can and cannot be recorded in specific

6    states inbound versus outbound, so I would not know

7    that off the top of my head.  We would have to look.

8        Q.    What -- I'm sorry.  What do you mean by

9    that, you have inbound versus outbound strict rules?

10       A.    There are actual legal rules around what

11   can be recorded via a phone call when you also have to

12   be able to let someone know you are recording them.

13   So if we are doing an outbound call, we would not be

14   able to let them know that unless somebody physically

15   said it versus an inbound call we have a recording

16   that indicates they can be recorded and then, again,

17   specific states even have different laws.  So

18   that's -- that's what I'm explaining that we would

19   have all different rules to follow around recording

20   our phone calls.

21       MS. PRATSINAKIS:  So I'm asking counsel, can you

22   please pull any phone call records related to this

23   OrderHub.

24       MR. CARLSON:  You can send me a request and

Confidential - Marielle Kokos

1    we'll look into it.

2         MS. PRATSINAKIS:   Okay.

3    BY MS. PRATSINAKIS:

4         Q.    So were there other options, so terms of

5    use accepted was one option.

6              Was there any other options when someone

7    was logging in to OrderHub?

8         A.    The other option would be to -- to not

9    accept them and then you wouldn't be using the tablet.

10        Q.    And when did the tablet stop being in use?

11        A.    So the tablet is -- is still in use today

12   but the tablets versus GrubCentral versus Grubhub for

13   Restaurants, when we rolled into GrubCentral, we no

14   longer had only an app-based system where you had to

15   use it on our specific device.  It became a web-based

16   system that you could use on any device that connects

17   to the internet.

18        Q.    So you are telling me restaurants today

19   use OrderHub?

20        A.    No, because OrderHub no longer exists.

21        Q.    Okay.  When did they --

22        A.    The tablet exists.

23        Q.    Okay.  So restaurants are using the tablet

24   with different software updated onto it, is that -- is

Confidential - Marielle Kokos

1   that how they are still using the tablet?

2        A.    Correct.  They would have been asked when

3   we changed from OrderHub to GrubCentral to log out,

4   log back in and a new app update would have been

5   presented to them --

6        Q.    Uh-huh.

7        A.    -- as well as for Grubhub for Restaurants.

8        Q.    Okay.  And so when this whole different

9   platform came into being, did you ask that they --

10  that the people updating to this new platform accept

11  terms of use?

12       A.    There was not a --

13       MR. CARLSON:  Object to form.

14            Sorry.  Go ahead.

15  BY THE WITNESS:

16       A.    -- a specific prompt as there was to the

17  OrderHub application because the terms of use was then

18  now placed in the bottom right-hand corner.

19  BY MS. PRATSINAKIS:

20       Q.    So the terms of use were nowhere on the

21  OrderHub tablet?  Other than at the beginning at sign

22  in?

23       A.    They were at the beginning of signup where

24  we were accepting them, yes.

```
1        Q.    Okay.  So people that were using OrderHub

2   you believe accepted -- I mean, it is before your

3   time, but you believe that based on information such

4   as Exhibit 23 that they accepted it, but then they

5   never saw another reference to terms of use on that

6   tablet?

7        MR. CARLSON:  Object to form.

8   BY THE WITNESS:

9        A.    No.  I'm saying that they were -- it was

10  specifically presented to them at the beginning when

11  to even be able to use the tablet.  I would have to go

12  back and see if maybe we had an old version of

13  OrderHub to see if it existed anywhere else, but I

14  know for a fact you could not use the tablet, because

15  I was there, I know I wasn't there in 2011, but I was

16  there when OrderHub was still in existence and we were

17  training people on it and you had to accept the terms

18  and conditions to even use the -- the tablet itself.

19       Q.    Did you forget that when you submitted

20  your first declaration?  You -- you don't really

21  mention OrderHub in here.

22            Why not?

23       A.    Ah, I did not necessarily forget it.  It

24  was just something that we were focused on the actual
```

Confidential - Marielle Kokos

1  update to the terms of use when an arbitration clause

2  was added.

3      Q.   Can I see a copy of these terms of use

4  that you claim people saw and accepted?  Did you

5  produce --

6      MR. CARLSON:  I think we actually produced

7  those.

8  BY MS. PRATSINAKIS:

9      Q.   Okay.  Did they have the word

10  "arbitration" in there?

11      A.   The OrderHub terms of use from 2011 into

12  before it became GrubCentral does not have the word

13  "arbitration" in it.

14      Q.   Okay.  So there is no arbitration

15  agreement in the OrderHub terms of use?

16      MR. CARLSON:  Object to form, calls for legal

17  conclusion.

18      MS. PRATSINAKIS:  She just testified to that and

19  I'm confirming it.

20      MR. CARLSON:  I think you are using legal --

21  legalese in that question.  I can object to it.

22      MS. PRATSINAKIS:  Okay.  I'm -- I'm sorry.

23      MR. CARLSON:  My -- she -- I'm not stopping her

24  from answering the question.  I am entitled to make an

1    objection and she can answer.

2    BY MS. PRATSINAKIS:

3        Q.    Do you remember the question?

4        A.    Yes.

5        Q.    Please answer.

6        A.    The OrderHub terms of use from 2011 into

7    2016 before it became GrubCentral do not have the word

8    "arbitration" in it.

9        Q.    Okay.  And just so I'm clear, do the terms

10   that replaced OrderHub, do those reference any

11   OrderHub tablets or anything like that?

12       A.    Are you referring to when OrderHub became

13   GrubCentral?

14       Q.    Right.  So OrderHub became obsolete, but

15   you were claiming that people still used their tablet?

16       A.    Correct.

17       Q.    But once that software became obsolete

18   and, you know, this new software was updated onto

19   it -- actually, strike that.

20             Do you know if Tiffin Elkins Park or

21   Tiffin Mount Airy use the OrderHub tablet today?

22       A.    To my understanding, the tablet has not

23   been collected from them.  We have no record of taking

24   the tablet back.  So the tablet would be still in

Confidential - Marielle Kokos

```
1   their possession.  I personally would not have data

2   specifically showing me if they accept -- or if they

3   confirm orders on a tablet versus a website or, like,

4   their own laptop for Grubhub for Restaurants.

5        Q.    Um, I'm -- my question is:  Do you know if

6   they use it today?

7        A.    My answer was I do not know if they use

8   our specific tablet that we've given them.  I know

9   that we do not have data that says we've collected it

10  back, so it would still be in their possession, and I

11  do not know if they access Grubhub for Restaurants on

12  our own tablet versus going to their own mobile device

13  or internet device.

14       Q.    Okay.  So you have no data to indicate

15  that they are actually using OrderHub tablet as of

16  today, you just know that they didn't give it back?

17       A.    I don't know what the relevance is to

18  whether they use the tablet or not.  We know that they

19  are using Grubhub for Restaurants and you can access

20  it on any device that connects to the internet.

21       Q.    So other than the person who saw the video

22  and set up the tablet, had any other person at Tiffin

23  Elkins Park or Tiffin Mount Airy ever been given the

24  terms of use of Grubhub for Restaurants or OrderHub or
```

1    anything else to your knowledge?

2        MR. CARLSON:  Object to form.

3   BY MS. PRATSINAKIS:

4        Q.    So other than the person setting up a

5   tablet, okay?

6        A.    Uh-huh.

7        Q.    There is a person who sets it up and has

8   to do these requirements, do you recall any other

9   instance where you've asked for acceptance of terms

10  from Tiffin Mount Airy or Tiffin Elkins Park?

11       A.    I do not specifically recall any instance

12  where they asked for their acceptance outside of the

13  OrderHub usage.

14       Q.    So there has been no acknowledgment of the

15  terms for GrubhubCentral.com [sic], correct?

16       MR. CARLSON:  Object to form.

17  BY THE WITNESS:

18       A.    For GrubCentral, when we switched to

19  GrubCentral from OrderHub?

20  BY MS. PRATSINAKIS:

21       Q.    Right, right.  When new terms started

22  applying and you switched over to an entirely

23  different system, you didn't say to Tiffin Elkins

24  Park, Okay, now we need you to accept or acknowledge

1    these other terms, correct?

2         A.    Correct.  The link to the terms of use was

3    now on the sign-in page.

4         Q.    I understand that, but you didn't say to

5    Tiffin Mount Airy, Hey, we are going to have a video

6    and we want you to click a button and all of that sort

7    of thing, there was no direct acknowledgment or notice

8    provided of these new terms to Tiffin Mount Airy,

9    correct?

10        MR. CARLSON:  Object to form.

11   BY THE WITNESS:

12        A.    Correct.  The -- when we switched from

13   OrderHub to GrubCentral there was not the same you

14   must accept the terms to be able to use the tablet.

15   BY MS. PRATSINAKIS:

16        Q.    Uh-huh.

17        A.    They had already accepted them.  And the

18   terms of OrderHub clearly state that Grubhub reserves

19   the right to change these at any time.

20   BY MS. PRATSINAKIS:

21        Q.    Does it say "without any notice"?

22        A.    It does.

23        Q.    Can you show me where it says that?  Do

24   you have it in front of you?

Confidential - Marielle Kokos

```
1        A.    I have the blurb that we've specifically

2   put on the timeline.  In the fourth line where it

3   says:

4              "Terms of use say Grubhub reserves the

5   right to modify these OrderHub terms of use at any

6   time without prior notice."

7        Q.    And -- okay.  So your -- your contention

8   is that the Plaintiffs are bound to any terms, even

9   though they are no longer OrderHub, that now we are --

10  we are on to a whole different system or on to a whole

11  different set of terms, you are saying that that right

12  there, without prior notice, so this specifically

13  relates to OrderHub terms of use, but you think

14  because it says "without prior notice" that the

15  amendment made with a whole new software and platform

16  didn't require notice, you think that this is the

17  notice for what happened in 2016 and then later 2018?

18       MR. CARLSON:  Object to form.  You are just

19  arguing with the witness.

20  BY MS. PRATSINAKIS:

21       Q.    No.  I'm asking you.  Is -- is that what

22  you contend?

23       A.    Correct.  You are on notice by signing a

24  contract with us.  We also in 2016 and 2018 have the
```

1    terms of use in those subsequent platforms after

2    OrderHub, it is now GrubCentral it's -- or excuse

3    me -- it was GrubCentral, it is now Grubhub for

4    Restaurants.  They have the terms of use link in the

5    bottom right-hand corner and again on every page.

6        Q.   Okay.  Do those terms require notice, the

7    GrubCentral terms of use, do -- when those are

8    amended, do those -- did those terms require notice?

9        A.   I believe that they say we may give

10   notice.

11       Q.   If there is a what kind of change, do you

12   remember?

13       MR. CARLSON:  Object to form.

14   BY THE WITNESS:

15       A.   A -- I believe it's reasonable change.

16   BY MS. PRATSINAKIS:

17       Q.   It's not material change?

18       A.   I would have to go through the documents

19   and find them.

20       Q.   Okay.  So putting OrderHub terms aside,

21   they were superseded or replaced entirely by

22   GrubCentral terms, correct?

23       MR. CARLSON:  Object to form, misstates

24   testimony.

1      MS. PRATSINAKIS:  I'm asking a question.

2   BY MS. PRATSINAKIS:

3      Q.    Were they superseded by these new terms?

4   You said I reserve -- Grubhub reserves the right to --

5   to modify the terms at the present time without prior

6   notice and they were modified in 2016 or before then

7   to basically say, now I'm going to give you notice, is

8   that correct?

9      MR. CARLSON:  Object to form.  Object to form,

10  misstates testimony.

11  BY THE WITNESS:

12     A.    They were modified, correct, and they were

13  modified to, again, based on our legal team, whatever

14  they decided they -- they felt should be changed to,

15  they changed the terms of use to say that we may give

16  you notice.

17  BY MS. PRATSINAKIS:

18     Q.    Okay.  And is it your contention that

19  these GrubCentral terms of use modified the written

20  contract of the restaurants and Grubhub?

21     MR. CARLSON:  Object to form.

22  BY THE WITNESS:

23     A.    The terms of use that are -- are located

24  on GrubCentral and now Grubhub for Restaurants are --

1    are referring to that platform and they are still

2    reserving the right to change them.  We may give

3    notice.  The restaurants' contracts that they signed

4    in 2011 lead them to a Grubhub.com/legal website that

5    also offers them terms of use that says in one

6    instance we don't have to give notice and then in

7    another instance that we may give 30-day notice and

8    the expiration of 30 days.

9    BY MS. PRATSINAKIS:

10       Q.    Wow, that's pretty confusing to keep it

11   all straight.  I mean, it sounds like you just said

12   three completely contradictory statements.

13       MR. CARLSON:  Object to form.  I -- I think we

14   are just going around in circles and you are arguing

15   with the witness.  This isn't being productive.  I

16   think we should wrap this up.

17   BY MS. PRATSINAKIS:

18       Q.    Just answer that question:  Are those

19   statements contradictory?

20       A.    I do not believe they are contradictory.

21   They are written down in two different documents.

22       Q.    I know, but you are talking about

23   modification of terms to a contract and in one we

24   don't have to give you notice and in the other we may

Confidential - Marielle Kokos

1    have to give you notice and in the other we are going

2    to give you 30 days' notice.

3              Aren't those three things contradictory?

4         MR. CARLSON:  Object to form, asked and

5    answered.

6    BY THE WITNESS:

7         A.    I do not believe they are contradictory.

8    They are all accessible and written down.

9    BY MS. PRATSINAKIS:

10        Q.    Okay.  But they are accessible, that

11   doesn't mean they are not contradictory.  I mean, you

12   are giving three different standards of notice, how is

13   that not contradictory?

14        MR. CARLSON:  Object to form.  You're just --

15   this is getting abusive.  This is the last question.

16   BY THE WITNESS:

17        A.    I mean, you asked my opinion and I gave

18   it.  I don't believe they are contradictory.  They are

19   listed out within the contracts very clearly, as well

20   as on the websites very clearly.

21   BY MS. PRATSINAKIS:

22        Q.    So just hypothetical, you sign up for

23   financing to buy a car and you agree to 4 percent and

24   they somewhere say, we may give you notice of a

1  change, somewhere else it says we'll give you 30 days

2  advantage notice of a change, and another place says

3  we are not going to give you any notice of a change.

4      What is your expectation as someone who

5  just financed their car as to what you're anticipating

6  with respect to notice of amended terms, just you

7  personally as a consumer, what is your expectation?

8      MR. CARLSON:  Object to form.

9  BY THE WITNESS:

10     A.    Sure.  Your analogy is not the same in

11 that you are signing up just to finance a car.  I'm

12 not using that instance of a car dealership for

13 anything else.  I'm just asking them to finance my

14 car.

15 BY MS. PRATSINAKIS:

16     Q.    Now, but you are paying, you are financing

17 a car, so you are paying every month to a bank, and

18 your bank says to you, Well, I can change it at any

19 time, I'm going to make it 22 percent interest.  And

20 in one document it says I'm not going to tell you I'm

21 going to make it 22 percent interest, the other

22 document says I'm going to give you advance notice of

23 the 22 percent interest increase, and another one says

24 I'll give you 30 -- I mean, how are you as a consumer

1    suppose had to reasonably understand that when three

2    different statements are being made to you --

3         MR. CARLSON:  Object.

4    BY MS. PRATSINAKIS:

5         Q.    -- about an obligation regarding notice?

6         MR. CARLSON:  Object to form, incomplete

7    hypothetical.  The hypothetical doesn't make any

8    sense.

9    BY MS. PRATSINAKIS:

10        Q.    I'm asking you a question.  How -- how are

11   you supposed to understand what your rights are under

12   that scenario?  What -- what would be your

13   expectation?

14        MR. CARLSON:  In -- objection; incomplete and

15   irrelevant hypothetical.

16   BY THE WITNESS:

17        A.    As a consumer I would read what the terms

18   of use or conditions are, as you should in any

19   partnership you are entering into with any type of

20   company, and, again, not so easy with a car because

21   you are kind of stuck with it, but with Grubhub, if

22   there was something that I was reading that I -- I

23   didn't like or I felt that that wasn't fair, I can

24   cancel my contract at any time.  There is -- there is

1  nothing binding me to having to still use Grubhub.  I

2  have the right to cancel my contract at any time.

3  BY MS. PRATSINAKIS:

4      Q.    Well, let's talk about that for a little

5  bit, because Grubhub becomes part of your business

6  model and, I mean, you talk about retention, correct?

7      A.    Sure.

8      Q.    Is it really that easy to just one day

9  shut off the account for your business, in other

10  words, I've been using Grubhub for ten years, can I

11  just shut it off?

12      A.    The answer is yes.  The restaurant could

13  shut it off at any time.

14      Q.    I know technically it could do it, but

15  after using it as part of its business model for ten

16  years, practically speaking, could someone shut it

17  off?

18      MR. CARLSON:  Object to form.

19  BY THE WITNESS:

20      A.    Any restaurant can choose to stop using

21  Grubhub.  It's not required for their business to be

22  successful to use Grubhub.

23  BY MS. PRATSINAKIS:

24      Q.    Right.  But is it harder to cancel Grubhub

```
 1   if you're a restaurant that it is part of your

 2   revenue, you've been using it ten years, and it is

 3   now -- it has now become 10, 15, 20, 30 percent of

 4   your revenue, whatever that percentage is, are you

 5   telling me it's as easy to quit after ten years of

 6   using it and having it become a -- a -- a chunk of

 7   your revenue versus Day 2 where you barely have used

 8   it at all, are you saying that one is as easy as the

 9   other?

10       MR. CARLSON:  Object to form.  Now this is

11   getting very abusive.  You are base -- you are raising

12   your voice at the witness.  This has been going on for

13   awhile.

14       MS. PRATSINAKIS:  I am not raising my voice.

15       MR. CARLSON:  You did just raise your voice to

16   the witness.

17       MS. PRATSINAKIS:  I apologize.  I don't mean to

18   raise my voice.

19       MR. CARLSON:  Let's -- let's -- let's answer

20   this question --

21       MS. PRATSINAKIS:  I'm asking --

22       MR. CARLSON:  -- and let's move on.

23       MS. PRATSINAKIS:  Okay.  Stop.  Let her answer

24   the question.
```

1          MR. CARLSON:  We need to wrap this up.

2     BY THE WITNESS:

3          A.     What you are asking is my opinion, I don't

4     own a restaurant, I don't run a restaurant, I don't

5     own that business.  It is completely up to that

6     restaurant owner's opinion and personal choice of

7     whether they want to continue their relationship with

8     Grubhub after one day, two days, ten years.

9     BY MS. PRATSINAKIS:

10         Q.     Excuse me.  You are head of restaurant

11    retention.  You are not just some person on the street

12    being asked a question, you know.  I'm asking you as

13    the head of restaurant retention, you must have some

14    understanding of it being more and more difficult as a

15    relationship with Grubhub increases and grows and

16    revenue increases and grows for that restaurant, you

17    must have some understanding that it gets more

18    difficult practically speaking to terminate that

19    relationship, don't you?  You are head of retention.

20         A.     I am head of restaurant success.

21         MR. CARLSON:  Objection.

22    BY MS. PRATSINAKIS:

23         Q.     Uh-huh.

24         A.     And I don't agree with that.  I -- my

Confidential - Marielle Kokos

```
1   answer still stands, that it is completely up to the

2   restaurant's choice of what they want to do, who they

3   want to partner with, how they want to continue

4   business.

5       MR. CARLSON:  Okay.  We are done.  We can go off

6   the record.

7       MS. PRATSINAKIS:  I -- let me make sure I am

8   done.

9       MR. CARLSON:  I think you are done.

10      MS. PRATSINAKIS:  Just let me make sure I'm

11  done.  This is -- you know, I -- I just saw this

12  today.  I just -- we're -- we're talk --

13      MR. CARLSON:  You just spent 20 minutes yelling

14  at my witness, so.

15      MS. PRATSINAKIS:  I didn't yell at your witness,

16  James, that's being a little bit, I don't know,

17  sensitive.

18  BY MS. PRATSINAKIS:

19      Q.    I just want to point out, on May 29th,

20  2017, it -- it states on this -- this event that

21  "available on every page within GFR is a" -- what does

22  that mean, "available on every page within GFR"?

23      A.    It means that that link in the bottom

24  right-hand corner and/or on the profile page is the
```

Confidential - Marielle Kokos

1    terms of use link.

2        Q.    Okay.  So as of May 29th, 2017, you're

3    testifying that that was on every page?

4        A.    No.  We are simply stating on May 29th,

5    2017, it is available on every page.

6        Q.    Okay.  So you don't know whether that's

7    the case before or after May 29th, 2017?

8        A.    No.  I do know it is the case.  We've

9    actually spoken about it multiple times today.

10       Q.    Uh-huh.  Uh-huh.

11       A.    That it is on -- in GrubCentral and in

12   Grubhub for Restaurants on every page is the terms of

13   use link.

14       Q.    Okay.  And prior to that you -- you know

15   or don't know?

16       A.    Prior to that it would have been OrderHub

17   which is a different platform.

18       Q.    And it wasn't on every page, correct?

19       A.    There was really only one page.  There was

20   a few different sections of settings and/or tickets to

21   customer care, but it was really only one page --

22       Q.    So it was only one page?

23       A.    -- that you were accepting it at the

24   beginning of OrderHub.

Confidential - Marielle Kokos

```
 1        Q.    So on that one page there was no terms of
 2   use link, correct?
 3        A.    On what one page?
 4        Q.    On OrderHub?
 5        A.    For where you are confirming orders, not
 6   to my knowledge.
 7        Q.    All right.
 8        MR. CARLSON:  All right.  I think we are all set
 9   then.
10        MS. PRATSINAKIS:  Okay.  Thank you so much for
11   your time and I hope this wasn't too terrible.
12        MR. CARLSON:  One just quick thing.
13        MS. PRATSINAKIS:  I really enjoyed meeting you
14   and this, I thought, went well.
15        MR. CARLSON:  Just two quick housekeeping items.
16            One is I want to designate the transcript
17   as confidential because we've marked some documents
18   that are confidential.  And the other is I want to
19   reserve the right to read and sign the errata.
20        MS. PRATSINAKIS:  Sure.
21        THE VIDEOGRAPHER:  We are going off the record
22   at 5:57 p.m.
23                (Time Noted:  5:57 p.m.)
24                FURTHER DEPONENT SAITH NOT.
```

Confidential - Marielle Kokos

```
 1                REPORTER'S CERTIFICATE

 2

 3            I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4   a Certified Shorthand Reporter, do hereby certify:

 5            That previous to the commencement of the

 6   examination of the witness herein, the witness was

 7   duly sworn to testify the whole truth concerning the

 8   matters herein;

 9            That the foregoing deposition transcript

10   was reported stenographically by me, was thereafter

11   reduced to typewriting under my personal direction and

12   constitutes a true record of the testimony given and

13   the proceedings had;

14            That the said deposition was taken before

15   me at the time and place specified;

16            That I am not a relative or employee or

17   attorney or counsel, nor a relative or employee of

18   such attorney or counsel for any of the parties

19   hereto, nor interested directly or indirectly in the

20   outcome of this action.

21            IN WITNESS WHEREOF, I do hereunto set my

22   hand on this 29th day of May, 2019.

23

24            JULIANA F. ZAJICEK, Certified Reporter
```

Confidential - Marielle Kokos

```
 1                DEPOSITION ERRATA SHEET

 2

 3   Assignment No.  217961

 4   Case Caption:  Tiffin vs. Grubhub

 5

 6           DECLARATION UNDER PENALTY OF PERJURY

 7

 8           I declare under penalty of perjury that I

 9   have read the entire transcript of my Deposition taken

10   in the captioned matter or the same has been read to

11   me, and the same is true and accurate, save and except

12   for changes and/or corrections, if any, as indicated

13   by me on the DEPOSITION ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if still

15   under oath.

16

17                              MARIELLE KOKOS

18

19

20   SUBSCRIBED AND SWORN TO

21   before me this      day

22   of              , A.D. 20__.

23

24           Notary Public
```

Confidential - Marielle Kokos

```
 1              DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                    MARIELLE KOKOS
```

1                  DEPOSITION ERRATA SHEET

2     Page No._____Line No._____Change to:_____

3     _____

4     Reason for change:_____

5     Page No._____Line No._____Change to:_____

6     _____

7     Reason for change:_____

8     Page No._____Line No._____Change to:_____

9     _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                    MARIELLE KOKOS